**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**Tallahassee Division**

DISABILITY RIGHTS FLORIDA, INC.,

     Plaintiff,

v.                                 Case No.

JULIE JONES, in her official capacity as
Secretary of the Florida Department of
Corrections,

     Defendant.

_____

**COMPLAINT**
**FOR DECLARATORY AND INJUNCTIVE RELIEF**

1.     The Florida Department of Corrections (FDOC) consistently violates the federal laws protecting people with disabilities who are incarcerated in the Florida prison system. These violations exclude Florida prisoners from numerous FDOC programs, services, and activities, and cause them to suffer from the humiliation, indignity, and difficulties that accompany such exclusion.  Plaintiff Disability Rights Florida, Inc., the federally designated Protection and Advocacy Agency for the state of Florida, brings this action under the Americans with Disabilities Act, the Rehabilitation Act, the Eighth Amendment, and the Due Process Clause, to redress the FDOC's pattern and practice of statutory and constitutional violations against prisoners with disabilities.

**Jurisdiction and Venue**

2.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331 in that this is a civil action arising under the Constitution of the United States, and pursuant to 28 U.S.C. § 1343(a)(3) in that this action seeks to redress the deprivation, under color of state law, of rights secured to

the Plaintiff by the Constitution and laws of the United States.

3.      Plaintiff's claims for relief are predicated, in part, upon 42 U.S.C. § 1983, which authorizes actions to redress the deprivation, under color of state law, of rights, privileges, and immunities secured by the Constitution and laws of the United States.  Plaintiff's claims are also brought pursuant to the Americans with Disabilities Act (ADA), 42 U.S.C. § 12132, and the Rehabilitation Act (RA), 29 U.S.C. § 794.

4.      Declaratory and injunctive relief are authorized by 28 U.S.C. §§ 2201 and 2202, as well as Federal Rule of Civil Procedure 65.

5.      Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b) and 1391(c), as Defendant does business in this judicial district and many of the events or omissions giving rise to the claims occurred in this judicial district.

## Parties

6.      Plaintiff Disability Rights Florida, Inc. (DRF) is a not-for-profit corporation serving as Florida's federally funded Protection and Advocacy agency for individuals with disabilities, and serves as such by Executive Order signed by the Governor of Florida.  Among other things, DRF is authorized to "pursue legal, administrative, and other appropriate remedies or approaches to ensure the protection of, and advocacy for, the rights of individuals within the State who are or who may be eligible for treatment, services, or habilitation…." 42 U.S.C. § 15043(a)(2)(A)(i)f.

7.      Defendant Julie Jones is the Secretary of the Florida Department of Corrections (FDOC), and is sued in her official capacity.  References to the FDOC herein also refer to Defendant Jones.  Defendant Jones is responsible for the operation of Florida's prison system, including compliance with the Constitution and federal laws.  Defendant Jones has statutory

authority to implement the relief sought in this Complaint.  *See* Fla. Stat. § 20.315.

8.     The FDOC is a public entity under Title II of the ADA, and receives federal financial assistance within the meaning of the RA, and has at all relevant times.

9.     At all relevant times, the actions of Defendant and her agents were state action and were taken under color of state law.  All staff members mentioned herein were employees or agents of Defendant and acted within the scope of their employment or agency at all relevant times.

10.     Plaintiff has no adequate remedy at law.   Unless enjoined by this Court, Defendant will continue to subject the prisoners in its custody to violations of their statutory and constitutional rights.

## Factual Allegations

### *Plaintiff Disability Rights Florida, Inc.*

11.     Congress has created a nationwide Protection and Advocacy (P&A) System to protect the legal and human rights of people with disabilities.  *See* 29 U.S.C. § 794e.  Each state has a designated P&A organization; Plaintiff Disability Rights Florida (DRF) serves as the P&A for the state of Florida.  DRF has authority to pursue legal, administrative, and other appropriate remedies or approaches to ensure the protection of, and advocacy for, the rights of people with disabilities.  29 U.S.C. § 794e(f)(3); 42 U.S.C. § 15043(a)(2)(A)(i)f.

12.     DRF has standing on behalf of its constituents and clients who are substantially affected by Defendant's noncompliance with constitutional and statutory protections because such noncompliance falls within DRF's general scope of interest and activity; the relief requested—declaratory and injunctive—is the type of relief appropriate for DRF to receive on behalf of its individual constituents; and neither the claims asserted nor the relief requested

require the participation of individual members or constituents in the lawsuit.

13.    DRF's constituents have suffered injury—and continue to suffer injury—that would allow them to have standing to sue in their own right.  The interests DRF seeks to protect are germane to DRF's purpose.

14.    DRF has a multi-member board of directors that includes persons with disabilities.

15.    DRF has an advisory council composed of people with disabilities who have significant input into the goals and objectives of the organization.

16.    DRF provides the opportunity for the public, including its stakeholders, to comment on its goals and objectives.

17.    DRF has a grievance procedure that complies with federal requirements and ensures that individuals receive necessary services.

18.    One of DRF's primary responsibilities is to investigate the failure of public entities to comply with the ADA, RA, and other laws protecting DRF's members, clients, and constituents.

19.    People with physical disabilities—among DRF's constituents—are on DRF's board of directors.  DRF represents people with physical disabilities and provides the means by which they express their collective views and protect their collective interests.

20.    Many persons with disabilities who are incarcerated in the FDOC system, including many described below, have complained to DRF about the FDOC's failure to comply with the ADA, RA, and other laws protecting DRF's constituents.  DRF has used, and continues to use, its resources to investigate these violations.

**FDOC's Systemic Violations of Laws Protecting People with Disabilities**

21.     The FDOC systematically violates the federal laws protecting persons with disabilities in its custody.  This includes but is not limited to prisoners who are deaf, hard of hearing, blind, have low vision, and have mobility impairments. The FDOC has violated, and continues to violate, the ADA, RA, Eighth Amendment, and Due Process Clause in the following ways.  This is not an exhaustive list.

a.   *Failure to Provide Qualified Interpreters.* The FDOC fails to provide qualified interpreters to deaf and hard of hearing prisoners in critical situations such as orientations, medical and mental health appointments, disciplinary hearings, classification reviews, religious services, educational programs, and court hearings held by phone.  If a prisoner knows sign language, FDOC policy requires a sign language interpreter for extended health care visits, and even prohibits the consideration of less effective alternatives.  But the FDOC repeatedly violates its own policy by not providing interpreters at all.  When "interpreters" are provided, they often consist of other prisoners or untrained FDOC staff, compromising the confidentiality of these critical interactions.  This failure results in many deaf or hard of hearing prisoners being unable to communicate, participate, or understand what is happening during these interactions.

b.   *Failure to Provide Auxiliary Aids and Services.*  The FDOC fails to provide prisoners with physical disabilities with appropriate auxiliary aids and services such as hearing aids, modified headphones, vibration alert devices, visual signaling devices, closed or open captioning, television transmitters, assistive listening devices, and specialized radios, which would allow these prisoners to access FDOC

programs, services, and activities.  The FDOC allows prisoners to go long periods without them.  The FDOC also has a policy of only replacing hearing aids every four years, and only permitting prisoners to possess one hearing aid at a time, regardless of the prisoner's level of hearing loss.  The FDOC also operates under the false stereotype that once a prisoner is given a hearing aid, his or her hearing is restored to perfect levels; the FDOC then refuses to provide any further accommodations even if the prisoner needs them.  For prisoners with visual disabilities, the FDOC fails to provide text-to-speech software or qualified readers that would allow access to the library and other written materials.  The FDOC also fails to provide prisoners with qualified assistants; when such assistants are provided, the FDOC fails to ensure that they are properly vetted and trained, and fails to ensure they are completing their responsibilities effectively. The FDOC also does not allow prisoners with low vision to have special devices if the prisoner has any vision whatsoever, again operating under the false stereotype that no further accommodations are required unless a prisoner is completely blind.

c.  *Failure to Provide Effective Telecommunications Access.* The FDOC fails to provide deaf and hard of hearing prisoners with effective telecommunications access. Communication with friends and family is critical for incarcerated people, but deaf or hard of hearing prisoners cannot use a typical voice phone, and require accommodations to communicate with loved ones.  However, many prisons have no such accommodations, and the ones that do often prevent prisoners from using them. Although some prisons have teletypewriters (TTY),[1] many do not.  When they do

---

[1] A teletypewriter (TTY) is an archaic device that allows the users to type messages back and forth instead of speaking.  A TTY user can communicate with a person using a voice telephone via a relay service, which is a third party

exist, they are frequently broken, inaccessible, or are not made available in the same manner as the voice phones for the non-deaf prisoners.  The TTY calls also result in higher charges for prisoners' families, and the TTYs often cannot make calls to certain numbers, such as the abuse hotline.  Moreover, the most effective and current technology for people who can sign is a videophone, which allows the deaf person to communicate quickly and effectively through signing, and allows the party receiving the call to effectively participate in the call through a video relay interpreter.  But the FDOC does not provide videophones.  As of result of these failures, many deaf or hard of hearing prisoners have been unable to communicate with their loved ones and attorneys.

d.  *Failure to Alert Prisoners with Hearing Disabilities.*   Deaf and hard of hearing prisoners cannot hear the announcements for critical events such as counts, meal times, medical and legal call-outs, recreation time, and others.  The FDOC fails to provide alerts such as flashing lights or vibrating watches to effectively communicate with deaf and hard of hearing prisoners.  As a result, these prisoners often miss these events, and are subject to discipline for failing to obey verbal orders.

e.  *Failure to Maintain Wheelchair Accessible Facilities.* The FDOC fails to ensure that prisoners using wheelchairs are housed in areas that are fully wheelchair accessible, thus preventing those persons from receiving equal and meaningful access to programs, services, and activities such as bathrooms, showers, recreation areas, and

---

intermediary that relays the messages back and forth between the parties by typing and speaking. TTYs are based on 50-year-old technology, and are not used anymore in the vast majority of settings.  Currently, Idaho, Kentucky, Maryland, Vermont, Virginia, and Wisconsin provide videophones in prisons.

dining halls.   For example, prisoners using wheelchairs are frequently housed in dorms with only one wheelchair-accessible bathroom and shower, resulting in long wait times and inequitable access to these facilities.   Many times the accessible shower—unlike the other showers—is exposed to the dorm, providing no privacy to the user.   Shower chairs and wands are frequently broken.   Dining halls have insufficient wheelchair-accessible seating, resulting in long wait times.   Finally, many prisons do not have wheelchair-accessible outdoor recreation facilities, preventing wheelchair users from accessing them.

f.   *Failure to Provide and Maintain Wheelchairs and Assistants.* The FDOC fails to provide wheelchairs to prisoners who need them for mobility.   When it does provide wheelchairs, it fails to maintain them or provides the wrong size, thus rendering them inoperable.   The FDOC also fails to ensure that prisoners with wheelchairs have assistants to help them move about the prison compound. When such assistants are provided, they are oftentimes insufficiently vetted and trained, and the FDOC fails to ensure that they are properly completing their duties.   The result is that prisoners with limited mobility are excluded from FDOC programs, services, and activities, and are denied the minimal necessities of civilized life.

g.   *Failure to Allow and Maintain Prosthetic Devices.*   The FDOC often takes away prisoners' prosthetic devices upon arrival to the FDOC system. Prisoners are sometimes given an inadequate substitute such as a pair of wooden crutches, which results in the prisoner losing mobility and being excluded from FDOC programs, services, and activities, and being denied the minimal necessities of civilized life. For those prisoners who are allowed to keep their prosthetic devices, the FDOC does

not repair or replace them when broken.

h.   *Exclusion from Jobs and Programs.* The FDOC prohibits otherwise qualified prisoners with disabilities from participating in jobs and programs because of their disabilities.  For instance, many deaf prisoners have been prohibited from working in prison industry programs or other jobs because they are deaf.

i.   *Imposing Surcharges for Aids, Services, and Accommodations.* The FDOC imposes illegal surcharges on prisoners with disabilities to cover the cost of measures that FDOC is required to provide to ensure nondiscriminatory treatment.  For example, the FDOC requires prisoners to schedule a medical appointment to obtain or renew passes for wheelchairs, hearing aids, and other auxiliary aids, and each medical appointment requires the prisoner to pay a $5 copayment.  Moreover, the FDOC requires prisoners to pay for certain auxiliary aids and services such as amplifiers, assistive listening devices, cup-style headphones, radio equipment, and others, even though FDOC policy requires that they be provided at FDOC expense.

j.   *Engaging in Retaliation and Interference.*  FDOC staff routinely retaliate against prisoners who assert their disability related rights.  Prisoners are threatened to stop filing grievances, and their property is unfairly confiscated for doing so.  FDOC staff interfere with prisoners' exercise of their ADA rights by warning them not to report ADA violations.

k.   *Failure to Give Primary Consideration.*  The FDOC routinely fails to give primary consideration to the requests of individuals with disabilities in determining what types of auxiliary aids and services are necessary and effective.  In fact, the FDOC rarely seeks any input at all from prisoners with disabilities in making that

determination.

l.   *Failure to Train Personnel on the Requirements of Federal Disability Laws.*  The FDOC has left much of the responsibility for complying with federal disability laws in the hands of its line staff.  However, staff have not been properly and rigorously trained on the correct application of these laws. This results in many necessary accommodations being denied or delayed.

### *Examples of FDOC's Failures*

22.   All persons described herein are qualified individuals with a disability, in that they, with or without reasonable modifications to rules, policies, or practices; the removal of architectural, communication, or transportation barriers; or the provision of auxiliary aids and services; meet the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by the FDOC.

23.   The FDOC knows that the individuals described herein are qualified individuals with disabilities.

24.   All persons described herein have, by reason of their disability, been excluded from participation in or been denied the benefits of the services, programs, or activities of the FDOC, or have been subjected to discrimination by the FDOC.

25.   All persons described herein suffer from serious medical needs.

26.   The events described herein are not isolated incidents; they are but some examples of the FDOC's failure to comply with federal laws protecting people with disabilities.

27.   These violations will continue unless enjoined by this Court.

### Prisoners Who Are Deaf or Hard of Hearing

*Kevin Stephans*

28.     Kevin Stephans was incarcerated in the FDOC system from October 2013 to October 2015.  He is deaf, which substantially limits one or more major life activity, including but not limited to hearing.   He requires the use of hearing aids in both ears.  His primary method of communication is American Sign Language (ASL).[2]  With his hearing aids, Mr. Stephans is able to speak and is somewhat able to hear.  However, Mr. Stephans's first language is ASL and he rates his English literacy at a 6th or 7th grade level.  Mr. Stephans does not understand more complicated English words, and writing is difficult for him.

29.     During his incarceration, Mr. Stephans was frequently forced to serve as an "interpreter" for other inmates at medical appointments and other critical proceedings, even if he did not want to do so, compromising the confidentiality of the proceedings and potentially violating the Health Insurance Portability and Accountability Act (HIPAA), and creating possible security risks.

30.     *Failure to Provide Qualified Interpreters*. When Mr. Stephans first arrived to the FDOC in October 2013, he had a series of medical and psychological screenings at Central Florida Reception Center (CFRC), an FDOC prison.  No ASL interpreter was provided to him, and he could therefore not adequately communicate with the nurses.  The nurses attempted to communicate with him by writing notes, but they were ineffective.

31.     While at CFRC, on October 4, 2013, Mr. Stephans filed a Reasonable Modification or Accommodation Request (RMAR).  He wrote, "cannot hear instructions.  Do not

---

[2] American Sign Language (ASL) is a language composed of hand gestures, facial expressions, and body move-ments.  It is the predominant sign language used in the United States.  Although many ASL signs are borrowed from English words, ASL is not a word-for-word translation of any particular spoken language, and does not follow Eng-lish grammar rules.

understand what I am being told. Getting in trouble because I cannot follow instructions[,] I cannot hear." He asked for an ASL interpreter to assist him and to be provided with hearing aids. His request was denied, and the FDOC staff member wrote on the response, "[Inmate] cannot request accommodation until permanent status."

32.     Compounding the problem, for the 22 days Mr. Stephans was at CFRC, both of his hearing aids were not functioning because the batteries were not working and he was refused working batteries. Mr. Stephans was transferred to Marion Correctional Institution on October 23, 2013, and still he did not receive batteries until three months later, around January 2014.

33.     Mr. Stephans was never provided with an interpreter at Marion C.I. for medical, psychological, and classification appointments. Mr. Stephans has also been denied an interpreter at religious services.

34.     While at Marion, Mr. Stephans attended GED classes for twelve months. He was not provided an ASL interpreter for the classes. On April 21, 2014, Mr. Stephans filed a grievance requesting an ASL interpreter for his GED class and also for a class on fatherhood. FDOC's response was to "advise the Education Supervisor regarding this [] issue." However, nothing was done. Because he was unable to make any progress without an interpreter, Mr. Stephans dropped the course and was not able to earn his GED.

35.     In June 2015, Mr. Stephans attended a transitional skills class that is mandatory for prisoners being released. Though he asked for an interpreter, no interpreter was provided to him. Mr. Stephans was given a book for the class, which he only partially understood. Nothing about Mr. Stephans's release from prison was explained to him in a way he could understand; he was not provided an ASL interpreter to communicate to him information about his release and what would be required of him following his release.

36.     Because staff at Marion C.I. have refused to provide qualified ASL interpreters for deaf prisoners, Mr. Stephans became the de facto interpreter, despite him not being a certified ASL interpreter, his limitations with English, and his inability to hear.  While incarcerated, Mr. Stephans was asked to interpret on a near-daily basis and was also routinely ordered to interpret for deaf prisoners at their medical appointments.  Mr. Stephans was once threatened with a Disciplinary Report (DR) if he did not interpret.

37.     On March 25, 2014, Mr. Stephans filed a formal grievance complaining that another inmate, Michael Boggs, did not have an ASL interpreter at a recent medical appointment, and that the nurse was rude to him.  Mr. Stephans observed this himself because he had been ordered to "interpret" at the appointment.  The grievance was denied on April 16, stating in part, "Interpreter services are not required for sick call."

38.     In June 2015, Mr. Stephans received a DR for an incident that occurred while he was sleepwalking.  At the hearing, Mr. Stephans was not provided with an ASL interpreter and, thus, could not adequately defend himself against the DR.

39.     The FDOC failed to give primary consideration to Mr. Stephans's request for interpreters.

40.     *Failure to Alert Prisoners with Hearing Disabilities.*  On April 23, 2014, Mr. Stephans filed a grievance asking the officers in the dorm to flash the lights when announcing such activities.  The FDOC responded on May 9, 2014, stating that the matter had been discussed, and that staff would be notified of the need to accommodate the population.

41.     Following his grievance, some officers have started to flash lights but others do not.  Moreover, officers generally do not announce in writing to deaf and hard of hearing prisoners what they are verbally ordering.  As a result, Mr. Stephans has missed meals and head

counts.

42.     In addition, instead of being woken up by an adequate announcement, flashing lights, or vibrating watch, Mr. Stephans was woken up every morning by an officer roughly kicking his bed.

43.     The FDOC failed to give primary consideration to Mr. Stephans's request for adequate alerts.

44.     *Failure to Provide Effective Telecommunications Access.*  On October 29, 2013, Mr. Stephans filed a formal grievance complaining that the TTY phone did not connect with family members, and asked for the FDOC to install video phones.  It was returned without action.

45.     In November and December of 2013, the TTY phone at Marion was not working. Mr. Stephans filed five grievances concerning FDOC's failure to provide him with a working TTY; the responses stated that the TTY should be working and that Securus, the company that contracts with the FDOC to operate the inmate phone system, had been notified.

46.     Compounding the problem, in December 2013, Mr. Stephans and the other hearing impaired inmates in his dorm were repeatedly denied physical access to the TTY phone. The phone was located in the officers' station, and officers were not permitting inmates to use the phone when requested.  Mr. Stephans filed a grievance about this on December 15, 2013. The response was that the issue was being investigated and would be taken care of.

47.     In April 2014, Mr. Stephans grieved three times that he was unable to use the prison TTY to communicate with deaf family members who were also TTY users, and was also unable to communicate with deaf family members who were videophone users.  Nothing was done and Mr. Stephans grieved the TTY-to-TTY issue again in May, June, July, and August.

Mr. Stephans appealed the denial of his grievances in September.

48.     On March 6, 2014, Mr. Stephans filed a grievance complaining about the high costs of the TTY phones.  He filed at least fourteen grievances on the high costs of the TTY, emphasizing that TTY users are doubly burdened, because the cost per minute is higher than the voice phone and TTY calls are inherently longer due to the slowness of the relay service.

49.     On May 12, 2014, Mr. Stephans filed a request, complaining that they only had 15 minutes to use the TTY phone, and asking for the time to be extended. The response stated that he would be provided with the amount of time allotted by the policy.[3]

50.     The FDOC maintains a TIPS line, which is a toll free number that prisoners can call to anonymously report sexual assaults or other problems.  On December 23, 2013, Mr. Stephans filed a grievance complaining that he could not dial this number on the TTY phone. The grievance was returned, stating that Tallahassee was working on it.  In March 2014, Mr. Stephans filed a complaint with the Inspector General's Office, stating that are multiple deaf or hard of hearing inmates at Marion that cannot make complaints on the TIPS line through the TTY.  On March 14, he was interviewed by an investigator from the Inspector General's Office. No ASL interpreter was provided at this interview, and the interview was conducted with the aid of writing questions and answers.  The Inspector General's Office referred the issue to "management."

51.     In March 2014, Mr. Stephans also filed a grievance complaining that the TTY phone did not allow calls made to the TIPS line.  The FDOC responded on April 21: "The TIPS line currently does not work with the TTY and Tallahassee is aware of this situation and are

---

[3]  There is actually a conflict in FDOC policy on this point. The Florida Administrative Code provision limits TTY calls to 30 minutes, which is double the time allotted for the voice phone.  *See* F.A.C. 33-602.205(2)(e) & 15(b). But the FDOC Procedure on ADA provisions allows TTY calls to be three times as long as voice calls.  *See* FDOC Procedure 604.101(3)(b).4.b.v (page 10).

attempting to rectify it."  On April 21, 2014, Mr. Stephans filed another grievance complaining that the TIPS line could still not be called on the TTY phone.  The grievance was approved on May 9, passing on instructions from Securus on how to dial the TIPS line.

52.     While FDOC eventually provided access to the TIPS line for TTY users, a poster with instructions on how to access the TIPS line from the TTY was taken down in mid-2015.

53.     *Engaging in Retaliation and Interference.*  Mr. Stephans was threatened by security staff because he complained about having to serve as an interpreter for other prisoners. The staff member threatened him with a Disciplinary Report if he did not comply.

### David Stanley

54.     David Stanley is incarcerated in the FDOC system and was at all relevant times. He has neurosensorial hearing loss in both ears, which substantially limits one or more major life activity, including but not limited to hearing.   He can hear some sounds, but can only understand people talking if he's looking directly at their face.  He can read lips, but not very well.  He can sign the manual alphabet but does not know ASL very well.  He requires the use of two hearing aids to be able to effectively access the programs, services, and activities of the FDOC.

55.     *Failure to Provide Auxiliary Aids and Services.* For years, the FDOC has failed to provide Mr. Stanley with his needed hearing aids, and has subjected him to a years-long campaign of false information and unnecessary obstacles that prevented him from promptly receiving an operable hearing aid.  In July 2009, his hearing aid was sent out for repair, and for much of the time since he has been without one.  He initially grieved the issue in August 2009, complaining that he could not hear other inmates and staff.  The response stated that his hearing aid was beyond repair and that he was going to be sent to Reception and Medical Center (RMC) for a new hearing aid fitting.  At some point he received a new hearing aid, but in June 2010 the

battery died. He submitted a grievance about it, and he was told that batteries were being ordered.

56.     In October 2011, Mr. Stanley's left hearing aid broke.  Mr. Stanley did not receive another left hearing aid for nearly three years.  While waiting to receive a new, left hearing aid, Mr. Stanley's right hearing aid malfunctioned several times, leaving him completely without hearing for periods as long as 35 days.  In January 2012, he saw a hearing aid specialist to be fitted for a new left hearing aid.  By March, Mr. Stanley had not received it, so he filed a grievance.  The response was that someone would look into it.  In April, he filed a request asking for a status update.  He was again told that someone would check on it.

57.     Another audiology consult was requested in May 2012.  In June, Mr. Stanley filed another grievance about the issue.  By June 22, the FDOC could still not figure out whether Mr. Stanley had received his hearing aid:  A notation was made by an FDOC employee at Utilization Management (UM), asking if Mr. Stanley had a hearing aid.   Another note was entered on July 24, confirming that Mr. Stanley did not have his hearing aid that was issued in 2010, and indicating a call had been placed to the prison to verify his story.  The employee then denigrated the credibility of all prisoners:  "The fact 'he says this' 'he says that' is not worth anything in the grand scheme of things. . . . AS we know, I/M's [inmates] are not reliable."

58.     On June 28, 2012, Mr. Stanley filed yet another grievance asking about his hearing aid.  The response stated that the doctor said the hearing aid was too old to be repaired, and they thought Mr. Stanley already had a hearing aid.  He appealed this decision, informing them that he in fact did not have his hearing aid, but the FDOC still did not believe him. The grievance was denied in July, stating: "all documentation suggests you were given back your hearing aid, issued in 2010, while at FSP.  Hearing aids are only issued ever[y] 4 years."

59.     Mr. Stanley continued to raise the issue, and in September 2012 a staff member at Tomoka emailed an employee at UM to say that that doctor confirmed that his right hearing aid was damaged beyond repair and needed replacement.  That request was denied.

60.     In October 2012, Mr. Stanley filed another request for the status of his hearing aid.  In November he was given the same response that defied reality:  "Beltone states the hearing aid you went with was too old for repair. You were also given one in 2012."  He appealed, noting that he did not receive a hearing aid in 2012, and that the one he gave the medical department had not been returned.  It was denied, saying he was not eligible for another hearing aid at that time.  He appealed, which was also denied in December, stating: "You have previously been advised you do not meet the criteria for another hearing aid at this time.  Ms. Papp spoke with FSP and they advised they did not have your hearing aid, nor did they send it out for repair."

61.     On December 3, 2012, Mr. Stanley was called to the medical department, and the nurse told him to submit a request to be sent to RMC to be fitted for a new hearing aid tube.  He did so on December 6.  The response said to watch the call out list and bring the hearing aid with him.  But when he showed up for the call out, no one was there. He filed a request on December 17, pointing this out.  The response was that he was scheduled to discuss the matter on December 20.  In the interim, he appealed the initial response.  The appeal was denied on January 29, 2013, stating, "It is the responsibility of the CHO [Chief Health Officer] to determine the appropriate treatment regimen for the condition you are experiencing including passes and assignment of a hearing aid."

62.     By April 2013, nearly two years after his hearing aid broke, he had still not been to RMC for the fitting, and submitted yet another request.  The response was that he had to see a

physician so a consult could be completed, and instructed him to access sick call.  He appealed.

The appeal was denied.  On April 22, he filed a formal grievance.  It was denied with similar

language.  He appealed again, and the final denial came on June 13, 2013.

63.    Mr. Stanley immediately filed a Reasonable Modification or Accommodation

Request asking for a hearing aid.  It was denied on June 29, instructing him to access sick call.

He appealed, saying he already went to sick call.  The appeal was denied on August 5.  Mr.

Stanley appealed again.  Finally, on October 25, the appeal was approved, saying he would be

seen by an audiologist for a hearing aid evaluation, giving the institution 30 days to implement

the action.

64.    Predictably, the institution did not comply.  On December 1, 2013, Mr. Stanley

filed Emergency Grievance to the Secretary because he still had not seen audiologist.  It was

returned without action on January 3, 2014.

65.    Mr. Stanley finally saw a hearing aid specialist on December 30, 2013, over three

years since his hearing aid broke.   The specialist told him that his hearing aid would be ready in

2-4 weeks.  Of course, four weeks came and went without a hearing aid.  On March 30, 2014, he

filed a request asking about it.  The institution responded, saying they were waiting for RMC,

stating "This takes a long time, unfortunately."  On April 4, 2014, he submitted a grievance

explaining that he had been waiting for his hearing aid to come back from repair since 2011.

The response accused him of filing a duplicate grievance.  He appealed, and response stated that

medication renewal was not automatic, and that he would have to access sick call.  He appealed

again, and the final response came on June 9, 2014, advising him that his appointment at RMC

had been rescheduled. That same day, Mr. Stanley was permitted to go to RMC to obtain his left

hearing aid.

66.     After obtaining his left hearing aid, Mr. Stanley sought to have his right hearing aid repaired on June 24, 2015.  He submitted it to medical staff at Tomoka to repair the volume control and circuit board.  Mr. Stanley received his right hearing aid back a full month later, on August 25, 2015, and the volume control was still broken, which makes the device ineffective.

67.     Numerous other prisoners have undergone similarly long and unjustified delays in attempting to obtain hearing aids and other assistive devices.

68.     In January 2015, Mr. Stanley filed a grievance asking for hearing amplifiers.  Mr. Stanley would like to have hearing amplifiers to assist him with hearing, particularly when his hearing aids go out for repair for months at a time.  Mr. Stanley did not receive a response to his grievance.

69.     The FDOC failed to give primary consideration to Mr. Stanley's request for hearing aids and other devices.

### Ray Spears

70.     Ray Spears is incarcerated in the FDOC system and was at all relevant times.  He is deaf and cannot communicate verbally with spoken English, which substantially limits one or more major life activity, including but not limited to hearing and speaking.  His primary method of communication is ASL.  Mr. Spears cannot write in English and can only partially read English.  Mr. Spears has been forced to seek the assistance of other prisoners to write grievances for him.

71.     *Failure to Provide Qualified Interpreters.*   Since 2003, Mr. Spears has been incarcerated at South Florida Reception Center, Okaloosa Correctional Institution, Dade Correctional Institution, and Tomoka Correctional Institution.  Although he has had many medical, classification, and mental health appointment at these prisons, he was very rarely

provided with an interpreter.  Occasionally, staff attempted to communicate with him by writing notes, but Mr. Spears could only partially understand what was being communicated to him.

72.     Mr. Spears has been experiencing back pain for the last four years.  Because he has never been provided with a qualified interpreter at his medical appointments during this time, Mr. Spears was reduced to communicating with Tomoka medical staff by pointing to where the pain is and making a face.  Because of the communication barrier, medical staff have been unable to diagnose or treat Mr. Spear's medical problem.  Mr. Spears went to sick call several times to try to get treatment for this problem, but became frustrated because medical staff couldn't understand him so he stopped going.

73.     Mr. Spears attends church and no qualified ASL interpreter is provided for him. Once a month, a volunteer comes to conduct the service in ASL; however, on days when the volunteer is absent, Mr. Spears cannot understand the church service.

74.     Mr. Spears would like to learn how to read English better and would like to learn how to write English.  Mr. Spears would attend and would have attended educational programing while in prison if a qualified interpreter was available.

75.     The FDOC failed to give primary consideration to Mr. Spears's request for interpreters.

### *Michael Boggs*

76.     Michael Boggs is incarcerated in the FDOC system and was at all relevant times. He is deaf and cannot communicate verbally with spoken English, which substantially limits one or more major life activity, including but not limited to hearing and speaking. His primary method of communication is ASL.  FDOC knows that Mr. Boggs is deaf and is in need of services related to his disability. For instance, Mr. Boggs' Classification Summary, dated

January 12, 2012, states that, "Inmate is deaf and does not read lips" and his February 2, 2012 Health Services Profile notes that Mr. Boggs is in need of impaired inmate services.

77.    *Failure to Provide Qualified Interpreters.*  Mr. Boggs was processed at Central Florida Reception Center (CFRC) in 2012.  He was not provided with an ASL interpreter during that processing, and therefore did not understand what he was told.

78.    Mr. Boggs was assaulted by other prisoners while at CFRC.  When he attempted to get medical help following his assault, without an ASL interpreter, medical staff at CFRC refused to treat his injuries.  Medical staff wrote down notes to him communicating that nothing was wrong with him.  Officers laughed at Mr. Boggs when he tried to correct the medical staff.  There was not effective communication at the medical appointment.

79.    Mr. Boggs was transferred from CFRC to Marion C.I. in 2012.  Mr. Boggs has not been provided with a qualified ASL interpreter for classification appointments at Marion.  In order to communicate, he passes notes during such appointments, which are not effective.

80.    Mr. Boggs has not been provided with a qualified interpreter at church.  He still attends church but is limited to watching the services and cannot fully participate due to the lack of an interpreter.

81.    Mr. Boggs has also not been provided with qualified interpreters at his medical and dental appointments at Marion.  Medical staff write notes to communicate with him but Mr. Boggs doesn't understand their writing.  Dental work is painful for Mr. Boggs, in large part because he cannot express his pain level to the dentist.  Mr. Boggs avoids going to the dentist because of these issues.

82.    Mr. Boggs suffers from pain in his back, head, and teeth, which is not being treated by medical staff at Marion.  Mr. Boggs's back has been hurting him since December

2012, when he lifted something heavy, felt severe pain in his back, and couldn't move or walk for some time.  Mr. Boggs routinely pays $5 to go to sick call to seek treatment, and finds that the medical staff cannot communicate with him or treat him.  Often, medical staff do not even attempt to communicate with Mr. Boggs and chat with the officers instead of communicating with him.  Mr. Boggs goes to sick call every month despite the communication barriers because he doesn't want his injuries and medical issues to be left untreated.  However, Mr. Boggs is denied treatment due to the failure to provide an ASL interpreter for him.

83.     In July 2012, Mr. Boggs began attending GED classes at Marion Correctional Institution.   He wanted to earn his GED because it was a prerequisite to the electrician's course at Marion.  When he first enrolled in the classes, an outside volunteer who was learning ASL assisted Mr. Boggs for four or five months.  The volunteer left in fall of 2012.

84.     Mr. Boggs went an entire year without being provided an interpreter for his GED classes, despite repeatedly requesting one.  He did not understand the instructor who was speaking to him without an interpreter and was even reprimanded for not following directions that he couldn't understand.

85.     On July 16, 2013, Mr. Boggs was issued a Disciplinary Report (DR) for Disobeying an Order.  He was not provided with an ASL interpreter at the hearing for the DR. He was punished with 30 days probation and lost eight days of gain time.

86.     The FDOC failed to give primary consideration to Mr. Boggs's request for interpreters.

87.     *Failure to Provide Auxiliary Aids and Services*.  Mr. Boggs requires two hearing aids.  One broke in 2014 while Mr. Boggs was incarcerated at Gainesville Work Camp.  Mr. Boggs went to sick call, filled out a form, and was charged $5 to have the hearing aid fixed.  Mr.

Boggs did not receive his hearing aid back for six months.  However, once returned the hearing aid still did not work, and when Mr. Boggs attempted to use it, he got a headache.  FDOC failed to provide Mr. Boggs with a follow-up appointment to fix the hearing aid and thus has denied Mr. Boggs use of an operable hearing aid.

88.     The FDOC imposed an illegal surcharge on Mr. Boggs to obtain his hearing aid.

89.     The FDOC failed to give primary consideration to Mr. Boggs's request for hearing aids.

90.     *Exclusion from Jobs and Programs.* Mr. Boggs was incarcerated at Gainesville Work Camp for six months, beginning in March of 2014 and ending on August 3, 2014.  During this time, he applied for work release programs and was turned down each time.   Upon information and belief, he was turned down because he is deaf.

91.     *Failure to Provide Effective Telecommunications Access.*  It is more expensive for Mr. Boggs to communicate with family and friends than it is for inmates who are not deaf. For example, in 2012, Mr. Boggs requested that FDOC address the issue that individuals using a TTY or placing a relay call are required to pay a higher fee per minute than the general inmate phone.  He was told that it would be looked into but that, until then, he would need to pay additional charges.  Mr. Boggs filed a grievance on June 16, 2012, with those allegations.  The grievance was denied.  The institution responded that it is an issue with the carrier and that there is nothing further they can add to their previous response.

92.     Not only has it been more expensive for Mr. Boggs to communicate with his family and friends outside of the institution, there have been periods of time where it was impossible.  On October 31, 2013, while at Marion Correctional Institution, Mr. Boggs filed an Inmate Request reporting that the TTY had not been working since January. Mr. Boggs was

advised to contact the dormitory supervisor and inform them of the problem. The problem was not remedied. In November 2013 and again in December 2013, Mr. Boggs submitted two additional Inmate Requests regarding the same issue. Mr. Boggs was then instructed to request use of the TTY from the correctional officers. However, on December 15, 2013, Mr. Boggs submitted another Inmate Request stating that when he requested the use of a TTY, the correctional officers responded that they were "not sure of it." The institution assured Mr. Boggs that the issue would be investigated and taken care of. Nonetheless, in February 2014, he alerted the institution again that the problems with the TTY persisted.

93.     On December 11, 2013, Mr. Boggs reported that the sexual abuse hotline was not functioning via use of the TTY. The deaf and hard of hearing prisoners ultimately reported this to an outside advocacy group.

*Lewis Parker*

94.     Lewis Parker is incarcerated in the FDOC system and was at all relevant times. He has conductive and sensoneurial hearing loss, and tinnitus.[4]  He has been declared hearing impaired by the FDOC, and was issued a hearing aid. His impairment substantially limits one or more major life activity, including but not limited to hearing.   When he has his hearing aid, he can hear fairly well. When he doesn't (which is most of the time in the FDOC), he can only hear someone talking if he can look right at them and see their lips, and there is no ambient noise. He has not had his hearing aid for some time because the FDOC has failed to repair or replace it in a timely fashion.

95.     *Failure to Provide Auxiliary Aids and Services.*  In November 2010, Mr. Parker filed a Reasonable Modification or Accommodation Request (RMAR) asking for large cup-style

---

4  Tinnitus is commonly described as a ringing in the ears, but it also can sound like roaring, clicking, hissing, or buzzing. It may be soft or loud, high pitched or low pitched and can be present in either one or both ears. *See* http://www.nidcd.nih.gov/health/hearing/Pages/tinnitus.aspx#1 (Last visited January 18, 2016).

headphones because the institutional headphones caused high frequency feedback with his hearing aid.    It was initially denied.   After seeing Dr. Calderon, the Chief Health Officer at Tomoka, Mr. Parker filed another grievance in December 2010 informing the prison that Dr. Calderon said that he couldn't find anything in his file showing that Mr. Parker had hearing aids. Mr. Parker said this was not possible and asked to be reevaluated.   An audiologist consult was recommended by a doctor, which was denied by FDOC on January 5, 2011, stating, "No clear documentation of medical necessity."   However, on January 10, Mr. Parker's request was granted, after he fought for months to prove that he was hard of hearing.

96.     More recently, at Tomoka C.I., Mr. Parker had headphones that worked with a volume booster so that he could hear his radio.   However, the headphones were confiscated when he was transferred to Sumter C.I.   He currently does not have a pair of headphones that accommodate his hearing loss, and thus cannot hear the radio.   He filed a Reasonable Modification or Accommodation Request in approximately April 2015 asking for a volume booster, but was told that he could only have it if he could pay for it himself.   He cannot afford it at this time.   Forcing Mr. Parker to pay for an auxiliary aid operates as an illegal surcharge.

97.     Mr. Parker has also experienced numerous ongoing problems with receiving and maintaining his needed hearing aid.   On October 24, 2012, Mr. Parker turned in his hearing aid for repair.   On November 30, he was informed that the hearing aid had still not been repaired. He tried to explain that he needed his hearing aid and that he was getting yelled at by staff because he wasn't responding.    He spoke again with Ms. Stern on January 9, 2013, and was informed that they were awaiting an appointment to get his hearing aid.   He filed a formal grievance about it on January 23.   The response approved the grievance, stating "your hearing aid was mailed out to be repaired as soon as you gave it to medical.   However, after speaking

with Hearing Care Resources they have advised that they never received it in the mail.  A new Consult has been written and submitted to UM for approval."

98.     Mr. Parker saw the audiologist on March 11, 2013, where a new mold was taken for a hearing aid.  He received his hearing aid shortly after that.  During the time he was without his hearing aid, his bed was next to a large exhaust fan, and he could not hear voices most of the time.  He missed two or three appointments or other meetings per week because he could not hear the call-out.

99.     FDOC also failed to properly accommodate Mr. Parker during a disciplinary hearing.  On November 6, 2012, Mr. Parker received a Disciplinary Report (DR) for fighting.  On November 13, a DR hearing was held without any accommodation and without ensuring that Mr. Parker could understand and participate in the proceedings.  In the middle of the reading of the statement of facts, Classification Officer Mr. Melton left the hearing and announced that it had to be postponed because Mr. Parker was deaf.  But on November 15, the hearing resumed with a new team, again without any accommodation.  Because Mr. Parker did not have his hearing aid, he could not hear what was happening because the hearing officer and guards were not speaking directly at him.  Mr. Parker was found guilty and sentenced to 20 days disciplinary confinement.

100.     Mr. Parker immediately filed a grievance, which was denied on December 18.  He appealed, and on February 24, 2013, Mr. Parker was notified that the DR was being overturned because the Warden found that he did not actually commit the infraction.  By that point, of course, Mr. Parker had already served his 20 day sentence in disciplinary confinement.

101.     Several months ago, Mr. Parker's hearing aid broke because the tube ruptured.  He turned it in for repair, but the FDOC kept it for four months, then returned it to him without

repairing it.  He has requested that the FDOC repair or replace it, but the FDOC has not done so.

102.    Mr. Parker receives a daily insulin injection in the medical department.  Without his hearing aid, he cannot understand what medical staff are telling him, unless they are looking directly at him, which they rarely do.  He tries his best to just follow along.  On one occasion, he was almost given the wrong insulin injection because he could not understand what the nurse was saying.  Thankfully, he noticed the bottle and was able to stop the nurse before he was improperly injected.

103.    Mr. Parker cannot watch television at Everglades C.I., where he is currently housed.  Sometimes there is closed captioning on the television, but the other prisoners don't like seeing the captions, so they turn it off with the remote.  The televisions also do not have transmitters that transmit the television audio over the radio waves, which can be picked up by a hearing aid paired with a special device.  If he had his hearing aid and had the proper equipment, and the televisions had transmitters, he would be able to hear the television.

104.    The FDOC failed to give primary consideration to Mr. Parker's request for hearing aids and other devices.

105.    *Failure to Alert Prisoners with Hearing Disabilities*.  Several years ago while at Tomoka C.I., Mr. Parker had a vibrating watch to wake him up in the morning, because he cannot hear an alarm clock.  Unfortunately, when he was transferred to Sumter C.I. two years ago, it was confiscated by staff.  Since then, he has missed approximately 30 appointments because he has not woken up in time, or was sleeping when he was called out and no one came to wake him.

106.    There are no flashing lights in Mr. Parker's dorm to alert deaf and hard of hearing prisoners about critical events such as count, going to the dining hall, recreation, or emergency

evacuations.  The officers expect Mr. Parker to listen when spoken to, even though he frequently cannot hear them without his hearing aid.  The officers get upset and curse at him when he does not respond to their commands, and he is subject to disciplinary action for failing to follow orders.

107.     The FDOC failed to give primary consideration to Mr. Parker's request for alerts.

108.     *Failure to Provide Effective Telecommunications Access*.   Throughout his incarceration, Mr. Parker has kept in close contact with his wife and other family members. When given the proper equipment and accommodations, he and his wife talk frequently (sometimes once a day).  However, his efforts to remain in contact with his wife have been stymied in recent years by the FDOC's failure to sure ensure equitable phone access.

109.     There is no TTY at Everglades C.I. that Mr. Parker can access.  Mr. Parker can use the voice phone if he turns the volume all the way up and his wife (his most frequent caller) yells into the phone.  There was a TTY at Sumter C.I., but it was portable, and prisoners were required to reserve it ahead of time with the officers.  Frequently, the officers did not produce the TTY in a timely fashion, and sometimes did not produce it at all.  In contrast, prisoners with no hearing loss could use the wall phones at almost any times, without delay.  Moreover, at Sumter, the voice phone was located next to a loud exhaust fan, which made it impossible for Mr. Parker to use.

110.     *Engaging in Retaliation and Interference*.   Upon information and belief, since Plaintiff began investigating the violations within the FDOC, the FDOC began holding ADA review meetings.  Mr. Parker has attended one or two of them, but before the meetings it was made clear to him that he was not permitted to raise any issues during the meeting.  After the meeting, prisoners are forced to sign refusal forms, ostensibly to confirm that they have no

pending ADA issues.

### *Daniel Edwards*

111.    Daniel Edwards is incarcerated in the FDOC system and was at all relevant times. He has severe hearing loss in both ears, which substantially limits one or more major life activity, including but not limited to hearing.  Mr. Edwards requires the use of two hearing aids. Mr. Edwards's mother is also hearing impaired and he has attempted to communicate with her regularly throughout his incarceration.

112.    *Failure to Provide Effective Telecommunications Access.*  Mr. Edwards has reported issues with access to the TTY for several years.  On October 4, 2011, Mr. Edwards filed a grievance at Tomoka C.I. claiming that hearing impaired individuals are being charged a much higher rate than non-deaf individuals to place phone calls.  Mr. Edwards used an example of a nine minute call to New York on the TTY that cost Mr. Edwards's mother $23.99.  Mr. Edwards stated that the same call would cost roughly $2.00 for a non-deaf inmate and he attached his phone bill as an exhibit.

113.    On October 11, 2011, his grievance was denied, with the FDOC blaming Securus and other carriers.   Mr. Edwards appealed this grievance and emphasized that he is not concerned with Securus's contractual obligation, stating that, "The simple fact is that FDOC provides the telecommunication service to inmates and FDOC is responsible for ensuring this service of provided without violating the law."  His grievance was again denied.

114.    On May 13, 2012, Mr. Edwards reported that the TTY had been out of paper for more than 10 days and requests to refill the paper have gone unanswered.  When there is no paper in the TTY deaf inmates are prohibited from placing calls because they can't be "recorded."  On May 14, 2012, he reported that the officers had been leaving the TTY paper out

on the counter where other inmates have access to their phone conversations and pin numbers.

115.   Mr. Edwards, while still at Tomoka, continued to have problems with access to the phone and became increasingly distraught at not being able to communicate with his family. On May 19, 2013, Mr. Edwards submitted a request regarding being unable to make collect calls on the TTY line.  The FDOC responded and informed Mr. Edwards that his account is active and his family must resolve that issue and that it is "their decision to accept collect calls."  On May 27, 2013, Mr. Edwards submitted an additional request clarifying that his family does not have a collect call block on their phone but his calls were still not going through.  His request was returned and he was advised that his family needed to contact the phone company.  Mr. Edwards requested again that FDOC look into why he is unable to make calls on the TTY and on June 5, 2013, was again told that the calls are being blocked by the phone company.

116.   On July 16, 2013, Classification Officer Julia Mead exchanged an e-mail with a representative from Securus that stated, "I hate to bother you but this one is driving me crazy! He is hearing impaired and so is his mother… he uses the regular phone when he can (when the dorm is quiet) but has approval to use the TDY also."  According to Ms. Mead, Mr. Edwards' mother's number goes through on the voice phone but not the TTY.  The Securus representative responded that Securus has nothing to do with billing and it's a matter of personal preference.

117.   Determined to be able to communicate with his family, Mr. Edwards continued to seek assistance in getting access to the phone.  On February 9, 2014, Mr. Edwards submitted an inmate request to the classification department at Tomoka Correctional Institution and attempted to explain his position again.  Mr. Edwards reported that no collect calls can be made from the TTY phone. The FDOC responded that they received a response from the Securus representative who stated that they have nothing to do with the TTY billing and that it is up to the individual

carrier.   Mr. Edwards appealed this response and his appeal was denied on March 5, 2014,

wherein he was informed that Securus and FDOC have no control over TTY billing.   Mr.

Edwards again appealed and his appeal was sent to FDOC's Bureau of Contract Management

(BCM).   BCM replied, "Florida Relay System (FRS) is a 3rd Party Provider of Relay Service to

Florida constituents, fully independent of Securus…Securus simply provides access to FRS

platform and operators.   From a Securus perspective, these are not collect calls, they're toll free

calls.   Once the call connects to the FRS operator, Securus loses full control of the call except re:

recording and timing."   Mr. Edwards was again directed to have the person he is trying to call

contact their carrier and determine if there is any resolution for this issue.

118.   Since March 2013, when he was still incarcerated at Tomoka and for the last year

at Marion C.I., Mr. Edwards has been unable to use the TTY.   When he last tried to use the TTY

in March of 2013, his calls would not go through.

119.   *Failure to Provide Auxiliary Aids and Services.*   While Mr. Edwards requires the

use of two hearing aids – one for each ear – as of September 2015, FDOC has only ever allowed

him to have one hearing aid at a time.   Mr. Edwards has needed to use two hearing aids since he

was 16 years old.

120.   In 2009 or 2010, the one hearing aid he had fell apart.   Mr. Edwards did not

receive another hearing aid until 2012, this time for his left ear.

121.   On May 2, 2011, Mr. Edwards submitted a request to the medical department at

Tomoka Correctional Institution regarding his broken hearing aid and his need for two new ones.

Mr. Edwards was told to use his routine access to sick call.   He was ultimately able to obtain a

consultation.   The June 15, 2011, Consultation Request/Consultant's Report stated that, "Inmate

is a 43 year old male with a history of hearing loss who received a hearing aid on 4/2004 not

reparable.  Please evaluate and advise if he needs a new hearing aid."  On July 18, 2011, Mr. Edwards went for an appointment and was found to have a totally occluded ear canal.  A cerumenectomy (the removal of extensive earwax) was recommended and completed.  Finally, on December 28, 2011, Mr. Edwards was approved for just one hearing aid, again, even though he has documented severe hearing loss in both ears.  Mr. Edwards received his left hearing aid in 2012.

122.    Mr. Edwards went to another audiology appointment in November 2014, this time to be fitted for a right hearing aid.  However, before he received the right hearing aid in May of 2015, his left hearing aid broke – the volume dial stopped working, causing Mr. Edwards to constantly hear static noise.  FDOC sent his left hearing aid out for repair in August 2015.  Mr. Edwards is hopeful that he may have two functional hearing aids when his left hearing aid is returned, which would be the first time in his 13-and-a-half years in prison.

123.    In addition to hearing aids, Mr. Edwards also needs hearing related devices in order to have equal access to programs, services and activities.  For example, On February 21, 2010 while at Polk Correctional Institution, Mr. Edwards requested a higher volume radio and headphones.   His request was "noted."   He submitted a Reasonable Modification or Accommodation Request in April 2010 regarding these same devices.  His request was denied and he was informed that, "At the current time, we have no provisions for an amplified radio and you are asking for a high decibel radio without advising how it differs from the canteen radios in decibels and how it will help you to hear the radio better.  We do have provisions for inmates to purchase over the ear headphones if the inmate cannot use the ear buds that come with the canteen radios.  There is nothing in the ADA that requires that we furnish you with an amplified radio and headphones."

124.   Mr. Edwards filed a formal grievance regarding these same devices and that grievance was denied on May 25, 2010.  He filed a timely appeal of that denial on June 21, 2010.  This appeal was also denied.  Mr. Edwards was told that he needs to contact medical call out and explain the issue to the Chief Health Officer and "If the CHO determines that a hearing test is in order then he will request one, it is up to him to make the decision as to whether or not you need an auxiliary aid different from those normally offered.  However it should be noted that any device such as a higher decibel radio is not provided by the Department.  All inmates must purchase their own radios."

125.   Finally, while Mr. Edwards resides in a dorm with other hearing-impaired and deaf prisoners, on his side of the dorm, he does not have adequate access to the television.  The television he is permitted to watch does not have closed captioning and does not have a transmitter.  Mr. Edwards is not permitted to use the television on the other side of the dorm, which provides those accommodations.

126.   The FDOC's pattern of failures to make the television accessible to deaf and hard of hearing prisoners is further illustrated by other similar lawsuits.  For instance, in previous litigation, the FDOC attempted to avoid the requirements of the ADA by not allowing a prisoner to have the necessary equipment to hear the television—a simple hookup to his hearing aid and a radio transmitter from the television.  *See Garcia v. Tucker*, Case No. 4:07-cv-474-SPM/WCS (N.D. Fla.).  After protracted litigation, the FDOC finally agreed to a settlement in 2012, allowing the prisoner to keep the necessary equipment and to be housed in a facility with a transmitter, and paying a substantial amount in attorneys' fees.

127.   The FDOC failed to give primary consideration to Mr. Edwards's request for hearing aids and other devices.

128.    The FDOC imposed illegal surcharges on Mr. Edwards by making him see medical staff and pay a $5 copayment to obtain an auxiliary aid and service, and by forcing him to pay for those aids and services.

### Ernesto Guevara

129.    Ernesto Guevara is incarcerated in the FDOC system and was at all relevant times.  He is deaf and cannot communicate verbally with spoken English, which substantially limits one or more major life activity, including but not limited to hearing and speaking.  His primary method of communication is reading lips in Spanish and his secondary method of communication is American Sign Language (ASL).  Mr. Guevara can neither read nor write English.

130.    *Failure to Provide Qualified Interpreters*.  Mr. Guevara would like to participate in educational programming but cannot because he knows that no ASL interpreter will be provided to him.  Mr. Guevara hasn't been able to participate in any programming while in prison because of the lack of ASL interpreters.

131.    In September 2015, Mr. Guevara had a medical appointment.  Another inmate served as an "interpreter."  As a result, the communication was difficult and not confidential.

132.    *Failure to Provide Effective Telecommunications Access.*  Mr. Guevara cannot use the TTY because he does not understand English.  Mr. Guevara can communicate in ASL; thus, if FDOC provided him with a videophone, he would be able to effectively communicate with his family and friends outside of prison, just as hearing inmates can.  Without a videophone, Mr. Guevara has been left totally isolated.

133.    *Failure to Provide Auxiliary Aids and Services.*  In September 2015, Mr. Guevara attempted to request a hearing aid at a medical appointment.  Mr. Guevara has previously used

hearing aids.  A hearing aid would permit Mr. Guevara to hear vehicles and other environmental sounds, thus affording him more independence and safety in an outdoor work program.  Medical staff at Marion denied his request.

134.   The FDOC failed to give primary consideration to Mr. Guevara's request for hearing aids and interpreters.

### Thomas Jameson

135.   Thomas Jameson was incarcerated in the FDOC system at all relevant times.  He is deaf and cannot communicate verbally with spoken English, which substantially limits one or more major life activity, including but not limited to hearing and speaking. His primary method of communication is American Sign Language (ASL).  Mr. Jameson has been deaf since childhood.  Mr. Jameson also requires the use of hearing aids in both ears.

136.   *Failure to Provide Qualified Interpreters*.  Mr. Jameson has gone to sick call for medical and/or dental appointments about six times in the last eight years and has only once been provided with a qualified ASL interpreter.  At times, FDOC has provided Mr. Jameson with a qualified ASL interpreter for psychological evaluations and treatment.  At other times, they have not.  For example, on January 27, 2011, a mental health evaluation had to be rescheduled because the FDOC failed to ensure an interpreter was present.  The FDOC counselor informed Mr. Jameson that an inmate interpreter could not be used because of "1) HIPAA concerns and 2) they do not satisfy ADA requirements."  Further, on September 9, 2015, Mr. Jameson was denied a qualified interpreter for a psychological evaluation.  As a result, Mr. Jameson could not communicate at all during the appointment.

137.   Mr. Jameson has attended church for the last six years at FDOC and has never once been provided a qualified interpreter.

138.    Mr. Jameson attended GED classes while at Polk C.I.  Before taking the classes, Mr. Jameson was at a 3rd-grade reading level.  A fellow prisoner who was a former teacher for the deaf interpreted the classes for him and Mr. Jameson's reading level improved to 5th grade.  However, the prisoner was removed from his classes, and Mr. Jameson could no longer understand any of the materials.  Mr. Jameson was forced to drop the GED classes, never attained his GED, and continues to have great difficulty writing English.

139.    Mr. Jameson attended a mandatory transition skills course for two weeks at Marion C.I.  He was not provided with an ASL interpreter and did not understand the course.

140.    The FDOC failed to give primary consideration to Mr. Jameson's request for interpreters.

141.    *Failure to Provide Effective Telecommunications Access.*  Mr. Jameson generally cannot use the TTY because he has great difficulty writing English.  Sometimes other prisoners helped him use the TTY, but this was difficult and was not confidential.  Mr. Jameson is able to sign and understand ASL and would be able to communicate with his friends and family through a videophone.  But videophones are not provided.

142.    On June 8, 2012, Mr. Jameson filed a grievance alleging that the TTY phone calls are being over-charged compared to a regular voice call.  The FDOC denied this grievance and told Mr. Jameson that FDOC is aware of the concerns and is working to resolve the issue.  Mr. Jameson was advised to pay the subject fees.  Mr. Jameson appealed and his grievance was again denied.  Mr. Jameson appealed to the FDOC Secretary and in August 2012, his appeal was denied.

143.    FDOC failed to give primary consideration to Mr. Jameson's request for a videophone.

144.    *Failure to Provide Auxiliary Aids and Services.*   In 2014, one of Mr. Jameson's hearing aids broke and the other hearing aid was lost.  Mr. Jameson saw an audiologist in 2014 at Jefferson C.I. to be tested and fitted for a hearing aid.    However, Mr. Jameson has not been provided with hearing aids and has been told to wait.  A hearing aid would allow Mr. Jameson to hear vehicles or lawn mowers approaching, providing him with needed safety.

145.    The FDOC failed to give primary consideration to Mr. Jameson's request for hearing aids.

146.    *Exclusion from Jobs and Programs*. On January 20, 2014, Mr. Jameson submitted an inmate request regarding his job placement.   He reported that approximately two months prior, the FDOC classification department changed his job assignment to the PRIDE[5] Garment factory and was told he would start work there in February.  However, when Mr. Jameson had an interview with a Ms. Howard at the PRIDE factory, he was told he could not work there because he is deaf.

## Edgar Lugo Martinez

147.    Edgar Lugo Martinez is incarcerated in the FDOC system and was at all relevant times.  He is deaf, cannot communicate well with spoken English, cannot lip-read effectively and cannot read proficiently, all of which substantially limits several major life activities, including but not limited to hearing and speaking.  His primary method of communication is American Sign Language (ASL), a language which he has used his whole life.   Mr. Martinez has been deaf since he was nine months old. Mr. Martinez has some minor residual hearing and when he is afforded properly fitted and operable hearing aids he can hear some loud noises such as a fire

---

5 Prison Rehabilitative Industries and Diversified Enterprises, Inc. (PRIDE) is a private, nonprofit organization that operates job sites within Florida prisons.  It allows prisoners to receive training and work in industrial, manufacturing, and agricultural fields.  *See* https://www.pride-enterprises.org/content.aspx?page=CompanyOverview (last visited January 18, 2016).

alarm.   Mr. Martinez has been designated as a deaf impaired inmate by the FDOC, and his deafness and other disabilities are well documented in FDOC records.   Therefore, FDOC has had full knowledge that Mr. Martinez is deaf and uses ASL to communicate. Moreover, he wears a badge every day which says he is HEARING IMPAIRED.

148.   *Failure to Provide Qualified Interpreters.*   FDOC has consistently failed to provide ASL interpreters for Mr. Martinez. The discrimination began when Mr. Martinez was first processed at Central Florida Reception Center.  FDOC failed to provide interpreters for the comprehensive interactive process. The processing procedure is designed to provide both verbal and written information that will be very important during incarceration. Processing includes physical, psychological, educational, and substance abuse exams and screenings.  Mr. Martinez was also required to attend interactive classes explaining the rules and procedures of the FDOC's prisons. Due to FDOC's failure to provide effective communication, Mr. Martinez was excluded from this process because he was deaf.

149.   In 2015, Mr. Martinez requested an interpreter at Tomoka C.I. for a GED class which consisted of lecture and computer based work. In lieu of providing a qualified interpreter, Mr. Martinez was told he would have to use an inmate assistant, who had hearing loss and was not proficient in ASL and relied mostly on fingerspelling.[6]  The assistant was unable to keep pace with the teacher and was not effective.  When Mr. Martinez would respond in ASL, the inmate assistant could not properly vocalize what Mr. Martinez was saying. Frustrated, Mr. Martinez quit school after one day.  He did not file a grievance regarding the GED issue since he simply decided to quit.

150.   Mr. Martinez experienced similar frustration when attempting to communicate

---

[6] Fingerspelling is the act of spelling out words with the hands using a manual alphabet, not by using designated signs. Although fingerspelling is used in ASL, it is used for words that do not have established signs, and is not effective when used without any established signs.

with the Chaplain.  Mr. Martinez is Catholic and tries to talk with Chaplain Perry Davis.  When he requested an interpreter directly from the Chaplain, he was told that he must use an inmate to interpret.  Again, the inmate assistant only knew how to fingerspell and did not know any signs in sign language.  Therefore, Mr. Martinez was not able to communicate with the Chaplain in any meaningful and equitable way. Additionally, the insertion of another inmate into his religious conversation hindered his abilities to be as forthright as was needed, for fear the inmate assistant would divulge his private information to other inmates.

151.    At Tomoka C.I., individuals representing various religions would come to the facility to worship with the incarcerated people.  When Mr. Martinez wanted to participate in those religious events, no qualified interpreter was provided.  Instead, occasionally another prisoner attempted to "interpret," but again it was ineffective because the prisoner was not qualified.

152.    In August, 2013, FDOC failed to accommodate Mr. Martinez at a very critical event: the mandatory sexual abuse orientation that is required by the Prison Rape Elimination Act (PREA) and its regulations.  *See* 42 U.S.C. § 15601, *et seq.*  PREA requires the FDOC to provide the orientation during the intake process, and to provide "comprehensive education" on sexual abuse topics within 30 days of intake, or within one year from the adoption of the PREA standards for current inmates.  28 C.F.R. § 115.33.  PREA also requires the FDOC to take "appropriate steps to ensure that inmates with disabilities (including, for example, inmates who are deaf or hard of hearing, those who are blind or have low vision, or those who have intellectual, psychiatric, or speech disabilities), have an equal opportunity to participate in or benefit from all aspects of the agency's efforts to prevent, detect, and respond to sexual abuse and sexual harassment. Such steps shall include, when necessary to ensure effective communication

- 40 -

with inmates who are deaf or hard of hearing, providing access to interpreters who can interpret effectively, accurately, and impartially, both receptively and expressively, using any necessary specialized vocabulary." 28 C.F.R. § 115.16(a).   Moreover, PREA prohibits the FDOC from "rely[ing] on inmate interpreters, inmate readers, or other types of inmate assistants except in limited circumstances." 28 C.F.R. § 115.16(c).   The FDOC has failed to comply with these standards.

153.   During Mr. Martinez's August 2013 encounter, a video was shown about rape prevention, which was followed by a group discussion led by two FDOC staff members. Despite the fact that there are numerous deaf prisoners at Tomoka C.I., no interpreter was provided during the viewing of the video, nor was the video captioned. Mr. Martinez and the other deaf prisoners were forced to stay in the room to watch the inaccessible video, and forced to remain during the group discussion without an interpreter. Mr. Martinez was then forced to sign a paper verifying that he watched and understood the video and group discussion. On August 29, 2013, Mr. Martinez submitted a Reasonable Modification or Accommodation Request. He received a response on October 3, 2013, stating that the video would be shown to him again with the close captioning function utilized.

154.   Approximately two weeks after the response, the FDOC provided an interpreter for Mr. Martinez and the other deaf inmates to watch the video. But this session was led by one FDOC employee who provided no narrative about the video and offered no group discussion as was done at the first presentation. Even though Tomoka has a high number of deaf inmates that use ASL, it was only after Mr. Martinez filed the RMAR that an interpreter was provided for this important training. Had he not done so, numerous deaf prisoners would not have had access to this critical information.

155.    Even after Mr. Martinez had been designated as deaf by the FDOC, and had been housed at Tomoka for some time, on August 29, 2013, Mr. Martinez filed an informal grievance because he was asked to speak to the classification department about his progress review, but was not provided an interpreter.  Mr. Martinez did not understand what the classification officer said, nor was he able to effectively express himself.  It was as a result of this grievance that FDOC finally provided the accommodation needed.   They told Mr. Martinez that the classification progress review would be rescheduled and conducted later with an interpreter.  It was only after this long delay, and requiring Mr. Martinez to file a grievance, was an interpreter provided.

156.    The FDOC failed to give primary consideration to Mr. Martinez's request for interpreters.

157.    *Failure to Provide Effective Telecommunications Access*. Mr. Martinez has been forced to use the antiquated TTY device to place telephone calls.  Because TTY calls take four to five times longer than voice calls due to the time needed for transmission and interpretation, it creates inequitable phone access and causes a higher phone charge for deaf prisoners' families.  Unlike the telephones used by the non-deaf prisoners, the TTYs are locked up and only accessible when a prisoner signs them out. This results in deaf prisoners being denied access to the phone and/or having less telephone access because their call time is limited.  The TTYs provided at Tomoka C.I. and Columbia C.I. often break down, preventing deaf inmates from making phone calls.  The calls are often garbled, making the words impossible to read on the TTY screen, which leads to the call being terminated prematurely.

158.    Pursuant to FDOC rules, when a deaf prisoner completes a TTY call, he or she must tear off the printout of the call, write their name and DC number on it, and turn it in to the

officers.  The printout contains the full transcript of the TTY conversation.  Mr. Martinez often sees his TTY printouts lying in plain sight for other prisoners to read.

159.    Mr. Martinez requested the accommodation of a videophone, which when used in conjunction with the free Video Relay Service (VRS), allows faster and more effective communication for deaf and hard of hearing people who use ASL.  FDOC refused this request, and continues to force deaf prisoners to use a TTY which is not only cost prohibitive for the inmates, but often breaks down, and often does not effectively provide telephone access.

160.    *Failure to Alert Prisoners with Hearing Disabilities*. Mr. Martinez has been excluded from other prison services and programs entirely due to his inability to hear the staff. For instance, on September 12, 2013, Mr. Martinez filed an inmate request/informal grievance stating that security staff did not alert deaf inmates for meal time, count time, canteen, yard call and many other events.  These types of call outs are often made by a guard who is located in a secure officers' booth.  To make the call outs, the guard will lift a small door flap in the booth and shout out various announcements.  Mr. Martinez cannot hear the call outs, and cannot see the guards' mouths to be able to lip-read, even if he had the ability to lip-read effectively.  If Mr. Martinez (or other deaf prisoners) do not hear the call out, they risk missing important events (such as medical appointments, visitation, or legal calls).   Mr. Martinez has endured this ineffective call out process at Tomoka, Okaloosa C.I., and Central Florida Reception Center.

161.    Officers frequently threaten Mr. Martinez with disciplinary reports for failing to follow commands, even though he cannot hear them. FDOC employees ridicule him, calling him a "faker," and question his deafness.

162.    Mr. Martinez requested the reasonable accommodation of using flashing lights and signage to properly notify deaf inmates. The grievance was denied. Mr. Martinez was told,

incorrectly, that the FDOC uses signage to alert deaf inmate.

163.    The FDOC failed to give primary consideration to Mr. Martinez's request for alerts.

164.    *Failure to Provide Auxiliary Aids and Services.* In the Spring of 2013, while at Tomoka C.I., Mr. Martinez's hearing aids were stolen. He reported them stolen, but to date they have still not been replaced.

165.    *Exclusion from Jobs and Programs.* In September 2012, Mr. Martinez requested to work in the kitchen at Columbia Annex, but was told that deaf inmates are not allowed to work in the kitchen.

166.    In December 2012, Mr. Martinez expressed a desire to go to work camp and inquired about the status of such placement.  On December 27, 2012, Mr. Martinez received a response from the FDOC that stated, "You are not eligible for work camp at Tomoka as you are hearing impaired." In August 2013, Mr. Martinez requested again to have equal access to programs and services such as work camp.  This request was "approved" but it did not address the work camp issue.  It simply stated that the progress review discussing the issue would be conducted with an interpreter.

167.    In September 2013, Mr. Martinez filed an informal grievance based upon the PRIDE Enterprise program's refusal to hire deaf inmates.  This grievance was denied and Mr. Martinez was told that, "Mrs. Russell from Pride was interviewed and stated due to your impairment and risk involved in this type of industry there is no way to guarantee your safety in this environment."  Attempting again to participate in work camp, Mr. Martinez submitted a grievance on January 10, 2014, stating that he is deaf and would like to go to work camp.  His grievance was returned "because asking questions are not grievances."

168.   *Engaging in Retaliation or Interference.*   Upon information and belief, after Plaintiff began investigating the violations within Florida's prisons, the FDOC began to hold meetings with Mr. Martinez to discuss his disability issues.   However, ASL interpreters are not provided.   In lieu of proving qualified interpreters, at CFRC the FDOC forced Mr. Martinez to sit in the front of the room and make him attempt to lip-read multiple speakers at the same time.   This is not effective.   At one meeting Mr. Martinez tried to use his "voice" to discuss a concern and was told to "shut up."   At the end of the meeting, prisoners are forced to sign a form confirming there are no pending ADA issues.   Signing the form is not optional.

### *Lamar Maddox*

169.   Lamar Maddox was incarcerated in the FDOC system at all relevant times.   He is deaf and cannot communicate verbally in spoken English, which substantially limits one or more major life activity, including but not limited to hearing and speaking.   His primary method of communication is American Sign Language (ASL).

170.   *Failure to Provide Auxiliary Aids and Services.*   Mr. Maddox is not completely deaf in his right ear.   Sixteen years ago, Mr. Maddox was using a hearing aid while at the Volusia County Jail.   However, that hearing aid broke and Mr. Maddox has not been provided with a new hearing aid since.   Mr. Maddox requested a new hearing aid for his right ear in 2000. Following his request, Mr. Maddox was transported from Central Florida Reception Center to Lake Butler to be tested by an audiologist.   Mr. Maddox was then told he would have to wait for a hearing aid.   Three years later, in 2003, Mr. Maddox was finally fitted for a hearing aid at Lake Butler.   But Mr. Maddox never received the hearing aid he was tested and fitted for.   Mr. Maddox asked medical staff again for a hearing aid in 2005, 2008, 2010, and, most recently, in

2013.  Mr. Maddox has never received a hearing aid and was told after each request that he would have to wait.

171.    The FDOC failed to give primary consideration to Mr. Maddox's request for hearing aids.

172.    *Failure to Provide Qualified Interpreters.*  In addition to being denied a hearing aid, Mr. Maddox has not once been provided with a qualified ASL interpreter for medical, dental, psychological, or classification appointments for the approximately 15 years he has been incarcerated at Tomoka C.I.  Medical staff will sometimes attempt to communicate with Mr. Maddox by writing English, but Mr. Maddox cannot understand some of the things they write because English is not his first language.  Mr. Maddox rates his English literacy at a 7th or 8th-grade level.

173.    Consequently, because Mr. Maddox cannot communicate with medical staff, in 2012 he was prescribed the wrong medicine.  Mr. Maddox went to a medical appointment with symptoms of a stomach ache and, due to the communication barrier, was given the wrong medication for his ailment, which he took for six days before the error was discovered.

174.    Mr. Maddox attends church every week at Tomoka C.I.  A volunteer gives sermons in ASL once per month; however, on other Sundays there is no sermon in ASL, and a qualified ASL interpreter has never been provided for him at church.  Mr. Maddox still attends on the other Sundays but he cannot understand or fully participate in the services.

175.    Mr. Maddox attended the Horizon Program at Tomoka C.I.  Although he completed the program and received a certificate, a qualified ASL interpreter was never provided to him during the course and, consequently, Mr. Maddox was not able to understand much of what was being said during the program.

176.    The FDOC failed to give primary consideration to Mr. Maddox's request for interpreters.

177.    *Failure to Provide Effective Telecommunications Access.* On May 14, 2012, Mr. Maddox reported that officers are leaving printouts of TTY phone conversations on the counter, where other inmates have access to personal conversations and phone numbers to family members. Mr. Maddox's sister informed him that another inmate called her without her authorization.  On June 5, 2012, FDOC returned Mr. Maddox's grievance because he "did not name a specific staff member."

178.    Mr. Maddox also reported that the officers in K dorm do not like to let him use the TTY phone, and he has been denied the use of it 4 or 5 times.

179.    *Exclusion from Jobs and Programs.*  In 2014, Mr. Maddox asked his classification officer for approval to work at PRIDE enterprises or in a work release program, but he was turned down for both.  Upon information and belief, he was denied because he was deaf. Mr. Maddox previously applied to work at PRIDE in 2013 and was turned down.   Upon information and belief, it was also because he was deaf.

180.    Mr. Maddox would like to take programs on reentry skills, such as budgeting, financial skills, and marriage skills.  However, Mr. Maddox was never permitted to take such classes because he is deaf.

### Calvin Rodriguez

181.    Calvin Rodriguez is incarcerated in the FDOC system and was at all relevant times.  Although he can speak, he is deaf, which substantially limits several major life activities, including but not limited to hearing.  Mr. Rodriguez has been deaf since he was six months old. His parents are deaf and all his siblings are deaf.  He effectively communicates through ASL, a

language which he has used his whole life.   Mr. Rodriguez has some minor residual hearing that can assist him to some degree if afforded with properly fitted and operable hearing aids.   Mr. Rodriguez has been designated as a deaf impaired inmate by the FDOC.   His deafness is well documented in his medical and administrative records, and therefore the FDOC has had full knowledge that Mr. Rodriguez is deaf and uses ASL to communicate.   Moreover, he wears a badge every day that says he is DEAF.

182.   *Failure to Provide Qualified Interpreters.*   In approximately September 2015, Mr. Rodriguez was accused of talking back to an officer and received a Disciplinary Report (DR). Mr. Rodriguez denied the allegations and requested a DR hearing and a certified ASL interpreter for the hearing.   This DR hearing was critical to Mr. Rodriguez, because if found guilty it would prevent him from being transferred to a facility closer to his deaf family.

183.   When Mr. Rodriguez arrived at the DR hearing in the morning, there was no interpreter and Mr. Rodriguez protested.   He was told to return that afternoon for a hearing with an interpreter.   He was in disciplinary confinement during this time.   When he returned in the afternoon, in lieu of securing a qualified and neutral interpreter, FDOC called an employee, Mr. Carter, who worked in the Educational Department to act as the interpreter.   On information and belief, Mr. Carter is not a trained ASL interpreter, he holds no credentials as an interpreter, and his signing was reportedly incomprehensible.   Mr. Carter does not meet the definition of a qualified interpreter under the ADA regulations.

184.   Once Mr. Carter began to sign, it was apparent he was not qualified. Mr. Rodriguez was unable to understand Mr. Carter, and Mr. Carter was unable to interpret the dialogue that occurred at the DR hearing.   Mr. Rodriguez was not provided meaningful access to the hearing and was unable to present his side of the story.   He was found guilty of the infraction,

and his request for a transfer, which had been in the works for over two years, was denied.  Mr. Rodriguez was extremely upset and frustrated.  He appealed the decision, but it was denied.

185.    On November 17, 2015, Mr. Rodriguez was sent to confinement because it was alleged that he was intoxicated in some way.  He requested an interpreter for his DR hearing.  As he waited for his DR hearing, on November 26, 2015, Mr. Rodriguez attempted to commit suicide by cutting himself.  He was moved to an observation cell in confinement, where his glasses and hearing aids were taken away.  His hearing aids help abate the symptoms of his tinnitus, which causes unbearable ringing in his ears.  Without his glasses he could not see, and without his hearing aids he suffered from severe ringing in his ears.

186.    Prisoners in observation are required to undergo a psychiatric evaluation.  Mr. Rodriguez requested an interpreter for his evaluation, but was told that no interpreter would be provided.  As a result, Mr. Rodriguez refused to meet with the doctor and began a hunger strike.  Three days later, he was asked to again submit to the evaluation, but he refused unless an interpreter was provided.  The FDOC still refused to provide one.

187.    Medical staff continued to insist that Mr. Rodriguez meet with the doctor without an interpreter.  Mr. Rodriguez finally relented and met with the doctor without an interpreter, but was unable to effectively communicate during the psychological evaluation.  Throughout his confinement, Mr. Rodriguez continued to ask for the return of this glasses and hearing aids, but they were not returned until much later when his family called on his behalf.

188.    The FDOC failed to give primary consideration to Mr. Rodriguez's request for interpreters.

189.    *Failure to Provide Effective Telecommunications Access*.  Like every other deaf prisoner, Mr. Rodriguez is forced to use the antiquated TTY to contact his family. Non-deaf

inmates at the prison can freely use the telephone when needed; however, deaf inmates must sign out the TTY, and their telephone time is limited.  Because Mr. Martinez's parents and siblings are deaf, placing calls through the TTY does not provide meaningful and equitable access to telecommunications.  Mr. Rodriguez's deaf family, like the majority of the deaf community, uses videophones to communicate by telephone and stopped using TTYs over nine years ago.

190.    To place a call to his deaf sister, Mr. Rodriguez must do the following:  1) He calls the Florida Telecommunications Relay Service (TRS); 2) once an operator answers he must type his conversation on the TTY; 3) the TRS operator then reads the TTY screen and vocalizes the call to a Video Relay Service Interpreter; and 4) the video interpreter interprets the vocalized message into sign language so that his sister can receive the message on her Videophone.  When Mr. Martinez's sister responds during the telephone call she 1) signs her comments in ASL; 2) then the VRS interpreter vocalizes her comment to the TRS operator who then 3) types the message to Mr. Rodriguez; 4) who then must read his TTY screen.  This process is not only time consuming, but it increases the cost of the telephone call astronomically. If the FDOC simply provided a videophone, Mr. Rodriguez could communicate directly with his sister, just like the non-deaf inmates speak directly to their family members without intermediaries.

191.    Mr. Rodriguez has been forced to endure this ineffective process because he wants to stay in touch with his deaf family, however in March 2015 his telephone calls to his family were blocked.  For some unknown reason, when Mr. Rodriguez now tries to call his deaf family through the TRS and the VRS his calls are blocked and he is told he cannot place these calls because the Columbia Annex is "restricted."  Once denied the ability to call his family, Mr. Rodriguez sought the help of his deaf sister Vivian Rodriguez.   Ms. Rodriguez emailed the FDOC and asked for assistance for her brother.  FDOC provided a convoluted answer which in

essence said they would not provide a videophone to allow Mr. Rodriguez to make equitable telephone calls, and that TTY calls would not work through the Video Relay Service. Without a videophone at the prison, the Video Relay Service is needed so that Mr. Rodriguez can contact his family.

192.    In the summer of 2015, a representative from Securus went to see Mr. Rodriguez at Columbia Annex to explain why he could not place calls through TRS and VRS. However, the FDOC failed to provide a qualified interpreter for the meeting and instead called a prisoner, who only knew fingerspelling, to attempt to interpret. Mr. Rodriguez left the meeting having no understanding of what the technical representative said about the blocking of his calls.

193.    Mr. Rodriguez is still unable to call his deaf family. He is also now currently housed in T-dorm, which does not have a TTY, and as a result, Mr. Rodriguez has no telecommunications access at all.

194.    *Failure to Alert Prisoners with Hearing Disabilities*. FDOC fails to provide visual or vibrating alert devices to allow Mr. Rodriguez to safely and timely respond to commands in the prison. Mr. Rodriguez has missed breakfast approximately 60% of the time because he cannot hear the breakfast call. As a result, Mr. Rodriguez submitted a Reasonable Modification or Accommodation Request for a wrist watch that vibrates instead of providing an auditory alarm. That request was denied.

195.    Mr. Rodriguez then asked for an aid who knew some sign language and would be reliable in waking him up and alerting him to other activities in the prison. That request was also denied.

196.    The FDOC failed to give primary consideration to Mr. Rodriguez's request for effective alerting accommodations.

197.   *Failure to Provide Auxiliary Aids and Services.*   Due to the fact that FDOC fails to provide him qualified interpreters Mr. Rodriguez requested an alternate and inferior device: the Ubi Duo.   This device allows two people who can read and write proficiently to type back and forth in a more natural manner than lip-reading.   The device is comprised of two portable keypads and screens that are synched to each other.   Mr. Rodriguez's request for the Ubi Duo in 2014 was also denied.

198.   Prior to his incarceration Mr. Rodriguez regularly wore two hearing aids so that he could hear some sounds, which increases his safety.   FDOC tested his hearing in 2013 and told him he would benefit from two hearing aids, but the second hearing aid has still not been provided, pursuant to FDOC policy.   Due to FDOC's failure to provide two hearing aids, in 2015 Mr. Rodriguez's family offered to pay for two hearing aids for his use.   The FDOC declined the offer.

199.   The FDOC failed to give primary consideration to Mr. Rodriguez's request for hearing aids and other devices.

200.   *Engaging in Retaliation or Interference.*   Due to their lack of training, officers threaten Mr. Rodriguez with Disciplinary Reports for failing to follow commands. Employees of FDOC ridicule and belittle him by standing behind him and "testing" his hearing by speaking behind his back to see if he can hear.   This humiliating and degrading behavior fosters an environment in which deaf inmates feel unsafe and excluded.

### Samuel Hart

201.   Samuel Hart is incarcerated in the FDOC system and was at all relevant times. He is hearing impaired, which substantially limits one or more major life activity, including but not limited to hearing.   He can speak.   His does not know ASL.   Mr. Hart also requires the use of

a hearing aid.  Mr. Hart has been designated as a deaf impaired inmate by the FDOC.  His hearing loss is well documented in his medical and administrative records; therefore the FDOC has had full knowledge that Mr. Hart cannot hear and would therefore require some accommodations.  Moreover, every day he wears an FDOC badge that says he is DEAF.

202.   *Failure to Provide Qualified Interpreters.* Mr. Hart communicates by using his residual hearing and lip-reading.[7]  Although this helps him to get through many one-on-one conversations, it is not effective in a group setting such as a classroom.  Throughout his incarceration, he has submitted various grievances which reflect his need for an Oral Interpreter[8] to provide effective communication when he attends church, meetings, classification appointments, disciplinary reviews and other events.  All of his requests were denied.

203.   The FDOC failed to give primary consideration to Mr. Hart's request for interpreters.

204.   *Failure to Alert Prisoners with Hearing Disabilities.*  FDOC has repeated failed to ensure that Mr. Hart's assigned assistants are carrying out their responsibilities effectively.  For example, in July 2012, Mr. Hart's assigned assistant was not waking him up for count or otherwise alerting him that staff is calling him.  Mr. Hart addressed this with both the medical and classification departments but the matter did not get resolved. Mr. Hart stated that FDOC simply reassigns the assistants, the cycle continues and the issues do not get resolved.  FDOC responded to Mr. Hart's concerns on July 30, 2012, stating that inmates do not choose their own

---

7  Lip reading is also known as speech reading.  It has been reported that only approximately 30% of what is said in English can be accurately read on the lips.

8  An Oral Transliterator, also known as an Oral Interpreter, does not use sign language.  Instead, they use silent oral techniques and natural gestures to transliterate a spoken message from a person who hears to a person who is deaf or hard-of-hearing. Oral Interpreters are trained to understand and repeat the message and intent of the speech and mouth movements of the person who is deaf or hard-of-hearing.  *See* http://www.rid.org/rid-certification-overview/otc-certification/ (last visited January 18, 2016).  Mr. Hart mistakenly requested a cued speech interpreter thinking it was the term for Oral Interpreter.

assistants and that if there is a medical issue that is not being addressed, he should notify the medical department.

205.    The problem with his assistant persisted and in August 2012, Mr. Hart filed several formal grievances.  In these grievances, Mr. Hart reported that he was given a choice to either accept his assistant as is or to sign a refusal.  If Mr. Hart were to sign a refusal then he was told that he would be stating that he does not need any assistance.  Mr. Hart pointed out that, according to FDOC policy, his assistant must be trained to assist him.  Mr. Hart claimed that his assigned assistant does not know how to interpret and he does not know any cued speech.  FDOC denied his request and referred Mr. Hart back to the July 30, 2012, FDOC response wherein he was advised that inmates do not choose their own assistants and that if there is a medical concern he should notify the medical department.

206.    In April 2013, Mr. Hart was placed in confinement at RMC. Meals are served in confinement by having an inmate walk down the confinement area hall with a food cart.  There are no visual alerts or other notifications to tell the inmates in confinement when the meal cart is coming. If an inmate is not standing erect at the door of their confinement cell when the meal cart arrives, they will miss their meal.  Due to the FDOC's failure to provide visual or vibrating alerts, Mr. Hart missed several meals.  He was so frustrated that he taped two cards in his cell window with the words, "Impaired Deaf inmate" in large black letters on one card and "Hearing impaired" written in large red letters on the other.  He hoped this obvious signage would prevent him from missing meals, but they did not work.  He grieved this issue, but his grievances were returned for failing to follow proper procedures in submitting the grievances.  Mr. Hart resubmitted the grievances attempting to comply with the procedural requirements and they were again returned.  In May 2013, when he filed a grievance claiming that his concerns were not

responded to, FDOC then denied his grievances stating that they had been submitted in duplicate. Meanwhile, Mr. Hart, because he could not hear the call-outs, continued to miss a number of meals and went days and even an entire week at one point without a shower.

207.    In March 2014, at Tomoka Correctional Institution, Mr. Hart was moved from the J-2 Dorm to the E-Dorm. Mr. Hart reported that the J-2 Dorm is specifically for hearing impaired inmates and now that Mr. Hart has been moved, he is going to need an impaired inmate assistant more than ever.  FDOC responded on April 1, 2014, stating "I don't know why you were moved- I'll check into it. You don't have a pass for an aide."

208.    The FDOC failed to give primary consideration to Mr. Hart's request for alerts.

209.    *Exclusion from Jobs and Programs.*  On June 7, 2013, Mr. Hart requested to be transferred to another institution so that he could participate in a vocational sign language course that was held there and could improve his communication skills.  He stated that he is deaf and will eventually be "totally deaf" and would benefit from such a program.  On June 19, 2013, FDOC denied this request and the ADA coordinator concurred with the decision to deny the request to transfer to another institution.

210.    *Failure to Provide Effective Telecommunications Access.* On May 20, 2013, Mr. Hart submitted a Reasonable Modification or Accommodation Request at Tomoka Correctional Institution, complaining that the TTY could not access the confidential toll-free TIPS hotline to report general crimes and rape.   Non-deaf inmates can freely call the TIPS line through the regular phone, and benefit from the safety the TIPS line provides.  On June 3, 2013, this request was denied and Mr. Hart was informed that these issues were out of the control of the institution.

211.    Mr. Hart filed a formal grievance and was informed on June 26, 2013, that, "Securus is required to connect a TTY user to a Relay Center Operator who then facilitates

collect only calls.  By policy they will not connect a user to a toll-free number and they won't leave voice mail messages.  Since the crime tip line is a voice mail only function there would be no way to facilitate these types of calls." Mr. Hart then appealed the matter to the FDOC Secretary on July 1, 2013. The inquiry was forwarded to FDOC's Bureau of Contract Management (BCM).  In November, FDOC responded, "[a]ccording to the contract provider, Securus Technologies, it will take an estimated (60) Sixty days for the work to be completed and the issue resolved. But they are working diligently to resolve it. Based on the foregoing information, your appeal is denied."

212.    The TIPS line is still not accessible via the TTY.  For instance, Mr. Hart attempted to place a call to the TIPS line via the TTY in approximately October 2015 and January 2016, but the calls do not get routed through the relay service; they go directly to the automated TIPS answering service, which, of course, the deaf and hard of hearing prisoners cannot hear.

213.    *Failure to Provide Auxiliary Aids and Services.*  FDOC has also failed to provide other auxiliary aids that would enable Mr. Hart to have equal access to programs and services. For example, on May 20, 2013, Mr. Hart submitted an accommodation request for batteries for his headphones and volume booster in order to be able to utilize the television transmitter.[9]  This request was denied and Mr. Hart was informed that batteries are not provided and must be purchased from the canteen.  Mr. Hart appealed and on June 19, 2013, and his request was denied again.  An appeal to the FDOC Secretary on June 21, 2013, was also denied.

214.    This operated as an illegal surcharge on Mr. Hart.

215.    On May 20, 2013, Mr. Hart reported that he cannot hear well enough to

---

9  At some prisons, FDOC maintains a policy that the volume is not used on the television sets. Therefore, when prisoners watch television they must listen to the TV audio through a separate individual radio with headphones.

understand church services and other programs and submitted an accommodation request for a pocket talker[10] with dual loops[11] and cup type headphones.  The FDOC responded that since Mr. Hart has hearing aids, a pocket talker is not allowed.   The FDOC said the cup type headphones were approved but must be purchased through the Independent Living Aids, a vendor of the FDOC.   This again operated as an illegal surcharge.

216.   Mr. Hart appealed this response and pointed out two issues.  First, a pocket talker would work well with hearing aids.  Second, Mr. Hart had been *without* hearing aids for months at that point.  His appeal was denied. Mr. Hart then appealed to the FDOC Secretary and this appeal was also denied on August 9, 2013 and Mr. Hart was reminded that, "You were advised previously that the pocket talker you requested was not an approved auxiliary aid. You should be able to hear effectively with your hearing aids."

217.   The FDOC has failed to provide and maintain hearing aids for Mr. Hart.  On April 1, 2013, Mr. Hart filed a grievance stating that he had been without hearing aids for several months.  He turned in his hearing aids in January 2013 and he was told that both hearing aids would either be repaired or replaced within 30 days.   On April 15, 2013, FDOC denied this grievance and informed Mr. Hart that he has been approved for new hearing aids since the ones turned in were not repairable.  Mr. Hart was further informed that he would receive a call out for clinic in order to be fitted for his new hearing aids.

218.   Mr. Hart was fitted for the new hearing aids, but had not yet received them.  Mr. Hart filed a request for administrative remedy on August 7, 2013 regarding receipt of his hearing

---

10  Pocket talkers are a type of assistive listening device that consists of personal amplifiers used to increase volume in face-to-face and small group conversations.  They are about the size of a deck of cards with both a microphone and listening cord connected to them.  *See* https://nad.org/issues/technology/assistive-listening/systems-and-devices (Last visited January 15, 2016).

11 Dual Loops, as requested by Mr. Hart, can be worn around the neck, and can work in conjunction with the telecoils in hearing aids or can be plugged into pocket talkers and headphones.  The telecoil allows a hearing aid to more effectively pick up sounds from electronic devices.

aids.  On August 21, 2013, FDOC denied his grievance stating that, "You have already gone to your appointment to receive your hearing aids.  Your care has been equal to or above community standards."  Still without his hearing aids, Mr. Hart appealed this denial to the FDOC Secretary. This was again denied, informing Mr. Hart that he was scheduled for an appointment "in the very near future."  In November or December of 2013, Mr. Hart finally received his hearing aids.

219.    In approximately February 2014, Mr. Hart's new hearing aids were stolen from his lock box along with his headphones and his booster.  He reported the theft, but his hearing aids were not replaced.  On September 8, 2014, Mr. Hart requested an update on getting new hearing aids.  He received no response.  Mr. Hart filed an informal grievance on September 24, 2014, again asking for an update on his hearing aids.  His grievance was denied and he was told at that point that an appointment would not be made until he signed a withdrawal for $360.00 so that his hearing aids could be re-made.  This again operated as an illegal surcharge.   He eventually received his hearing aids in approximately October 2015, although they are not properly functioning.

220.    The FDOC has failed to ensure equal access to television programming.  For example, in 2015, Mr. Hart was transferred to Union Correctional Institution, a facility which initially did not have closed captioning on the television sets. Mr. Hart grieved the lack of captioning.  Captioning is now provided; however, the FDOC fails to ensure that the accommodation is maintained.  Often the other prisoners will turn off the captions, leaving Mr. Hart unable to access television viewing.  It is not safe for Mr. Hart to protest turning off the captions with the other prisoners, and the FDOC fails to intervene.

221.    The FDOC failed to give primary consideration to Mr. Hart's request for hearing aids and other devices.

*Robert Hawk*

222.    Robert Hawk is incarcerated in the FDOC system and was at all relevant times. He is deaf, which substantially limits one or more major life activity, including but not limited to hearing.  His primary method of communication is ASL.

223.    *Failure to Provide Qualified Interpreters*.  On July 23, 2012, Mr. Hawk received a disciplinary report for alleged possession of a contraband cell phone.  The statement of facts on the report alleged that Mr. Hawk admitted in written notes to the sergeant that the phone belonged to him.  However, in his July 27, 2012, witness statement, Mr. Hawk wrote that he never admitted to anything and that "[t]hey were misunderstood my writing to colonel…I didn't say I admitted to anything."  Mr. Hawk was placed in confinement and his visitation privileges were suspended.

224.    Mr. Hawk filed a grievance related to the July 23, 2012 incident stating that he did not admit to owning the contraband phone.  He asked the disciplinary team to obtain a copy of the notes taken by the officer questioning him, but he was refused.  He stressed that those notes were valid evidence.  He also reported that the disciplinary team failed to provide an ASL interpreter upon his request.  This grievance was denied on August 31, 2012, stating, "You were found guilty based on the statement of facts and the witness statements."

225.    At a disciplinary hearing the following year, the FDOC again failed to accommodate Mr. Hawk by not providing an interpreter.  On June 4, 2013, Mr. Hawk filed a grievance claiming that at a disciplinary hearing for contraband, no ASL no interpreter was provided.  He stated in his grievance that, "Sgt. notified about my need for sign language interpreter. Violated my ADA right.  I was handcuffed in the back, unable to writing [sic] my verbal statements, the hearing quickly plea me guilty without judgement."  The grievance was

denied and did not address the interpreter issue.  Mr. Hawk's visitation privileges were again suspended after being found guilty of the infraction.

226.    The FDOC failed to give primary consideration to Mr. Hawk's request for interpreters.

### *Roosevelt King*

227.    Roosevelt King is incarcerated in the FDOC system and was at all relevant times. He has severe hearing loss, which substantially limits one or more major life activity, including but not limited to hearing.  Mr. King requires the use of hearing aids.

228.    *Failure to Provide Effective Telecommunications Access*.  On May 7, 2013, Mr. King filed a grievance reporting the following: Mr. King was residing in I dorm at Reception Medical Center but there was no TTY there.  He had a pass to goto the J dorm to use it but was given a disciplinary report for being in an unauthorized area. King requested to have the disciplinary infraction removed.  On May 17, 2013, Mr. King received a denial and was told that staff have discretion to accept or reject Mr. King's reasons for being where he was and staff found his reasons insufficient.  Mr. King appealed this to the FDOC Secretary May 31, 2013 and it was again denied.

229.    In February 2014, at Jefferson Correctional Institution, Mr. King requested to be moved to H dorm so that he could use the TTY.  Mr. King stated, "Please move me so I can call my family.  I haven't been able to use the TTY in over a month."  On February 23, 2014, his request was denied and he was told to "follow up with medical; you do not meet the criteria for TTY phone use."  Mr. King made the request to the medical department as instructed and was again told that he did not meet the criteria for TTY phone use.

230.    Confused by FDOC's responses in light of the fact that he had been previously

approved for and had been using the TTY for years, Mr. King filed a formal grievance.   Mr. King was told by the ADA coordinator that he does not meet the criteria to use the TTY even though he has been using a TTY since 2009.   King noted that the FDOC just spent $2500 on a hearing aid that helps very little.   Mr. King reported that "all I hear is just sound (beeps) over a regular phone" which is why he has a pass to use the TTY.   However, he is not housed where the TTY is located and would like to be moved.   On May 16, 2014, his grievance was denied.   On May 28, 2014, Mr. King appealed the denial of his formal grievance to the FDOC Secretary and, on July 2, 2014, it was again denied.   To date, at Jefferson Correctional Institution, Mr. King still must be escorted to another dorm to use the TTY, greatly limiting the amount and time of day he is permitted to use it.   In contrast, prisoners using the typical voice phone have much greater access to it.

### Kenneth Land

231.    Kenneth Land is incarcerated in the FDOC system and was at all relevant times. He has severe hearing loss, which substantially limits one or more major life activity, including but not limited to hearing.   Mr. Land requires the use of hearing aids.   FDOC has been aware of Mr. Land's disability since the beginning of his incarceration in 1981.

232.    *Failure to Provide Effective Telecommunications Access*.   On June 27, 2012, an Impaired Inmate Management and Service Worksheet (IIMS) recommended that Mr. Land have access to a TTY and noted that he did not have access to it at that time.   On August 3, 2012, Mr. Land submitted an inmate request asking that a TTY be installed.   FDOC told Mr. Land that it was "being worked on."   However, a December IIMS documented that there was still no TTY available in Mr. Land's complex and he had been waiting more than six months.   Mr. Land was transferred to another institution before this was resolved.

233.    In August 2014, Mr. Land was moved to DeSoto Correctional Institution for a good adjustment transfer.  There was no TTY there either.  He filed a formal grievance about this on November 12, 2014.   Mr. Land was then moved out of DeSoto and sent to Dade Correctional Institution.  He was transferred within several weeks to Northwest Florida Reception Center's Main Unit where, again, he did not have access to a TTY.   After complaining to FDOC, Mr. Land was finally moved to Northwest Florida Reception Center's Annex where there is a TTY.

234.    *Failure to Alert Prisoners with Hearing Disabilities*.  Mr. Land is continuously at risk for being charged with disciplinary infractions because he cannot hear guards' commands and call-outs.  For example, in May 2014, security staff actually called the medical department to determine whether or not Mr. Land had an assigned impaired inmate assistant because it appeared to security that Mr. Land was having hearing difficulties resulting in disciplinary infractions.  This continues to be a problem for Mr. Land at his current institution, Northwest Florida Reception Center.

235.    Moreover, due to the absence of alerting devices, Mr. Land's cellmate must wake him in the morning because Mr. Land is not able to hear the guards' commands.  Instead of providing an accommodation, the guards kick the cell door on some occasions and he can feel the vibrations which may wake him, but this is not always the case and he has missed wake up calls.  Mr. Land filed an informal grievance on August 5, 2014, stating that he could not hear what the officers were saying over the intercom, and that he needed an inmate assistant because he was losing his vision.  The response said, "[i]f you feel that you an impaired inmate that requires special needs and assistance, you need to send an Inmate Request to Mr. Edwards, Assistant Warden of Programs, and he will set up an evaluation."  The response ignored the fact that Mr. Land had been designated an impaired inmate for years.  On August 6, 2014, Mr. Land

received a Corrective Consultation, which is a disciplinary action that does not result in a formal Disciplinary Report (DR), for not sitting up in his bed during count. As Mr. Land pointed out, he was not sitting up because he could not hear the announcement that it was count time.

236. The FDOC failed to give primary consideration to Mr. Land's request for alerts.

*Richard Tasker*

237. Richard Tasker is incarcerated in the FDOC system and was at all relevant times. Mr. Tasker is deaf, he has tinnitus, and although he can speak, he has difficulty communicating. Mr. Tasker became deaf later in life—at approximately age 40—and as a result he struggles to acquire skills to allow him to communicate effectively. Mr. Tasker has some minor residual hearing and if given properly fitted and operable hearing aids, can hear to some degree. Mr. Tasker was in a motorcycle accident in 1973 that crushed his vertebrae, resulting in chronic cervical, thoracic and lumbar pain which impedes his mobility. Mr. Tasker's left leg was amputated in 2000 while in FDOC custody. He uses a leg prosthesis and a wheelchair for limited mobility, and requires special shoes. His deafness and mobility issues substantially limit several major life activities, including but not limited to hearing, walking, and caring for himself.

238. Mr. Tasker has been designated as a mobility impaired inmate and a deaf impaired inmate by the FDOC. His deafness and other disabilities are well documented in his medical and administrative records by FDOC. FDOC has full knowledge that Mr. Tasker has disabilities and requires accommodations. Moreover, every day he wears a badge in the prison which says he is DEAF, and he sits in a wheelchair when it is made available to him.

239. *Failure to Provide Qualified Interpreters*. Because Mr. Tasker does not use ASL, and can speak, often the FDOC wrongly believes he can communicate in a bi-directional way. Since July 2013, Mr. Tasker has filed at least ten grievances or Reasonable Modification or

Accommodations Requests seeking the services of an Oral Interpreter. Oral Interpreters were requested for disciplinary review hearings, programing, medical visits, classification appointments, dental visits, mental health visits, and other investigations. To date, FDOC has failed to provide an Oral Interpreter for any of his interactions with FDOC.

240. The FDOC failed to give primary consideration to Mr. Tasker's request for interpreters.

241. *Failure to Provide Effective Telecommunications Access*. Mr. Tasker has been allowed to use the TTY while incarcerated by the FDOC since approximately 1997. Even with the documented need and historical authorization to use the TTY, since June 2008 Mr. Tasker has had to file approximately eleven grievances or other requests to use the TTY equitably.

242. Mr. Tasker's TTY related grievances include the FDOC denying him use of the TTY because the FDOC said he was no longer deaf enough, limiting his call time to fifteen minutes, and placing the TTY in a physical location which was inaccessible to him as a wheelchair user. Although Mr. Tasker has used the TTY in the FDOC system for approximately 16 years, when transferred to different facilities, the FDOC fails to provide him with access to a TTY, and he must renew his request for use. To gain equitable telephone access, Mr. Tasker was forced to grieve the absence of effective telecommunications access multiple times.

243. Moreover, the FDOC has a practice of requiring deaf inmates like Mr. Tasker to go the medical department to get authorization to use the TTY, and therefore pay a $5 copayment. This copayment operates as an illegal surcharge to obtain an accommodation or auxiliary aid.

244. *Failure to Provide Auxiliary Aids and Services*. Mr. Tasker's records outline the discrimination he experienced trying to get the FDOC to accommodate his hearing loss through

any means possible. The FDOC's own records verify the policymakers' misunderstanding of the efficacy of hearing aids.

245.    The FDOC makes the following notes in Mr. Tasker's records: "Your hearing aid provides you the ability to hear the TV." (5/31/14); "You are assigned a hearing aid which has corrected your hearing." (8/4/14); "You have the ability to hear when you wear your hearing aid that has been documented by medical." (11/13/14); "According to our clinic here you have no problems communicating and hear fine with hearing aids." (12/5/14); "You have a hearing aid and all phones at Franklin C.I. have adjustable volume, this is ample accommodation to allow you to use the phone." (4/8/15). Contrary to what the FDOC documents in Mr. Tasker's records, a hearing aid does not make a deaf person have perfect hearing. When properly fitted, hearing aids can help to amplify and clarify some sounds.  But hearing aids do not guarantee that Mr. Tasker can hear all spoken dialogue, commands, noises, TV audio, voices on a telephone, or other alerts.[12]

246.    When a prisoner is given a hearing aid by the FDOC, it is not tested for all applications in which it may be needed.  For instance, its efficacy is not tested while the prisoner is using the phone, watching TV, listening to a PA system, and in other situations where the hearing aid must be used. Inmates are simply given the hearing aid to use with the hope that it will help for all of the inmates' needs.  For example, FDOC performed Mr. Tasker's hearing evaluation in a special audiological booth at Reception and Medical Center, but he was not allowed to test it in other situations.

247.    As a result of FDOC's fundamental misunderstanding of the efficacy of a hearing aid, Mr. Tasker has been on a 16-year journey to be accommodated properly for his hearing loss.

---

[12]  *See*  "Hearing aids can't restore normal hearing." http://www.mayoclinic.org/diseases-conditions/hearing-loss/in-depth/hearing-aids/art-20044116 (last visited January 19, 2016).

For example, the radio available for purchase in the canteen does not allow him to hear the TV audio. As a result, Mr. Tasker requested a reasonable auxiliary aid of a radio with amplification accessories to watch TV.  Even though his family agreed to purchase the device for him, the FDOC denied his request to be accommodated.

248.    FDOC records show that Mr. Tasker has been requesting the accommodation of a radio with the accompanying booster and amplifier so that he can participate in equitable television viewing since approximately March 2005. Although FDOC's medical department diagnosed him as having hearing loss, they continually deny his request for a radio saying, in essence, that he is not deaf enough. As recent as November 2014, he was once again denied the accommodation of an amplified radio.

249.    Upon repeated written requests, FDOC denied Mr. Tasker any alternate accommodation to the radio, except telling him to use his hearing aids.  FDOC repeatedly fails to give primary consideration to his request for an amplified radio.  In fact, they have failed to provide him any effective accommodation in lieu of the standard radio.  As of December 2015, Mr. Tasker has not been provided a radio with sufficient amplification and clarification technology that allows him access to the TV audio.

250.    The FDOC has also failed to grant his 2013, 2014 and 2015 requests for a transmission device to attach to the TV so that amplified radios can be used by deaf and hard of hearing inmates.

251.    Unable to hear the TV through a radio, Mr. Tasker has tried but has been unable to access the TV audio through seeing the spoken word via captioning.  On September 21, 2013, May 14, 2014 and February 13, 2015, Mr. Tasker made Reasonable Modification or Accommodation Requests or grieved the need for captioning.  All were denied.

252.    In response to his February 13, 2015 grievance, Mr. Tasker was told report to the medical department if he had further issues.   But again, the $5.00 copayments operate as an illegal surcharge.

253.    When Mr. Tasker has been afforded closed captioning at certain facilities, the non-deaf inmates will often turn off the captions, complaining they block sections of the TV screen. It is unsafe for Mr. Tasker to protest the caption removal, and the FDOC fails to intervene to safeguard his federally protected rights.

254.    As the FDOC continually denied his requests for radios, TTYs, captioning and other accommodations, in July 2013, Mr. Tasker attempted to obtain the accommodation of a pocket talker. A pocket talker is a device equipped with a microphone that amplifies sound resonating near the inmate (for example, a guard's voice), and then to some degree clarifies that sound.  A pocket talker could possibly assist Mr. Tasker with hearing noises, commands, dialogue or other alerts as he travels through the prison buildings.   This request was denied by the FDOC, again by telling him his hearing aids were a sufficient accommodation.

255.    The FDOC has also failed to provide Mr. Tasker with functioning hearing aids. Mr. Tasker's medical and administrative records document the tension between Mr. Tasker and the FDOC about the granting, use, fitting, and need for batteries for his hearing aids.   He has fought to get the correct number of properly fitted hearing aids and batteries as far back as May 2012.

256.    Hearing aids provide Mr. Tasker a level of safety.  Hearing aids allow him to hear the voices of some officers and inmates when they are in close proximity and looking at him, making it easier and safer for him and others to navigate through prison life. They also provide him the ability to protect himself to some degree because although he may not be able to identify

a loud sound, he will hear something.  FDOC has littered Mr. Tasker's records with denials for

other accommodations based on him having operable and properly fitted hearing aids, when in

fact that he has not always had the correct number of operable and properly fitted hearing aids.

257.   The FDOC failed to give primary consideration to Mr. Tasker's request for

hearing aids and other devices.

258.   *Failure to Alert Prisoners with Hearing Disabilities.* The FDOC fails to

accommodate Mr. Tasker with any type of device to assist him with hearing, and fails to

structurally modify the prisons with visual flashers or other signage.  As a result, Mr. Tasker has

missed call-outs, count, yard calls, and other commands which lead to reprimands, disciplinary

reports, or missing meals, appointments, and access to the recreation yard.

259.   As early as October 9, 2013, Mr. Tasker submitted an inmate request seeking help

with following officer commands, stating, "[t]here is no way that I can hear [officers] calling me

over intercom (yard) unless I'm looking dead at them when I'm being called spoken to" and

"[y]ou have to do something because I'm getting in trouble for not hearing the orders and trying

things they're saying to me.  They act as though I can hear them and I can't 100% only about

50% and this is only when my hearing aids are functioning.  Please I don't want to get into any

trouble, please."  However, FDOC failed to provide Mr. Tasker with any accommodations for

this issue.

260.   In a July 2014 grievance appeal filed by Mr. Tasker, he again tells the FDOC he

can't hear the commands of the officers.  FDOC failed to act.  Then in October 2014, there was a

verbal announcement for inmates to remove kitchen items from their cells.  Mr. Tasker did not

hear the command and received a Disciplinary Report for not following orders.  At the DR

hearing, Mr. Tasker requested an Oral Interpreter to help him understand what was happening.

The request was denied, and he was found guilty of having the kitchen items in his cell in defiance of a verbal order.

261.    In June 2015, Mr. Tasker grieved a corrective consultation for again failing to follow a verbal order.  On this occasion Mr. Tasker was in the bathroom when a verbal command was made for inmates to report to count. Mr. Tasker did not hear the order.

262.    The FDOC failed to give primary consideration to Mr. Tasker's request for alerts.

263.    *Engaging in Retaliation and Interference.*   Upon information and belief, after Plaintiff began investigating the violations within the FDOC, Mr. Tasker has been asked to attend two ADA Review meetings to discuss his ADA concerns during his 30 years of incarceration.  Both meetings occurred at Franklin C.I.  On one occasion, Mr. Tasker was called to an ADA Review meeting, but because he was denied a pusher for his wheelchair, he arrived at the meeting late, and was told he could not participate because he was late.  At another ADA meeting, Mr. Tasker tried to discuss issues he was having as a deaf inmate, and the assistant warden for security looked directly at him and told him to "shut the fuck up."

### Kevin Osborn

264.    Kevin Osborn was incarcerated in the FDOC system and was at all relevant times. He was formally committed to prison by the State of Wyoming, but spent 13 years in the FDOC system under an interstate compact agreement.  He has hearing loss, which substantially limits one or more major life activity.  He began losing his hearing significantly at age 55 while in prison and as a result can speak very well, but he does not know ASL.  Mr. Osborn also requires the use of a hearing aid.  Mr. Osborn has been designated as a deaf impaired inmate by the FDOC.  His hearing loss is well documented in his medical and administrative records; therefore the FDOC has had full knowledge that Mr. Osborn cannot hear and would therefore require some

accommodations.  Moreover, every day he wears an FDOC badge that says he is Impaired.

265.  *Failure to Provide Qualified Interpreters*.  Mr. Osborn communicates by using his residual hearing and lip-reading.  Although this helps him get through some one-on-one conversations, it is not effective in all settings such as telephonic hearings.  Since 2014, Mr. Osborn submitted various grievances which reflect his need for an Oral Interpreter to provide effective communication.  Although interpreters were approved for his use, he only received an interpreter one time during his incarceration.

266.  Mr. Osborn was scheduled to have a telephonic parole hearing with the Wyoming Department of Corrections on March 10, 2015.  Because the Okaloosa C.I. administration building had no operable TTY, Mr. Osborn was unable to participate by phone, and requested an oral interpreter for the hearing.  Because the FDOC failed to act in time, the hearing had to be postponed to March 12, 2015 to allow time to secure either an operable TTY and or an oral interpreter.  The FDOC failed to provide either, and the hearing was postponed a second time to March 24, 2015.

267.  But even with the significant advance notice, the FDOC failed again to provide either accommodation for the March 24, 2015 hearing.  As a result, Ms. Ellis Armstrong, a classification specialist, insisted that she act as Mr. Osborn's interpreter.  In lieu of providing an operable TTY or a qualified and trained oral interpreter which would have allowed Mr. Osborn to independently participate in his parole hearing, Ms. Ellis would listen to the parole board on the telephone, and then "tell" Mr.  Osborn what was being said.  This was not effective, and denied him the two-way exchange required in a parole hearing. Mr. Osborn strenuously objected to using Ms. Armstrong as an "accommodation" and expressed his objection to the members of the Wyoming Parole Board.  Ms. Armstrong then terminated Mr. Osborn's parole hearing

268.    Mr. Osborn then filed a formal grievance about the denial of effective communication for the telephonic parole hearing and requested another parole hearing. Although Mr. Osborn never agreed to allow Ms. Ellis to act as an interpreter, on April 6, 2015, the FDOC responded to his grievance by saying Mr. Osborn agreed to the classification officer helping with the telephonic hearing, based on the fact that in essence both the FDOC and Mr. Osborn knew the TTY did not work. This was not true because Mr. Osborn was told the TTY issues would be corrected, but they never were.  Mr. Osborne was also told in the response that another parole hearing would be scheduled.

269.    However, Mr. Osborne did not receive a new date for his parole hearing, so he then sent a letter to the Wyoming Parole Board on April 28, 2015 asking about the rescheduling of his parole hearing.  On May 4, 2015, the Wyoming Parole Board told Mr. Osborn by way of letter that his hearing was not rescheduled and that the result of the March 24, 2015 parole hearing, which he was unable to access due FDOC's failure to accommodate him, was that his parole had been denied. This caused a great deal of stress and concern for Mr. Osborne who had been denied parole without the opportunity to be heard at his hearing.

270.    Upset about the discrimination and the inability to participate in his own parole hearing, Mr. Osborne sent another letter to the Wyoming Board of Parole on June 4, 2015 stating the FDOC told him he would get a new parole hearing due to the lack of the interpreter and inoperable TTY during the March 24, 2015 hearing.  On June 12, 2015, the Wyoming Board of Parole finally agreed to provide a new parole hearing.  On June 23, 2015, over three months after the date Mr. Osborn should have had his parole hearing, and after enduring a great deal of unnecessary stress, Mr. Osborn was granted a hearing with a qualified interpreter.

271.    These problems have persisted in the medical context.  In October 2012, Mr.

Osborn was diagnosed with an aortic abdominal aneurism.  Thus, when he attended medical calls he wanted to make sure there was no miscommunication.  As his hearing became worse, in February 2014 Mr. Osborn requested an Oral Interpreter for his medical consultations. His request was approved but only as "medical deem necessary."  Even with this approval, the FDOC failed to provide interpreters for any of his medical visits.

272.    As a result of substandard medical care he was receiving, in January 2015 Mr. Osborn filed a medical negligence lawsuit against Corizon (the private medical provider) and a Corizon doctor. A telephonic hearing was scheduled on the matter on July 10, 2015.  Mr. Osborne filed a motion with the Court requesting a telephone appearance explaining to the Court that he will be using a TTY to attend the hearing.  On July 6, 2015, the Court granted Mr. Osborn's motion and advised of the immediate need to contact the court so that his call can be placed through the CourtCall system. This instruction was included not only in the Court's Order but in a letter signed by the Court on the same day.

273.    Again Mr. Osborn requested the use of an operable TTY or a qualified oral interpreter from the FDOC for the July 10, 2015 hearing.  On July 10, 2015, Classification Officer Brunson attempted to call the Court so that Mr. Osborne could participate in the hearing by way of TTY.  But the FDOC was unable to provide an operable TTY line for this hearing, which was the exact same problem Mr. Osborn experienced in March 2015 for his telephonic parole hearing. FDOC tried unsuccessfully to get the antiquated device to connect with the Court, but failed. The hearing did not happen because no contact with the court could be made.

274.    On July 21, 2015, Mr. Osborn filed a Request for an Administrative Remedy based on his inability to participate in the telephonic hearing, explaining that this was the same problem he faced months before and should have been rectified. His request was denied, and the

FDOC placed the blame for the failed TTY call on the Court's CourtCall system and not on the inoperable TTY line.  Eventually, the court rescheduled the hearing for August 12, 2015.

275.     Unfortunately, the August 12, 2015 telephonic court hearing was just as inaccessible as the July hearing. Again, in lieu of providing a qualified interpreter or an operable TTY, Classification Officer Johnson falsely and over Mr. Osborn's objections told the Court she was his "oral interpreter."  Without an interpreter or an operable TTY, Mr. Osborn had to rely on Ms. Johnson who attempted to type everything the Court and defense counsel said during the hearing so that Mr. Osborn could read the dialogue on a computer screen.  Although Mr. Osborn was able to speak at times, he could not effectively participate in the hearing because of Ms. Johnson's inability to type quickly and without error.  As a result, Mr. Osborn could not understand all of what the court and opposing counsel was saying, which left him unable to meaningfully and effectively participate, although he tried.  Moreover, Ms. Johnson could not be considered "impartial," as the lawsuit is against FDOC's medical contractor, and Ms. Johnson is an FDOC employee. When Mr. Osborn grieved the use of the classification officer, the FDOC again responded by saying, falsely, that Mr. Osborn agreed to it.  Mr. Osborn vehemently denies he agreed to use the classification officer instead of being provided a qualified interpreter or a working TTY.

276.     The FDOC failed to give primary consideration to Mr. Osborn's request for qualified oral interpreters.

277.     *Failure to Alert Prisoners with Hearing Disabilities.*  The FDOC has failed to make the required structural modifications to ensure that prisoners with hearing disabilities can hear announcements, wake in the morning, or respond to emergency drills.  As a result, Mr. Osborn must rely on a cellmate to wake him in the morning or he will miss meal calls. He must

also rely on other inmates during emergency evacuation drills due to the absence of proper lighting or vibrating devices to warn him independently of emergencies. In the event of an evacuation, Mr. Osborn must be able to independently evacuate, and not rely on others inmates who may put his safety second to theirs.

278.    *Failure to Provide Effective Telecommunications Access.* As discussed above, Mr. Osborn has been denied access to a TTY for telephonic hearings. Additionally, in October 2013, Mr. Osborn filed a Reasonable Modification or Accommodation Request because the TTY relay number had not been added to his calling list.  In order for a deaf person to place a call on the TTY, they must go through the Telecommunications Relay Service (TRS).  Without the TRS the call cannot be made, unless the call is being made directly to another TTY user.  The vast majority of all TTY calls from prison must go through the TRS.  Mr. Osborn was denied equitable phone access because he could not call TRS.  In December 2013, the TRS number had still not been added to his call list.  It wasn't until January 2014, after the holidays, that the TRS number was added allowing him to make telephone calls more equitably.

279.    In November 2014 while at Okaloosa, Mr. Osborn filed a formal grievance because the TTY was only working for 15 minutes, and not the longer time allotted for TTY calls.  On December 5, 2014, FDOC responded to the grievance by stating they inspected the TTY and it was working fine.  This response demonstrated that staff fail to understand how the device operates.  A person trained on the use of a TTY would know that it was not the TTY device itself that was shutting off after 15 minutes, but it was Securus, the telephone provider, that was automatically terminating the calls after 15 minutes. On December 16, 2014, Mr. Osborne promptly appealed the decision and explained to the FDOC how the TTY works and identified Securus as the issue.  FDOC did not respond until April or May of 2015, saying that it

would run a separate cable to ensure that the TTY would not terminate calls after 15 minutes.

280.   *Failure to Provide Auxiliary Aids and Services.*   FDOC has also failed to provide auxiliary aids that would enable Mr. Osborn to have equal access to programs and services. When certain aids and services are approved, the FDOC imposes an illegal surcharge.   For example, in January 2015 Mr. Osborn requested headphones so that he can hear the radio and utilize the television transmitter.   This request was approved, but Mr. Osborn was told he would need to pay for these accommodations himself.   This operated as an illegal surcharge on Mr. Osborn.

281.   The FDOC has failed to ensure equal access to television programming.   At Okaloosa C.I., the FDOC fails to ensure that the closed captioning accommodation is maintained.   Often the non-deaf inmates will turn off the captions and will not allow them to be turned on. It is not safe for Mr. Osborn to protest turning off the captions with the other inmates, and the FDOC fails to intervene.

282.   The FDOC failed to give primary consideration to Mr. Osborn's request for auxiliary aids and services.

### Bobby Webb

283.   Bobby Webb is incarcerated in the FDOC system and was at all relevant times. He is severely hearing impaired, which substantially limits one or more major life activity, including but not limited to hearing.   Mr. Webb has been incarcerated since 1980 and began to experience hearing loss in 2002.   He had previously served for 10 years in the Navy and worked around jet engines, sometimes without hearing protectors.

284.   *Failure to Provide Auxiliary Aids and Services.*   On March 10, 2014, Mr. Webb saw an audiologist at Northwest Florida Reception Center (NWFRC), who told Mr. Webb that he

had no hearing in his right ear and less than 40% hearing in his left.   The audiologist recommended a hearing aid for his left ear and advised Mr. Webb to begin learning ASL.

285.    Later that month, Mr. Webb saw an ear, nose, and throat specialist at NWFRC, who also found he had significant hearing loss and noted that the audiologist had recommended a hearing aid.  The ENT specialist also recommended a hearing aid for Mr. Webb's left ear.   On March 26, 2014, Dr. Resilard submitted a consultation request for a hearing aid for Mr. Webb, noting that an amplification device was recommended by audiology and by the ENT.   The request was denied by the FDOC on April 4, 2014.

286.    In April of 2014, Mr. Webb had a follow-up appointment with Dr. Resilard, where Mr. Webb was informed that his hearing aid had been denied, despite being recommended by the two specialists.

287.    As a result of FDOC's failure to provide Mr. Webb with hearing aids, Mr. Webb cannot hear officers paging him on the intercom, sometimes cannot hear officers' orders, and is often unaware of what is going on in prison.  Mr. Webb has lost any semblance of independence he previously had, as he is forced to rely on other prisoners to make sure he is in compliance with officers and conduct his day-to-day living activities.

288.    Mr. Webb continues to be denied hearing aids despite his profound and documented hearing loss.  Mr. Webb also suffers from dizziness, which may be the result of his diminished hearing and lack of hearing aids.

289.    The FDOC failed to give primary consideration to Mr. Webb's request for hearing aids and other hearing assistive devices.

### *Fernando Sotolong*

290.    Fernando Sotolong is incarcerated in the FDOC system and was at all relevant

times.   He is hearing impaired, which substantially limits one or more major life activity, including but not limited to hearing.   Mr. Sotolong requires the use of a hearing aid in his right ear.

291.   *Failure to Provide Effective Telecommunications Access.* In September 2014, the person Mr. Sotolong had been calling with the TTY received a phone bill for $360.35 for fourteen TTY calls.   Because of this exorbitant bill, Mr. Sotolong has not used the TTY since then as he is afraid of such charges.   Mr.  Sotolong attempted to use the regular phone to call his mother who is very ill by pushing it very close to his ear, but he still could not hear.   Each time he files a grievance, FDOC claims that it is beyond their control.

### Valerie Boyette

292.   Valerie Boyette was incarcerated in the FDOC system from February 25, 2015 to December 23, 2015.   She is deaf, cannot communicate well with spoken English, cannot lip-read effectively and cannot read proficiently, all of which substantially limits several major life activities, including but not limited to hearing and speaking.   Her primary method of communication is American Sign Language (ASL).   Ms. Boyette was diagnosed as being deaf when she was five months old.   She was designated as a deaf impaired inmate by the FDOC and is only 23 years old.   She had a badge which says she is Hearing Impaired.

293.   *Failure to Provide Qualified Interpreters*.   FDOC consistently failed to provide ASL interpreters for Ms. Boyette.   The discrimination began when she was first processed at Florida Woman's Reception Center (FWRC). FDOC failed to provide interpreters for the interactive receiving process. Processing includes physical, psychological, educational, and substance abuse exams and screenings. Due to FDOC's failure to provide effective communication, Ms. Boyette was excluded from this process because she was deaf.

294.    In lieu of providing qualified interpreters, Ms. Boyette was told she would have to use inmate assistants as her interpreters.  Many of the assistants could not sign adequately, and all of them afforded her no privacy or confidentiality.   Ms. Boyette had several medical appointments where no qualified interpreter was provided; instead she was forced to attend the appointment with another inmate.   Sometimes Ms. Boyette was given an impaired inmate assistant who knew sign language, but then that assistant would be transferred and Ms. Boyette would again be without the ability to communicate. Ms. Boyette filed Inmate Requests at FWRC and at Lowell C.I. to obtain interpreters. But she only received a qualified interpreter one time during her incarceration, which was the day she graduated Boot Camp on December 23, 2015.

295.    During her incarceration, Ms. Boyette attended one AA meeting, and at that meeting she was forced to use an inmate interpreter who only knew how to fingerspell. Although Ms. Boyette was still unable to follow much of what was said because there was no interpreter, the inmate who would finger spell was better than nothing, and allowed her gather some of what was happening.  Moreover, for Ms. Boyette to attend future meetings, both Ms. Boyette's name and the name of the inmate interpreter needed to be on the attendee list. The FDOC never put the inmate interpreter's name on the list.  Ms. Boyette filed an Inmate Request asking for the inmate interpreter to be allowed to attend, regardless of the inmate interpreter's skill, but FDOC refused. She was denied the ability to benefit from the AA meetings and never attended another AA meeting.

296.    Upon her arrival at the FWRC she was also mocked and belittled by the guards. They called her "deaf and dumb," teased her, told her she was feigning her deafness and mimicked her signing in an offensive way.  She filed several Inmate Requests seeking help for the bullying and intimidation but received no response to her requests.  The bullying continued at

Lowell C.I.

297.    The FDOC failed to give primary consideration to Ms. Boyette's request for interpreters.

298.    *Failure to Provide Effective Telecommunications Access.* Immediately upon her arrival to FWRC, Ms. Boyette requested to talk with her family by telephone.  Because she was told FDOC does not provide videophones, she asked to use the antiquated TTY. Ms. Boyette then began a 10 month quest to try to place a call to her family through a TTY.  But it never worked.  Throughout Ms. Boyette's 10-month incarceration, she never was never once able to communicate with her family through the TTY.

299.    Accessing the TTY was a multi layered problem created by the FDOC, and Ms. Boyette received conflicting responses as to why she could never call her family.  First, she was placed in dorms that did not have a TTY, and when that occurred she had to make requests to be transferred to a dorm with a TTY. This happened several times at both FWRC and Lowell.

300.    Ms. Boyette's mother began a calling and emailing campaign to receive a TTY call from her daughter.  Ms. Boyette's mother spoke to classification officers, assistant wardens and Securus representatives and was provided conflicting responses several times each month. In March and in May of 2015, Ms. Boyette's mother was told the phone list had not been approved.  In June 2015, Securus said the mother's account was working properly, but the FDOC said the list had not been approved.  In July, Ms. Boyette's mother was told by Classification they had not received the list but would contact her, and the assistant warden said she would check on it.  In August, the classification department told her they were still trying to get the TTY to work and they would assign Ms. Boyette a new pin number.

301.    Once Ms. Boyette was transferred to the Boot Camp on approximately August 20,

2015, she was told to bring the TTY with her because allegedly the TTY issues had been resolved.  However, when Ms. Boyette attempted to call her mother the TTY call would not go through.  FDOC thought the TTY was broken and obtained a new TTY. The new TTY was set up in approximately September 2015 and Ms. Boyette attempted again to call her mother. The TTY call would still not go through.

302.    FDOC was never able to correct the TTY issue. In lieu of providing her a videophone, the FDOC had an officer at the Boot Camp make a phone call for Ms. Boyette each Saturday to her family. To place the call, the officer would talk to her family, and then write down what the family was saying to Ms. Boyette    Then Ms. Boyette would write what she wanted to say to her family and the officer would vocalize her words into the telephone. This process did not constitute equitable and effective communications access.

303.    *Failure to Alert Prisoners with Hearing Disabilities*. Ms. Boyette has been excluded from other prison services and programs entirely due to her inability to hear the staff. For instance, other prisoners had to wake her up in the morning.  When other prisoners forgot to wake her, the guards would kick her bed which scared her and made her feel unsafe.  Ms. Boyette endured this intimidating wake up procedure at FWRC and Lowell.

304.    *Exclusion from Jobs and Programs*.  Ms. Boyette did not receive the mandatory sexual abuse orientation that is required by the Prison Rape Elimination Act (PREA).  Instead the FDOC provided her some sheets of paper with rules on them, but she did not fully understand the papers.

305.    Ms. Boyette was Court-ordered to attend Boot Camp, and at first the FDOC refused to allow her to attend, telling her that the FDOC does not allow deaf prisoners at the Boot Camp.  She became very upset and through the use of an inmate interpreter had to explain

why it was unfair to deny her the opportunity to try Boot Camp because of her deafness. Only upon her protests did the FDOC let Ms. Boyette attend Boot Camp, where she was able to successfully complete the program. She was told she was the first deaf woman to be allowed in Boot Camp.

### Prisoners with Mobility Impairments

#### *Dennis Waller*

306.    Dennis Waller is incarcerated in the FDOC system and was at all relevant times. Mr. Waller had back surgery in 2011 and has not been able to walk since then.  He has a physical impairment that substantially limits one or more major life activity, including but not limited to walking.  He uses a wheelchair for mobility.

307.    *Failure to Maintain Wheelchair Accessible Facilities.*  On November 14, 2013, Mr. Waller filed an informal grievance complaining that there are 15 wheelchairs in one dorm and not enough space to access all programs and services, such as watching television.  The grievance was denied.

308.    Mr. Waller has had difficulty using the shower facilities because there was only one handicapped shower at Mayo C.I., where he was housed.  There was also not sufficient room in the dining hall for all the inmates using wheelchairs, and the outdoor track is not paved, thus making it impossible to use it with a wheelchair and exercise.

309.    In January 2014, Mr. Waller filed a formal grievance at Mayo Annex, complaining that there were 12 wheelchairs in J2 Dorm and only one accessible shower, which did not have a handheld wand, thus making it inaccessible.

310.    *Failure to Provide and Maintain Wheelchairs and Assistants.*  Mr. Waller has had difficulty getting his wheelchair repaired and/or replaced.  On May 21, 2015, Mr. Waller asked

for his wheelchair to be fixed as it developed a problem with its wheels and bearings. Mr. Waller was told to "watch for callout." On July 24, 2015, he inquired again and was told the wheelchair was on backorder. On August 26, 2015, he asked again and was told it would take up to two weeks. FDOC finally issued Mr. Waller a new chair on Friday, September 24, 2015, nearly four months after his initial request.

311.    After he received his new wheelchair, Mr. Waller has seen the old broken ones out on the grounds being used by other inmates. He is able to verify that they are the same wheelchairs because he can identify them either by number or he recognizes the missing parts.

312.    On March 15, 2013, Mr. Waller filed an informal grievance complaining that he had never met the inmate who was supposedly assigned to push his wheelchair. Mr. Waller has continued to have difficulty securing such assistance throughout his incarceration. He has gone weeks and even months at a time without a "pusher." When this happens, Mr. Waller must get himself around the grounds of the prison and it is extremely difficult, often arriving late for meals and other activities or arriving drenched in sweat. If one pusher is no longer available, the process of requesting and securing a new one can take months.

313.    For example, Mr. Waller had a pusher at Mayo Correctional Institution but that individual was no longer available after being sent to confinement. On June 9, 2015, another prisoner requested to be Mr. Waller's pusher. FDOC responded, "You'll be reviewed." Mr. Waller inquired about the status on June 15, 2015, and FDOC responded that training would be scheduled. Mr. Waller inquired again and was informed, "I'm working on it." To date Mr. Waller still does not have a wheelchair pusher assigned to him.

314.    *Engaging in Retaliation and Interference.* Mr. Waller and the other prisoners who use wheelchairs have been subjected to unfair harassment that interferes with their equal

- 82 -

access to FDOC programs, services, and activities.  For instance, Officer Mossley has been telling the inmates that no one other than an assigned inmate is allowed to assist a wheelchair-user.  As a result, on October 21, 2015, there was no one available to assist Mr. Waller with getting to a medical appointment because his assigned assistant was in confinement, and Officer Mossley would not permit another inmate to assist Mr. Waller.  Mr. Waller filed an informal grievance about this on October 23, pointing out that it took three and a half months for his current assistant to be assigned, and he would rather not be harassed for several months waiting for a new one.

### *David Belle*

315.    David Belle is incarcerated in the FDOC system and was at all relevant times.  As a result of a birth defect, Mr. Belle is missing both feet and uses two artificial limbs. He can ambulate to some degree, but not for long periods of time, and for that reason he also uses a wheelchair for mobility. His right hand is missing most of the digits. His mobility issues substantially limit several major life activities, including but not limited to walking and caring for himself.  Mr. Belle has been designated as a mobility impaired inmate by the FDOC.  His disabilities are well documented in his medical and administrative records by FDOC.  FDOC has had full knowledge that Mr. Belle is disabled and requires accommodations.  Moreover, every day he wears a badge in the prison which says he is IMPAIRED, and uses prostheses or sits in a wheelchair.

316.    *Failure to Maintain Wheelchair Accessible Facilities.* Mr. Belle has been housed at a number of facilities including Gulf C.I., Mayo C.I. and Suwanee Annex.  Each facility has features that are inaccessible to wheelchair users.  At Suwannee C.I., there are ten inmates with disabilities who must share one handicapped accessible urinal, and one handicapped toilet stall.

This is not sufficient to accommodate the disabled inmates who require longer time for toileting. The one handicapped stall in the bathroom is often taken over by other prisoners without disabilities.  As a result the stall is constantly in use.  It is widely known that abled bodied inmates use the handicapped stall, but the FDOC fails to ensure that the toilets are available for the prisoners with mobility impairments.

317.    The showering facilities at Gulf C.I., Mayo C.I., and Suwanee C.I. are not accessible to Mr. Belle.  Mr. Belle is unable to bring his wheelchair into the shower, and cannot shower with his artificial limbs or they will be damaged.  Mr. Belle must jump out of his wheelchair and shower on the stall floor while balancing himself on his knees. This is degrading and humiliating for Mr. Belle.   Once Mr. Belle completes his shower he must jump back into his wheelchair while his body is still wet.  This has caused water damage to his wheelchair seat, and as a result his wheelchair has been replaced three times.  If Mr. Belle was afforded an accessible shower stall, with proper benches, wands, and accessible water control handles, this preventable wheelchair damage would not occur.

318.    The shower benches at the three facilities are insufficient in a number of ways. The benches are too far from the shower head to be able to use them while showering.  At Suwannee C.I. the bench is on a hinge, and Mr. Belle must physically push the bench out of the way so that he may shower on the stall floor on his knees.  The hinge does not lock, and if he makes any contact with the bench while showering it will fall and hit him on the head.  Similar bench barriers exist at Mayo and Gulf C.I.  Due to his missing digits and feet he can't balance himself on the bench to reach the water controls.  Therefore, at Gulf C.I., Mayo C.I., and Suwanee C.I., the only way Mr. Belle can reach the hot and cold water controls is when he is on his knees on the floor.  The shower wands at the three facilities are either of insufficient length or

not provided at all.  Mr. Belle has requested a shower wand at Suwannee, but it has not been provided.

319.    At Gulf C.I., Mayo C.I., and Suwanee C.I., Mr. Belle is not afforded any privacy when using the handicapped shower stall.  The stalls are in plain view of other inmates and the guards, and there is no privacy screen.  Mr. Belle tries to position his wheelchair or a laundry cart to block the view of others, including female guards, but sometimes the guards tell him to move the obstruction.  The abled bodied inmates are afforded the ability to shower behind a half wall which blocks the view of the lower half of their bodies.

320.    The dining halls at Gulf C.I., Mayo C.I. and Suwanee C.I. have insufficient seating for wheelchair users.  Inmates with disabilities must wait, often outside without cover, until a seat is available for their wheelchair.  Inmates with disabilities wait longer to eat than the abled bodied inmates.

321.    At Gulf C.I., Mayo C.I. and Suwanee C.I., Mr. Belle is excluded from activities on the yard. The facilities offer only a cement sidewalk to a pavilion, where the handicapped seats are limited. The walking track is made of dirt which prohibits inmates in wheelchairs from using it, or if used risk destroying their wheelchairs and tires.  The abled bodied inmates are allowed to enjoy basketball, volleyball and other activities, while the inmates in wheelchairs are limited to travel to and from the pavilion.  The pavilion has a checker table, but the FDOC fails to provide checkers.

322.    *Failure to Provide and Maintain Wheelchairs and Assistants.*  Although Mr. Belle has two prosthetic legs, he often must use a wheelchair to travel longer distances on the prison compounds, for call-outs, showering, or when going to the dining hall.  The wheelchair is needed at the dining hall because he must wait a long time in line to be seated, and due to his disability is

unable to stand for a long duration.

323.    When Mr. Bell was first incarcerated in 2014, he was sent to the Central Florida Reception Center in Orlando, Florida.  He arrived with his two prosthetic legs, and upon arrival requested a wheelchair.  FDOC told Mr. Belle he could either use his prosthesis or a wheelchair, but he could not have both.  Mr. Belle explained that he needs a wheelchair in addition to the prostheses because he cannot walk long distances, cannot stand for long period of times and when his body is tired it impacts the efficacy of the prostheses.  The wheelchair request was denied.

324.    On April, 24, 2014, the same day he arrived, instead of being provided a low bunk and low tier cell as he requested, he was placed on a top bunk on the second floor of the facility.  Later that same day Mr. Belle, fell down the stairs at the facility.  After this preventable injury, FDOC finally provided him a wheelchair, a low bunk, and a low tiered cell.  However, when Mr. Belle was transferred to Mayo C.I., they would not renew his wheelchair pass. Mr. Belle, with his documented disabilities in the FDOC records, needed to submit another request to obtain a wheelchair pass at Mayo C.I.

325.    Mr. Belle is now using his third FDOC issued wheelchair which has been repeatedly replaced due to damage while showering.   His current wheelchair is ripped on the seat and near the rods which provide support to the seat.  Mr. Belle requested a cushion for the seat to cover the tears and for support, but his request was denied.

326.    *Engaging in Retaliation or Interference.*   Mr. Belle has filed a number of grievances in an attempt to improve the conditions of his incarceration, and as a result has been threatened by FDOC staff.  While at Gulf, Warden Blackwood and the Assistant Warden told Mr. Belle if he did not stop filing grievances they would have someone in the compound "take

care of him."   The stress of having a disability while incarcerated caused Mr. Belle to lose 55 pounds since he entered prison a year and a half ago.

327.    Mr. Belle has been forced to sign "refusal forms," which in essence state that he has no ADA access issues pending.  Signing these forms was not optional.  In October or November of 2015, Mr. Belle, along with approximately 90 other wheelchair users were called for an ADA review meeting.  After waiting an hour in line, the majority of the impaired inmates just signed the refusal form because FDOC could not manage the crowd, and it is well known that these meetings do not rectify access issues.

### *Troy Cheeks*

328.    Troy Cheeks is incarcerated in the FDOC system and was at all relevant times. He is paraplegic, which substantially limits one or more major life activity, including but not limited to walking and caring for himself.  Mr. Cheeks uses a wheelchair for mobility.

329.    *Failure to Maintain Wheelchair Accessible Facilities.*   Mr. Cheeks has faced barriers throughout his incarceration due to his wheelchair use and FDOC's failure to comply with the ADA.  Mr. Cheeks was placed in confinement at Dade Correctional Institution on October 14, 2011 and the showers there were not ADA complaint.   Accordingly, he was permitted to shower in the medical department.  However, his first shower did not take place until the Friday after Thanksgiving, over a month later.  He was permitted to shower in the medical department several more times but was then met with resistance.  On December 19, 2011, Mr. Cheeks was taken to the medical department to receive treatment and a shower but the medical officer refused to assist him stating that she worked in medical and did not want Mr. Cheeks taking showers there.  It was not until Mr. Cheeks filed a grievance on January 2, 2012, that the issue was resolved.

330.    Mr. Cheeks faced barriers at other FDOC institutions as well.   In 2014, he reported that his unit at Mayo Correctional Institution was only equipped with one handicapped accessible bathroom with grab bars.  Mr. Cheeks has to wait when other prisoners are using the shower and has been harassed by the other prisoners when he tells them he needs to use it.  On several occasions, other prisoners have smeared feces on the toilet in retaliation.

331.    Another concern with the accessible bathrooms at Mayo Correctional Institution is that there is no privacy wall, forcing the inmates to be exposed to other inmates and guards when they shower.  This makes Mr. Cheeks extremely uncomfortable.  The institution informed Mr. Cheeks that they would remedy the problem, but as of September 2015, it had not been fixed.

332.    There are other areas of Mayo Correctional Institution that are not accessible to Mr. Cheeks and other inmates who use wheelchairs.  The dining hall, for example, does not have enough spaces for wheelchairs and there is not a place that Mr. Cheeks can exercise.  There is no exercise equipment he is able to use and the track is made of dirt, making it impossible to traverse in a wheelchair.   In addition, there is no accessible scale in the medical department.  Since Mr. Cheeks is unable to stand on the regular scale, he has not been weighed in over a year.

333.    *Failure to Provide and Maintain Wheelchairs and Assistants*.   Mr. Cheeks informed the responsible FDOC staff in January 2012 that his wheelchair would soon need new wheels.  The staff person informed Mr. Cheeks that she had never ordered such equipment.  Mr. Cheeks asked her to speak with another staff member familiar with such equipment.  The staff person did so and told Mr. Cheeks in February 2012 that the wheels would be ordered.  In May 2012, Mr. Cheeks still did not have his new wheels.  He filed a grievance and on May 31, 2012, FDOC approved the grievance and finally placed the order.

334.     Mr. Cheeks's wheelchair is customized for him and was his own chair prior to incarceration.   He is not able to use the standard institution issued wheelchairs as he is fully paraplegic and fears he will fall out.   In 2014, Mr. Cheeks began asking for a new wheelchair as his is about 10 years old.   Both brakes on Mr. Cheeks chair are broken, creating danger for Mr. Cheeks particularly when he transfers to and from his wheelchair. His requests for a replacement wheelchair suitable for his condition have been denied and to date, Mr. Cheeks does not have a new one.

### *Thomas Pekari*

335.     Thomas Pekari was incarcerated in the FDOC system at all relevant times.   He suffers from multiple injuries, including spinal fractures, which cause him severe pain and prevent him walking anything longer than very short distances.   The injuries substantially limit one or more of his major life activities, including but not limited to walking.   He requires the use of a wheelchair for moving more than very short distances.   He is also a military veteran.

336.     *Failure to Provide and Maintain Wheelchairs and Assistants.*   In June 2011, he submitted an informal grievance complaining that his wheelchair had been taken away.   In August, the response noted that they did not believe he needed a wheelchair or a wheelchair pusher.  By December 2011, his wheelchair was falling apart.   He filed a grievance asking for a replacement or permission to bring in his own.   The grievance was denied, saying wheelchairs do not fall within the FDOC's donation policy.

337.     In June 2012, he filed a grievance saying that his wheelchair, which had been approved by Dr. Colombani, was taken away.   He explained that although security claimed he could walk, he could only walk sometimes and needed the wheelchair.   It was denied, saying there was no indication for a wheelchair at this time.

338.    In January 2014, Mr. Pekari filed a formal grievance seeking a 20 inch wheelchair to fit him, noting that the 18 inch wheelchair is causing more damage to both knees and aggravating his shoulder injuries.  It was denied in February, but the denial said that a larger wheelchair had been ordered.

339.    During this period, the Department of Veteran's Affairs was willing to provide Mr. Pekari with his needed equipment at their expense, but the FDOC would still not allow it.

*Brian Follmer*

340.    Brian Follmer is incarcerated in the FDOC system and was at all relevant times. He has neuropathy (pain, weakness, and numbness) caused by a chronic illness which substantially limits one or more life activity, including but not limited to walking.  Mr. Follmer's condition is progressive in nature.  From 2007 to 2012, Mr. Follmer used a cane to assist with mobility and in 2013, FDOC provided him with a wheelchair and wheelchair assistant.

341.    *Failure to Provide and Maintain Wheelchairs and Assistants.* Mr. Follmer was transferred to Santa Rosa Correctional Institution in 2014 and placed in Close Management, a solitary confinement unit, at which point FDOC confiscated his wheelchair.   Mr. Follmer complained about the confiscation of his wheelchair at a prison ADA meeting and instead of being provided with his wheelchair, Mr. Follmer was simply removed from the ADA list at Santa Rosa from September of 2014 to April of 2015.

342.    On May 4, 2015, Mr. Follmer filed a grievance regarding his wheelchair.  Mr. Follmer claimed that his mobility has gotten worse since he has been made to use a walker rather than a wheelchair.  FDOC denied his grievance stating, "a review of your records suggests that a wheelchair is not needed at this time.  While you are a CM (Close Management) inmate, the walker you currently have is deemed to be adequate and appropriate for your use at this time."

Mr. Follmer made several additional attempts to get his wheelchair returned, all of which were denied.

343.    Without his wheelchair, Mr. Follmer has had difficulty gaining access to services and activities.  For example, on February 23, 2015, Mr. Follmer filed an informal grievance regarding an incident in the medical office.  Mr. Follmer was advised to stand on a scale.  He told the nurse that he would not be able to get an accurate weight since he was unable to stand without the walker and would need to put his weight on the walker for support.  Rather than accommodating Mr. Follmer, the nurse simply documented that Mr. Follmer refused to be weighed.  His grievance was denied stating, "Treatment was adequate and if want to be reevaluated sick call is available." Mr. Follmer appealed and his grievance was again denied.  A similar incident took place in May 2015 wherein Mr. Follmer was again not able to stand on the scale and a proper weight was not able to be obtained.  Due to the nature of Mr. Follmer's illness, maintaining a proper weight is an integral part of his treatment thereby making it essential to obtain.

344.    Mr. Follmer rarely leaves his housing unit because it is so difficult for him to ambulate.  This further exacerbates the consequences of the extreme isolation he has been put in.  In fact, Mr. Follmer reported that he has asked to be taken out of certain mental health groups because it is too difficult for him to get there.

*James Lunt*

345.    James Lunt is incarcerated in the FDOC system and was at all relevant times.  Mr. Lunt has Crohn's disease,[13] as well as lumbar and cervical degenerative disease as a result of a

---

[13] Crohn's disease is an inflammatory bowel disease which causes inflammation of the lining of the digestive tract that can lead to abdominal pain, severe diarrhea, fatigue, weight loss, and malnutrition.  Inflammation caused by Crohn's disease can involve different areas of the digestive tract in different people.  *See* http://www.mayoclinic.org/diseases-conditions/crohns-disease/basics/definition/con-20032061 (last visited January 19, 2016).

car accident prior to incarceration.  He can ambulate to some degree, but can only walk very short distances, and for that reason spends most of the day using a wheelchair.  His conditions substantially limit several major life activities, including but not limited to caring for oneself, performing manual tasks, eating, walking, standing, lifting, and bending.  Mr. Lunt has been designated as a mobility impaired inmate by the FDOC. His disabilities are well documented in his medical and administrative records by FDOC.  FDOC has had full knowledge that Mr. Lunt is disabled and requires accommodations.  Moreover, every day Mr. Lunt sits in a wheelchair.

346.    *Failure to Maintain Wheelchair Accessible Facilities.* When Mr. Lunt first arrived in Suwannee C.I., he was placed in a dorm which did not provide equitable access for inmates with disabilities.  For example, at Suwannee C.I. there is an insufficient number of handicapped accessible toilets.  The one handicapped stall in the bathroom is often taken over by other prisoners without disabilities.  As a result, the stall is constantly.  FDOC does not ensure that it is readily available for use by wheelchair users.

347.    The shower bench at Suwanee C.I. does not have a slip resistant pad; this causes the people using it to fall off the bench.  Moreover, the benches are too far away from the shower head, so that Mr. Lunt cannot use it.  He requested the shower head be extended, but that modification occurred in another dorm, and Mr. Lunt must use a cup to rinse off his body while showering.

348.    At Suwanee C.I., Mr. Lunt is not afforded any privacy when using the handicapped shower stall.  The stalls are in plain view of other inmates and the guards, and there is no privacy screen.  Mr. Lunt tries to move the trash barrel in front of the shower stall to block the view of others, but sometimes the guards tell him to move the barrel. The abled bodied inmates can shower behind a half wall which blocks the view of the lower half of their bodies.

Mr. Lunt grieved the lack of shower privacy in January 2015 and was told by FDOC that the showers are ADA compliant, and they have no obligation to provide him a privacy screen.

349.    The dining halls at Suwanee C.I. have insufficient seating for wheelchair users. Inmates with disabilities must wait, often outside without cover, until a seat is available for their wheelchair.   Inmates with disabilities wait longer to eat than the abled bodied inmates. In October 2013, Mr. Lunt sat at a non-wheelchair accessible table so that he could avoid the long wait the disabled inmates endure. He was berated by two officers for sitting where he did not belong. Mr. Lunt grieved the treatment, but it was denied.

350.    Mr. Lunt also grieved the insufficient number of wheelchair accessible tables in the dining hall in November 2013.  Although not all the wheelchair-using prisoners are sent to the dining hall at once, there are still approximately 70 inmates in wheelchairs, who must wait in line for the approximately 14 wheelchair accessible seats.  This results in a huge back up, which is exacerbated by inmates who have slow eating passes that require even more time to eat. Mr. Lunt must wheel himself to the dining hall, and because he moves slower than other inmates, there are already 15-20 wheelchair users in line once he arrives.  As a result, there have been times where he has been unable to finish his meal before the end of dining time because of the long time waiting for an accessible seat to become available.

351.    Due to Mr. Lunt's Crohn's disease, he has been granted an Early Chow and Slow Eat pass, he also has an order for a low residue/low soy diet.  Although these passes were awarded approximately 15 years ago, Suwanee will no longer honor the passes.  The FDOC tells Mr. Lunt "We are not making one special meal for you" and "If medical ordered something for you, then medical should pay for it too."

352.    At Suwanee C.I., Mr. Lunt is excluded from recreational activities on the yard.

The facilities offer only a cement sidewalk to a pavilion, where the handicapped seats are limited.  The walking track is made of dirt which prohibits inmates in wheelchairs from using it, or risk destroying their wheelchairs and tires.  The abled bodied inmates are allowed to enjoy a number of activities while the inmates in wheelchairs are limited to travel to and from the pavilion.

353.     Due to Mr. Lunt's Crohn's disease he must frequently use the restroom, and sometimes the need to use the restroom comes on quickly. The FDOC gave Mr. Lunt a pass for a single man/handicapped cell. However, at Martin C.I., Everglades C.I. and Suwanee C.I., his requests to be housed in a handicapped accessible cell were denied, or he was told he must wait until a handicapped cell is available for him.  He was at Suwanee C.I. for two years before he was given an accessible cell.

354.     While housed in the open dorm areas there was insufficient space for the 15 inmates using wheelchairs, and the hallways did not afford enough room for him to turn in his wheelchair.  These issues not only caused access issues but also safety concerns.  Moreover, the TV rooms at Suwannee are not large enough to accommodate the able bodied inmates and the 15 inmates using wheel chairs.  The inmates in wheelchairs are forced to sit in the back of the TV room, making it difficult or impossible to view or hear the small television.

355.     *Failure to Provide and Maintain Wheelchairs and Assistants.* Mr. Lunt requested an aid to help push his wheelchair so that he can navigate through prison in a timely way, and remain safe.   Although the FDOC granted his request, the aids are not properly trained or vetted. Mr. Lunt was assigned aids who tried to extort him.  To remove a particular aid, Mr. Lunt must relinquish his aid request, which results in unreasonable delays.

356.     *Engaging in Retaliation or Interference.* Mr. Lunt has filed a number of

grievances in an attempt to improve the conditions of his incarceration, and as a result has been threatened by FDOC staff.  On February 4, 2015, Captain Brennend threatened Mr. Lunt by telling him "I don't want to hear any more grievances, if I do you know what to expect."  In February 2015, Mr. Lunt's grievance documentation, attorney mail, medical records and other documents were confiscated as contraband.  Mr. Lunt immediately filed a request seeking the return of his documentation.   Even though FDOC rules require confiscated materials to be kept for at least 30 days, he was eventually told that his documents were destroyed.

357.   *Engaging in Retaliation and Interference*. Upon information and belief, after Plaintiff began investigating the violations within the FDOC, the FDOC started conducting ADA review meetings.  Mr. Lunt has attended some of them; however, the meetings do not result in a resolution of ADA issues.  Moreover, inmates are required to sign "refusal" forms, ostensibly affirming that they have no ADA issues.  Signing the form is not optional, whether inmates have ADA issues or not.

### Nick Molfetto

358.   Nick Molfetto is incarcerated in the FDOC system and was at all relevant times. He has degenerative disc disease, diabetes, and his right and left legs are different lengths. Although Mr. Molfetto can stand and walk to some degree, he requires braces and a wheelchair to move through the prison safely.  Due to his size, Mr. Molfetto uses a large wheelchair which is 20 inches wide, which creates more problems for him in the FDOC facilities.  His conditions substantially limit several major life activities, including but not limited to walking, standing, lifting, and bending.  Mr. Molfetto has been designated as a mobility impaired inmate by the FDOC. His disabilities are well documented in his medical and administrative records by FDOC, therefore FDOC has had full knowledge that Mr. Molfetto has a disability.  Moreover, every day

he sits in a wheelchair.

359.    *Failure to Maintain Wheelchair Accessible Facilities.* Mr. Molfetto is currently housed at Columbia C.I., and has been at that facility for approximately two years.   He is currently housed in the P-1 Dorm.   At Columbia C.I. there are 15 disabled inmates who must share one handicapped accessible urinal, and one handicapped toilet stall. The handicapped accessible urinal was broken for approximately two years, and was just repaired in December 2015. There is not sufficient toileting accommodations for the inmates with disabilities who require longer time for toileting, which forces others to wait a long time to use the toilet.

360.    The showering facilities at Columbia C.I. are not accessible to Mr. Molfetto because there are not sufficient grab bars.   The handicapped shower stall is filthy, and there is mold on the shower walls.   He will not use the handicapped accessible shower stall for this reason and instead showers in the non-accessible shower stall and holds himself up by using the wall.

361.    At Columbia C.I., if you want to use a shower wand, you must go to the officer's booth and sign it out.   Carrying a wand while moving in a wheel chair is not easy, and cannot be performed by some disabled inmates.   Columbia C.I. also allows disabled inmates to sign out a plastic privacy screen which can be used to block the view of the shower stall. However, this screen must also be signed out and many inmates in wheelchairs cannot drag the screen into the bathroom because it is approximately 4 feet long and 5 feet high.

362.    Except during breakfast, the dining halls at Columbia C.I. have insufficient seating for wheelchair users.   Inmates with disabilities must wait, often outside without cover, until a seat is available for their wheelchair.   Inmates with disabilities wait longer to eat than the abled bodied inmates. In approximately July 2015, Mr. Molfetto filed a grievance about being

forced to wait outside, but has not yet received a response.  Some of the handicapped accessible

tables in the dining hall are located in an area that causes Mr. Molfetto to block the beverage

machine if he eats there.  If this occurs the guards will yell at Mr. Molfetto to move while he is

eating.  The guards also yell at the disabled inmates to "hurry up," "get out," and tells them they

are "sitting too long."  They yell because they need the handicapped accessible seats to be freed

up for use by other prisoners using wheelchairs.

363.    There is insufficient aisle width in P-1 Dorm in between the beds for Mr. Molfetto

to turn his wheelchair.  This barrier impacts Mr. Molfetto's ability to move throughout the dorm,

and affects his ability to leave the area in case of an emergency.

364.    At Columbia C.I. Mr. Molfetto is excluded from activities on the yard.  The

facility offers only a cement sidewalk to a pavilion, where the handicapped seats are limited.

The able-bodied inmates are allowed to enjoy basketball and flag football, while the inmates in

wheelchairs are limited to travel to and from the pavilion.  Mr. Molfetto can walk around the

track holding a cane or his wheelchair, but cannot access any other activity.

365.    The FDOC refuses or delays transfers of inmates to facilities closer to their

families because they have disabilities.  In 2013, Mr. Molfetto was transferred from a facility

close to Tampa (where his family lives) to Columbia C.I.  Upon information and belief, he was

transferred because he uses a wheelchair.  Mr. Molfetto requested a transfer from Columbia C.I.

to a facility closer to Tampa, but at least 15 months have passed and he still has received no

transfer.  He was told the delay was because he uses a wheelchair.

366.    In 2012, Mr. Molfetto was fitted for $10,000 customized bilateral metal braces for

his legs. The braces support his knees and helped him walk longer, and more safely. When he

was transferred from RMC to Florida State Prison in 2013, the FDOC took away these

customized braces and destroyed them, claiming they could be used as weapons.  Mr. Molfetto grieved the removal and destruction of the braces and was told because they were made of metal he could not keep the braces.

### Richard Jackson

367.     Richard Jackson is incarcerated in the FDOC system and was at all relevant times. He has paraparesis, a condition that causes paralysis of the lower limbs.   The condition substantially limits one or more major life activity, including but not limited to walking, caring for himself, standing, performing manual tasks, working, and using the bathroom.  He requires a wheelchair for mobility.

368.     *Failure to Provide and Maintain Wheelchairs and Assistants.*  Mr. Jackson has used a wheelchair for mobility since he entered the FDOC system in 1993.  When Mr. Jackson was moved to Santa Rosa Correctional Institution in October 2012, he was put in close management (CM), a form of solitary confinement.    FDOC permits medical personnel to disallow accommodations such as wheelchairs that have already been deemed necessary by other staff.

369.     This policy was applied to Mr. Jackson.  Although prison officials had deemed a wheelchair necessary and permitted Mr. Jackson to have and use one at other facilities and at Santa Rosa C.I. outside his cell, FDOC's policy permitted Santa Rosa C.I. officials to take away Mr. Jackson's wheelchair while inside his CM cell.

370.     From October 2012 through December 2013, Mr. Jackson was not permitted to have his wheelchair in his CM cell.  He was forced to drag himself across the dirty and abrasive cell floor, where it was very difficult to transfer to the bed, toilet, and wash basin.  Because he was on CM, he was confined alone to his cell for 24 hours per day, 7 days per week, except that

he was permitted to leave his cell for one hour, three times per week.

371.    In April 2013, Mr. Jackson filed a *pro se* lawsuit complaining of these degrading conditions.

372.    In December 2013, Mr. Jackson was transferred to Northwest Florida Reception Center.  He was promptly physically assaulted by a guard who had been instructed to do so by a defendants named in Mr. Jackson's *pro se* lawsuit.  This was done as retaliation for asserting his rights under the ADA, Rehabilitation Act, and Eighth Amendment.

373.    Mr. Jackson's *pro se* lawsuit was dismissed, and then re-filed with counsel in October 2014.  The case was eventually settled in April 2015 for substantial damages and attorneys' fees.

### Christopher Villanueva

374.    The FDOC does not permit some prisoners to have medically necessary prosthetic devices.  Christopher Villanueva is incarcerated in the FDOC system and was at all relevant times.  As a result of an ATV accident and resulting infection, Mr. Villanueva's left leg was amputated below the knee.  That condition substantially limits one or more major life activity, including but not limited to walking.   Since 1993, he used a titanium and carbon fiber prosthesis for mobility.

375.    Mr. Villanueva was first incarcerated in the FDOC from 2000 to 2005. During that time, he had his prosthesis and was permitted to use it without any security incidents whatsoever.  The prosthesis enabled Mr. Villanueva to access FDOC programs, services, and activities in substantially the same way as the other prisoners without disabilities.  Further, using the prosthesis enabled him to use the muscles in his left leg, which prevented atrophy and ensured that the prosthesis would continue to fit properly.

376.   Mr. Villanueva returned to the custody of the FDOC in March of 2012.   During his intake process at RMC, his prosthesis was taken away from him without consultation with medical staff.   Mr. Villanueva immediately began to file grievances requesting the return of his prosthesis, but they were all denied.

377.   Mr. Villanueva was forced to live without his prosthesis for nearly two years.   It was only returned to him after Mr. Villanueva's attorney began investigating.   However, as a result of not having the prosthesis, his leg and entire left side of his body atrophied, and he lost substantial range of motion in his knee.   He also could not immediately use the prosthesis because it caused blistering on his leg from lack of use, and needed physical therapy to be able to use it in the same way that he did before.

378.   Mr. Villanueva filed a lawsuit against the FDOC over this mistreatment.   The case settled for substantial damages and attorneys' fees.

### Richard Tasker

379.   Richard Tasker is incarcerated in the FDOC system and was at all relevant times. He was in a motorcycle accident in 1973 that crushed his vertebrae, resulting in chronic cervical, thoracic, and lumbar pain which impedes his mobility.   Mr. Tasker's left leg was amputated in 2000 while in FDOC custody.   He uses a leg prosthesis and a wheelchair for limited mobility, and requires special shoes.   His mobility issues substantially limit several major life activities, including but not limited walking and caring for himself.   Mr. Tasker has been designated as a mobility impaired inmate by the FDOC.

380.   *Failure to Provide and Maintain Wheelchairs and Assistants*.   For approximately eight years, Mr. Tasker used a 22 inch manual wheelchair which he purchased for himself. The wheelchair had a support cushion which was prescribed by an FDOC physician, and Mr. Tasker

had used this chair to travel through prisons compounds.  It was an 8 year old chair and was worn but worked well for Mr. Tasker.

381.    In February 2014, his wheelchair was confiscated at Santa Rosa C.I. because it had a tear in the cushion and a split on the back of the seat. FDOC staff ripped the cushion and the back of the wheelchair searching for contraband. No contraband was found. After confiscating and destroying the wheelchair, the FDOC provided Mr. Tasker with a semi-operable, 18 inch wheelchair without a cushion. The wheelchair was too small for him, and the absence of the cushion further aggravated his documented back and leg pain.  He grieved the confiscation and destruction of his wheelchair, and his grievance was denied.

382.    One year later, in approximately February 2015, Mr. Tasker again grieved the confiscation of his wheelchair and asked for the chair back.  The wheelchair was eventually given back to him, but most of the parts that were on the wheelchair before it was confiscated had been removed and replaced with inferior parts from other wheelchairs. Mr. Tasker is now using an FDOC issued wheel chair that is too big, has no cushion, and does not allow him to move himself easily with his one leg.

383.    Mr. Tasker's records show a history of him grieving, requesting, and appealing the failure to provide auxiliary aids to assist with his mobility impairments.  Mr. Tasker has one leg, and uses a wheelchair for mobility.  To move his wheelchair he relies on his one leg for momentum, causing him to move slowly, and limiting the distance he can travel without resting. The prison compounds are large, and inmates are required to arrive at certain buildings at designated times or face reprimand.  Mr. Tasker has endured a great deal of emotional stress trying to adhere to time schedules because he is physically unable to arrive at certain locations as required.  Mr. Tasker's records reflect he has requested both a wheelchair pusher and or an aid

approximately 4 times since March 2014.  When an aid is provided, they are not properly vetted for the assignment; other times they are denied.

384.    In 2012, Mr. Tasker filed at least two grievances concerning his pusher, who wasn't doing his job for years and threatened to assault him.

385.    On November 8, 2014, he grieved the absence of a wheelchair pusher and explained the difficulty he had pushing himself, especially when handcuffed.  FDOC responded by falsely telling Mr. Tasker that he had been pushed by staff.  Mr. Tasker was not pushed by staff.  When Mr. Tasker does receive a wheelchair pusher, the help is inconsistent.  And if he is transferred, FDOC fails to ensure that he has a pusher at his new institution, requiring Mr. Tasker to grieve the absence of a wheelchair pusher all over again.

386.    *Failure to Maintain Wheelchair Accessible Facilities.* Mr. Tasker also has experienced a number of structural barriers that have impeded his access at several prisons.  These barriers are exacerbated by his ongoing issues with maintaining his leg prosthesis.  He currently has his prosthesis, which he was told cost thousands of dollars to make, but the FDOC has failed to provide him with the $100 shoes needed to use it.  As a result, he is unable to use the prosthesis.  His prosthesis allows him to stand erect and walk for up to one hour, and when properly medicated he can stand for almost half the day.

387.    Mr. Tasker has also been housed in dorms and cells that are not wheelchair accessible.

388.    In October 2013, Mr. Tasker filed grievances at Mayo C.I. because the cells in the newer buildings were not wide enough to accommodate his wheelchair. FDOC then moved him to another dorm which was worse.  The second dorm did not have the required wheelchair clearance to allow him to safely get in and out of the area.

389.    Mr. Tasker has also experienced ongoing access barriers in the bathrooms at several correctional facilities including RMC, Mayo, and Franklin. Mr. Tasker has one leg, and to safely and efficiently use the shower he must be able to get himself out of his wheelchair and then temporarily stand on his one leg, or sit on a shower bench.  Often the shower benches are broken or placed too far away from the water source so that if he sits on the bench he cannot position under the shower head.

390.    At Franklin, RMC, CFRC, and Tomoka C.I., the shower wand hose is too short to be used.  At Mayo C.I. there was no shower wand. Without appropriate benches or wands, Mr. Tasker is forced to stand on his one leg while showering, which is not safe. At Franklin and Tomoka C.I., instead of having grab bars, the shower stall is equipped with a grab rail which fills with water, making it unsanitary and unsafe.

391.    At Franklin, Tomoka, and Mayo, Mr. Tasker was not afforded any privacy when using the handicapped shower stall. The stalls are in plain view of other inmates and the guards, and there is no privacy screen. While showering, Mr. Tasker tries to position his wheelchair to block the view of others, but sometimes the guards tell him to move the wheelchair. The prisoners without mobility impairments are afforded the ability to shower behind a half wall which blocks the view of the lower half of their bodies.

392.    In Mr. Tasker's dorm at RMC, there are no handicapped shower stalls. This has forced Mr. Tasker to wheel himself into the main shower area to a location which he can fit his wheelchair.   But the main shower area is not equipped with the proper grab bars or accommodations.

393.    At Franklin and Tomoka C.I., Mr. Tasker is excluded from activities on the yard. The facilities offer only a cement sidewalk to a pavilion, where the handicapped seats are

limited.  The walking track is made from dirt and cannot be used with a wheelchair.  The abled bodied inmates are allowed to enjoy football, hand weights and other activities, while the inmates in wheelchairs are limited to travel to and from the pavilion.  Mr. Tasker requested a chess set be provided for the pavilion, but that request was denied

394.   The dining halls at Tomoka, Franklin, Mayo and Santa Rosa have insufficient seating for wheelchair users.  Inmates with disabilities must wait, often outside without cover, until a seat is available for their wheelchair.  Some of the wheelchair accessible tables are located in areas which block access for abled bodied inmates to beverage areas or trash receptacles.  Officers yell at the inmates using wheelchairs to move out of the way while they are eating.  Due to the fact that Mr. Tasker can't hear the commands, he is sometimes approached by the officers and berated for ignoring their commands.

### Prisoners Who Are Blind or Have Low Vision

#### *Earvin Ealy*

395.   Earvin Ealy is incarcerated in the FDOC system and was at all relevant times.  He is legally blind which substantially limits several major life activities, including but not limited to seeing.  Mr. Ealy became blind later in life, when he was 36 years old, and has not been trained to read Braille.  Mr. Ealy has been designated as an impaired inmate by the FDOC, and his vision loss is well documented in his medical and administrative records by FDOC.  Therefore, FDOC has had full knowledge that Mr. Ealy is blind and requires accommodations.  Moreover he wears a badge every day in the prison which says he is BLIND.

396.   *Failure to Provide Auxiliary Aids and Services.*  Mr. Early has been repeatedly denied auxiliary aids and services that have precluded him from accessing numerous FDOC programs, services, and activities.  For example, FDOC law libraries have printed books and

offer electronic computer research.  Mr.  Ealy cannot read printed text, and the law libraries at his institutions are not equipped with speech-to-text software or other accommodations that allow computer text to be read out loud.  Therefore, Mr. Ealy cannot independently access the law library as other inmates can.

397.    Mr. Ealy wanted to use the law library to assist in understanding his rights as a blind prisoner, and assist in the prosecution of his civil cases.  Because he was not able to access the law library independently, Mr. Ealy could not meaningfully assist with his cases or independently represent himself in civil cases filed to protect his federal rights. Due to these barriers, Mr. Ealy had to pay aids to draft and read printed material for him, and some of the aids did not possess the required literacy to effectively assist him.

398.    In 2012, Mr. Ealy requested a text-to-speech wand which can be used to scan a printed word and read it out loud to him. That request was denied, and no alternate accommodation was provided.  Unable to access printed text in the library and in his personal letters, Mr. Ealy requested an aid[14] who could sit with him, read legal research off the computer, and read and write for him.  At times, Readers were provided, but often they were ineffective. At Gulf C.I. and Columbia C.I., his requests for a Reader were either denied, or they were only provided after he grieved their absence. When the Readers were provided, they were often unwilling or unable to fulfill the role of an accommodation for Mr. Ealy.  Sometimes they would begin their task, but then leave early, leaving Mr. Ealy stranded in the library.  In 2014, for example, a Reader was assigned to Mr. Ealy who did not fully speak English, and did not possess the reading competency required to relay the content of the legal information on the computer.

---

[14] Mr. Ealy used the term aid in his Reasonable Modification or Accommodation Requests and grievances because he was seeking an accommodation that could both assist in accessing printed material (reading and writing it), and assist him in other ways. Mr. Ealy was essentially seeking a Qualified Reader.  *See* 28 C.F.R. § 35.104.  Inherent in the role of a Reader is the concurrent service of a Scrivener, who takes notes and writes for others.

399.    Oftentimes the assigned Readers demand some form of payment from Mr. Ealy, such as money, items from the commissary, food from his tray, or other favors.  Sometimes, the other prisoners take the payment without providing the assistance.  Moreover, when Mr. Ealy is in confinement, his ability to access printed materials becomes even more tenuous, because aids are not allowed to stay with Mr. Ealy while confined.

400.    Mr. Ealy filed several grievances about his lack of access to printed material and computer based information, however the FDOC has failed to accommodate him.

401.    The FDOC has also failed to ensure that prisoners with visual disabilities can access the grievance system.  Although there is a written policy allowing verbal requests, they are not accepted in practice.  Mr. Ealy has asked to submit requests and complaints verbally and was told verbal requests are prohibited.  Similarly, to request disability-related accommodations, Mr. Ealy has been told he must submit a written Reasonable Modification or Accommodation Request form because verbal requests are prohibited.  Mr. Ealy thus has no way to access the grievance system privately and independently, as other sighted inmates can.

402.    Thus, to use the grievance system, Mr. Ealy has been forced to rely on other prisoners. This assistance has not always been free; other prisoners have demanded payment in the form of money, food, canteen items, or other favors.  The other inmates do not always fill out the forms correctly, and are not always available.  This caused great stress to Mr. Ealy and caused him to miss grievance deadlines since 2007.

403.    Moreover, the FDOC requires prisoners to sign various forms during their incarceration, such as medical consent and authorization documents.  These forms are only available in printed text, which prevents Mr. Ealy from having independent access to his medical information and the ability to understand medical consents prior to execution.  Prisoners like Mr.

Ealy are required most of the time to sign forms immediately in a staff member's presence, which affords Mr. Ealy no time to have someone explain the content of the form to him. Thus, throughout his incarceration, Mr. Ealy has refused to sign medical forms and consent forms because he is unable to understand their content.

404. Moreover, other sighted prisoners can access recreational books and newspapers. This material is provided to the inmates only through printed text. Prisoners with visual disabilities like Mr. Ealy cannot access these materials.

405. From 2007 to 2013, Mr. Ealy had a digital audio player used to listen to audio books. During that period, he was allowed to write to the Bureau of Blind Services who provided catalogs of audio materials that Mr. Ealy used to select permissible books to hear. During this period, he was also allowed to receive audio books from his family. In January 2014, however, while at Gulf C.I., his audio player was taken from him, because the FDOC alleged that his family had somehow violated a rule for selecting audio books. The confiscation of the audio player was a surprise to Mr. Ealy because his family had been using the same process to order audio books for some time, and was not advised the process was prohibited. The audio player has not been returned, and his family has been prohibited from sending more audio books. Mr. Ealy filed a grievance about it in February 2014, but it was denied.

406. The FDOC has also failed to ensure that prison facilities are structurally accessible to Mr. Ealy. Throughout his incarceration, Mr. Ealy has requested to be housed in a two-person cell that accommodates his vison loss. At Columbia C.I., where he is currently housed, and at Gulf C.I., where he was before, those requests were denied. Mr. Ealy has instead been housed in an open bay dorm,[15] at times with an inmate aid. However, his aid's bunk is far

---

[15] An open bay dorm is one in which the prisoners do not sleep in cells. Rather, they sleep in multiple bunk beds that are set up in the middle of the dorm, and are generally free to move about the dorm, with some restrictions.

from Mr. Ealy's, and thus it is difficult for Mr. Ealy to get assistance when needed. For example, Mr. Ealy is unable to use the restroom at night, because it would be unsafe for him to call out for his aid.

407.    In a two person cell, Mr. Ealy can independently and safely get in and out of his bed, use the restroom, and access his locker. All of Mr. Ealy's grievances and requests asking to be put in a two person cell in 2014 and 2015 were denied.

408.    Due to the size of the prison compounds where Mr. Ealy has been incarcerated, he has also requested an aid to help him navigate through the buildings in a timely way. At times Mr. Ealy was provided an aid, but the aids would refuse to assist him or fail to appear when needed. At other times he was denied an aid completely.

409.    Due to FDOC's failure to provide Mr. Ealy with an effective aid, Mr. Ealy has missed meal calls in 2014 and 2015 because he was unable to independently get to the dining hall on time.

410.    In March 2014, Mr. Ealy was left behind during a fire drill because his aid failed to retrieve him.

411.    The FDOC has failed to give primary consideration to Mr. Ealy's requests.

412.    *Exclusion from Jobs and Programs.* Mr. Ealy is eligible for both a faith based dorm placement and work release, but has been denied such opportunities because of his blindness. In 2015, he was denied after being told there were not enough "ADA rooms" for him.

413.    *Engaging in Retaliation or Interference.* Mr. Ealy is known as a "writ writer." This is a pejorative term the FDOC uses to describe prisoners who attempt to improve the conditions of their incarceration with the established grievance system and filing lawsuits. At Gulf C.I., Okeechobee C.I., and Dade C.I., he has been given false DRs and unjustly put in

confinement because he frequently complains about the lack of disability accommodations. At Gulf C.I., Mr. Ealy was threatened by the assistant warden not to go over his head with grievances or there would be trouble. FDOC staff have told him similar things at other institutions.

### *Charles Grossman*

414.    Charles Grossman is incarcerated in the FDOC system and was at all relevant times. He is blind, which substantially limits one or more major life activity, including but not limited to seeing. Mr. Grossman has a rare condition which caused retinal detachment in both eyes and he has undergone numerous complex surgeries. He is completely blind in the right eye and can only see shadows with the left.

415.    *Failure to Provide Auxiliary Aids and Services*. Mr. Grossman utilizes various assistive devices to accommodate his disability. FDOC has provided some, but not all, of these accommodations. However, FDOC has failed to ensure that they are provided consistently. On June 19, 2013, Mr. Grossman submitted a request to Nurse Lytle at Gulf Correctional Institution Annex stating, "As an impaired inmate I am instructed to talk to you monthly regarding my conditions that prohibit me from functioning as an inmate without any physical challenges. This has not been done since I returned from Lake Butler in January. I have been down in the Gulf 19 months and the only thing I have received is a tap stick and key lock."[16]   Even these devices were taken from Grossman at Reception Medical Center and only the white cane was replaced. FDOC responded on June 26, 2013, and stated that Mr. Grossman's concerns were addressed and that he would be seen again in 30 days.

---

[16] A tap stick or white cane is a long rod-like device used by blind or visually impaired travelers to give them infor-mation about the environment they are traveling through. Using a cane can warn them of obstacles in their path, tell them of stairs they are coming to, warn them that they are coming up to a curb, and tell them of many other things in the environment that they must deal with. The cane also alerts others around them that they are blind. *See, e.g.,* Na-tional Federation for the Blind, https://nfb.org/free-cane-program (last visited January 7, 2016).

416.    Mr. Grossman's concerns were not in fact addressed. On July 10, 2013, Mr. Grossman appealed and claimed that FDOC has failed to provide the "necessary equipment which would allow me to function as a normal inmate."  Mr. Grossman alleged that he has not yet received any responses to his requests for the following: a key lock pass, books on tape, a watch for the blind, and a controlled environment with a voice recorder so he may dictate his letters. This grievance was returned.

417.    FDOC occasionally uses inmate assistants to assist other inmates with disabilities, yet fails to ensure that they and FDOC staff are carrying out their duties effectively and safely. For example, on October 19, 2012, Mr. Grossman had to be seen in the FDOC Emergency Room because he walked into a shelf and hit his head while being guided by another inmate.

418.    On July 15, 2013, Mr. Grossman filed a grievance against two officers at Gulf Correctional Institution who put him in harm's way.  Classification Officer Young kept saying that Mr. Grossman could see, and Officer Cutchen made Mr. Grossman walk on a yellow line with his assistant behind him.  The assistant cannot guide him from behind.   This grievance was returned since Mr. Grossman did not provide a copy of the formal grievance.

419.    In August 2013, Mr. Grossman was transferred temporarily to Reception and Medical Center for care.  Officer Moore on the West Unit would not allow Mr. Grossman's volunteer assistant to help him with his tray.  FDOC informed Mr. Grossman that the West unit "does not have orderlies that are trained to assist with special needs inmates."

420.    Mr. Grossman has continued to have trouble securing an impaired inmate assistant at his current institution, Franklin Correctional Institution.  He arrived at Franklin in November 2014.  Since then, Mr. Grossman has had more than five different assistants.  The assistants were either released, transferred to a different prison, sent to solitary confinement or

refused to actually assist Mr. Grossman.  Between each assistant, Mr. Grossman was forced to get around the grounds on his own or rely on the kindness of other inmates to help him, many of whom refused to assist him.  Earlier in 2015 at Franklin Correctional Institution, Mr. Grossman put his hand on another inmate's shoulder and asked to be guided to the dining hall.  The other inmate yelled at Mr. Grossman stating, "Get your hands off me."

421.    To date, Mr. Grossman is still not receiving the other accommodations that he needs.  In fact, his tap stick had broken – one third of the cane had broken off of the bottom, rendering it almost useless to Mr. Grossman and posing a safety risk.  It was not until Mr. Grossman enlisted outside intervention was his tap stick was replaced in November 2015.

422.    The law library is not accessible to Mr. Grossman.  On June 5, 2015, Mr. Grossman filed a grievance (written by another inmate) asking that Franklin Correctional Institution "accommodate the library with a recording device/cassette in order for me [Grossman] to have equal effective communication with my lawyer."  His grievance was returned on June 18, 2015 and Mr. Grossman was instructed to file a Reasonable Modification or Accommodation Request and that, "[y]ou will be put on the call out for classification to assist you is completing this form."  Several months passed, and Mr. Grossman had not been called out, had not been given the form and reported that he did not even know who his classification officer is.   Finally, in November 2015, Mr. Grossman's classification officer assisted him with the form and Mr. Grossman is awaiting FDOC's response.   The law library is still not accessible to Mr. Grossman.

423.    The FDOC failed to give primary consideration to Mr. Grossman's requests.

*Kenneth Lamkin*

424.    Kenneth Lamkin is incarcerated in the FDOC system and was at all relevant

times. He has the progressive disease macular degeneration, which substantially limits one or more major life activity, including but not limited to seeing.

425.   *Failure to Provide Auxiliary Aids and Services.*  At the end of January 2012, Mr. Lamkin was struck in the face and injured by another prisoner.  He was then transferred to Mayo Correctional Institution for his protection in February 2012.   At Mayo, Mr. Lamkin requested an impaired inmate assistant to help him with his daily activities.  He submitted a request to that effect on July 12, 2012.   FDOC denied his request, telling Mr. Lamkin that he does not need an assistant and that "You [Lamkin] can use orderlies in the library to assist you with reading and writing. You are able to go to bathroom & lunch on your own." Mr. Lamkin appealed and his request was again denied.

426.   On November 15, 2012, Mr. Lamkin again inquired about obtaining an impaired inmate assistant and asked for clarification on the procedure.  He was told that, "Mayo doesn't have the job code for assistants and your medical passes shows you don't need an assistant."

427.   At Mayo Correctional Institution, Mr. Lamkin has had a difficult time securing the accommodations that had been granted at his previous institution such as a tape recorder and his cane with a red tip.  Additionally, his glasses were broken during the attack.

428.   On September 17, 2013, Mr. Lamkin requested that he be provided a cane that has the red tip which identifies him as a person with a visual disability.  This request was denied citing security as the reason.  Mr. Lamkin appealed and further elaborated on the safety concerns. The cane he was given is not for blind or visually impaired individuals and Mr. Lamkin can easily step out of line or veer off when walking.  On October 29, 2013, FDOC again denied his request.  Mr. Lamkin appealed to the FDOC Secretary and his grievance was returned.

429.   Mr. Lamkin submitted a Reasonable Modification or Accommodation Request on

September 17, 2014, again requesting a proper cane with a red tip that would indicate that he is blind.  Mr. Lamkin was continuing to get bumped by security staff and other prisoners. On October 10, 2014, his request was again denied.

430.    In February 2015, Mr. Lamkin continued to seek the accommodations he had at his previous institution, specifically a proper collapsible red tip cane and the prescription tinted glasses which were broken during a January 29, 2012 assault at Tomoka.  FDOC denied his requests.  Mr. Lamkin was told that there was no medical reason for such a cane.  With respect to the glasses, even though they were destroyed through no fault of Mr. Lamkin's, he was told that he can buy sunglasses at the canteen.  These would not be prescription and would of course be at his own expense.  Mr. Lamkin has been at Mayo nearly four years and still has not received the proper glasses and cane.  Forcing him to pay for such an accommodation operates as an illegal surcharge.

431.    The FDOC failed to give primary consideration to Mr. Lamkin's requests.

### *FDOC's Failure to Permit DOJ to Conduct Disability Investigation*

432.    In addition to its widespread failure to comply with laws protecting prisoners with disabilities, the FDOC has also obstructed attempts by the U.S. Department of Justice (DOJ) to investigate FDOC's noncompliance with disability laws.

433.    In exchange for the FDOC's acceptance of federal financial assistance, FDOC is required to comply with Section 504 of the Rehabilitation Act (RA), and to permit DOJ to inspect its records and facilities to ascertain compliance.

434.    In early 2013, DOJ's Civil Rights Division began to receive complaints of FDOC's noncompliance with the RA and its implementing regulations.  On June 26, 2013, the DOJ sent a letter to FDOC notifying it that DOJ was conducting a compliance review to

determine whether FDOC was complying with its RA obligations at Tomoka Correctional Institution.

435.    The FDOC responded in September 2013, notifying DOJ that it would not consent to any on-site inspections of its facilities, and advising that all interview requests would be handled under the FDOC's "Special Visit" rule and would be coordinated through FDOC. The DOJ responded in November 2013, providing the DOJ's legal authority to conduct on-site inspections, and again requesting to conduct such inspections.

436.    The FDOC ignored the DOJ's request for nearly two years, despite DOJ making several attempts to contact FDOC to schedule the visits.  On June 16, 2015, DOJ sent a findings letter to FDOC, notifying FDOC that it was in noncompliance with its obligations to cooperate with the DOJ's compliance review, and threatening litigation.

437.    As of the filing of this Complaint, the FDOC has still not permitted DOJ to conduct on-site inspections of its facilities, and still has not complied with its obligations under the RA.

## COUNT 1
## Americans with Disabilities Act

438.    This count is brought under Title II of the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101, et seq. & 42 U.S.C. § 12131, *et seq.*, and its implementing regulations.

439.    Defendant is a public entity.  42 U.S.C. § 12131(1).

440.    All individuals mentioned herein who are or were in FDOC custody are qualified individuals with a disability.  42 U.S.C. §§ 12131(2) & 12101(1).

441.    Defendant has a pattern and practice of excluding qualified individuals with disabilities from participation in, and denying those individuals the benefits of services,

programs, and activities, by reason of those disabilities.  42 U.S.C. § 12132.

442.    Defendant has a pattern and practice of subjecting qualified individuals with disabilities to discrimination.  42 U.S.C. § 12132.

443.    Defendant has a pattern and practice of discriminating against prisoners because they have opposed acts and practices made unlawful by the ADA, or because they have made charges, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing related to disability rights.  42 U.S.C. § 12203(a); 28 C.F.R. § 35.134(a).

444.    Defendant has a pattern and practice of coercing, intimidating, threatening, and/or interfering with prisoners' exercise or enjoyment of their ADA rights, and doing so because prisoners have exercised or enjoyed their ADA rights or aided and encouraged others to do so. 42 U.S.C. § 12203(b); 28 C.F.R. § 35.134(b).

445.    Defendant fails to provide qualified individuals with disabilities with equal access and enjoyment of aids, services, and benefits.  28 C.F.R. § 35.130(b)(1).

446.    Defendant denies qualified individuals with disabilities the opportunity to participate in services, programs, or activities that are not separate or different.  28 C.F.R. § 35.130(b)(2).

447.    Defendant uses criteria or methods that have the effect of discriminating against persons with disabilities.  28 C.F.R. § 35.130(b)(3).

448.    Defendant fails to make reasonable modifications in policies, practices, and procedures when the modifications are necessary to avoid discrimination on the basis of disability.  28 C.F.R. § 35.130(b)(7).

449.    Defendant uses eligibility criteria that tend to screen out people with disabilities. 28 C.F.R. § 35.130(b)(8).

450.    Defendant places surcharges on individuals to cover the costs of measures required for nondiscriminatory treatment.   28 C.F.R. § 35.130(f).

451.    Defendant fails to maintain in operable working condition the features required for programs, services, and activities to be readily accessible to individuals with disabilities.  28 C.F.R. § 35.133(a).

452.    Defendant excludes inmates from participation in, and denies them the benefits of programs, services, and activities, and subjects them to discrimination, because facilities are inaccessible and unusable by persons with disabilities.  28 C.F.R. § 35.149 & 35.152(b)(1).

453.    Defendant fails to make programs, services, and activities readily accessible and usable to individuals with disabilities.  28 C.F.R. § 35.150(a).

454.    Defendant fails to house inmates in the most integrated setting appropriate to their needs; places inmates in inappropriate security classifications because no accessible cells or beds available; places inmates in facilities that do not offer the same programming as other facilities; and deprives inmates with disabilities of visitation with family members by placing them in distant facilities where they would not otherwise be housed.  28 C.F.R. § 35.152(b)(2).

455.    Defendant fails to ensure that each inmate is housed in a cell with the accessible elements necessary to afford the inmate access to safe, appropriate housing.   28 C.F.R. § 35.152(b)(3).

456.    Defendant fails to furnish appropriate auxiliary aids and services where necessary to ensure equal participation and benefits in programs, services, activities. 28 C.F.R. § 35.160(b)(1).

457.    Defendant fails to give primary consideration to the requests of individuals with disabilities in determining what auxiliary aids and services are necessary. 28 C.F.R. §

35.160(b)(2).

458.    Defendant has known about the violations noted herein but has failed to correct them, thereby exhibiting deliberate indifference to the rights of individuals in FDOC custody.

459.    As a direct and proximate cause of this pattern, practice, and deliberate indifference, individuals with disabilities in FDOC custody—Plaintiff's clients and constituents—have suffered, and continue to suffer from harm and violation of their ADA rights. These harms will continue unless enjoined by this Court.

## COUNT 2
### Rehabilitation Act

460.    This count is brought under Section 504 of the Rehabilitation Act (RA), 29 U.S.C. § 701, et seq. & 29 U.S.C. § 794, et seq.

461.    Defendant is a program or activity receiving federal financial assistance.   29 U.S.C. § 794.

462.    Defendant has a pattern and practice of excluding qualified individuals with disabilities from participation in, and denying those individuals the benefits of programs or activities, solely by reason of the individuals' disabilities.  29 U.S.C. § 794(a).

463.    Defendant has a pattern and practice of subjecting qualified individuals with disabilities to discrimination.  29 U.S.C. § 794(a).

464.    Defendant excludes qualified handicapped persons from participation in, denies them the benefits of, and otherwise subjects them to discrimination under its programs and activities.  28 C.F.R. § 42.503(a).

465.    Defendant denies qualified handicapped persons the opportunity accorded others to participate in programs or activities.  28 C.F.R. § 42.503(b)(1)(i).

466.    Defendant denies qualified handicapped persons an equal opportunity to achieve

the same benefits that others. 28 C.F.R. § 42.503(b)(1)(ii).

467.    Defendant provides different or separate assistance to handicapped persons or classes of handicapped persons than is provided to others.  28 C.F.R. § 42.503(b)(1)(iii).

468.    Defendant intimidates or retaliates against individuals for the purpose of interfering with rights secured by section 504 of the RA. 28 C.F.R. § 42.503(b)(1)(vii).

469.    Defendant denies qualified handicapped persons the opportunity to participate in programs or activities on the ground that other specialized aids, benefits, or services for handicapped persons are available. 28 C.F.R. § 42.503(b)(2).

470.    Defendant utilizes criteria or methods of administration that either purposely or in effect discriminate on the basis of handicap, defeat or substantially impair accomplishment of the objectives of Defendant's programs or activities with respect to handicapped persons.  28 C.F.R. § 42.503(b)(3).

471.    Defendant fails to insure that communications with applicants, employees and beneficiaries are effectively conveyed to those having impaired vision and hearing. 28 C.F.R. § 42.503(e).

472.    Defendant fails to provide appropriate auxiliary aids (including but not limited to brailed and taped material, qualified interpreters, readers, and telephonic devices) to qualified handicapped persons with impaired sensory, manual, or speaking skills.  28 C.F.R. § 42.503(f).

473.    Defendant fails to insure that no qualified handicapped person is denied the benefits of, excluded from participation in, or otherwise subjected to discrimination under its programs or activities because Defendant's facilities are inaccessible to or unusable by handicapped persons.  28 C.F.R. § 42.520.

474.    Defendant has known about the violations noted herein but has failed to correct

them, thereby exhibiting deliberate indifference to the rights of individuals in FDOC custody.

475.    As a direct and proximate cause of this pattern, practice, and deliberate indifference, individuals with disabilities in FDOC custody—Plaintiff's clients and constituents—have suffered, and continue to suffer from harm and violation of their RA rights. These harms will continue unless enjoined by this Court.

## COUNT 3
### Eighth Amendment; 42 U.S.C. § 1983

476.    This count is brought under the Eighth Amendment to the U.S. Constitution pursuant to 42 U.S.C. § 1983.

477.    Defendant knows, and has known, that the persons in FDOC custody described herein suffer from serious medical needs, yet Defendant has failed and intentionally refused to provide the necessary aid and treatment that would alleviate those serious medical needs. Defendant has been deliberately indifferent to the serious medical needs of the persons in FDOC custody.  While the Defendant has contracted with private entities to provide medical care, she nonetheless has a non-delegable duty to ensure adequate medical care for all prisoners in her custody.

478.    Defendant knows, and has known, of the substantial risk of serious harm, and actual harms, faced by persons with disabilities in FDOC custody.  Yet Defendant has disregarded, and continues to disregard, that risk and harms by failing and intentionally refusing to do anything that would remedy the situation.  Defendant has been deliberately indifferent to the substantial risk of serious harm to the persons with disabilities in FDOC custody.

479.    Defendant knows, and has known, that the persons with disabilities in FDOC custody have been deprived of humane conditions of confinement and have been exposed to grave conditions that violate contemporary standards of decency, resulting in the denial of

civilized life's minimal necessities.  Yet Defendant has failed and intentionally refused to do anything that would remedy the situation.  Defendant has been deliberately indifferent to these conditions.

480.   As a direct and proximate cause of this pattern, practice, and deliberate indifference, individuals with disabilities in FDOC custody—Plaintiff's clients and constituents—have suffered, and continue to suffer from harm and violation of their Eighth Amendment rights.  These harms will continue unless enjoined by this Court.

## COUNT 4
### Due Process Clause of the Fourteenth Amendment; 42 U.S.C. § 1983

481.   This count is brought under the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution, pursuant to 42 U.S.C. § 1983.

482.   Persons with disabilities in FDOC custody have a liberty interest in gain time ("good time" credits).  Gain time can be taken away or not awarded as a result of being found guilty of a Disciplinary Report (DR).  Losing gain time or failing to award gain time affects the length of a person's incarceration; that is, losing gain time or not being awarded gain time can cause prisoners to spend more time in prison.  Thus, taking away gain time or failing to award it requires constitutionally adequate procedures.

483.   By failing to provide interpreters or other effective accommodations during DR hearings to prisoners with disabilities, Defendant has failed to provide people with disabilities in FDOC custody with constitutionally adequate process.

484.   Defendant knows, and has known, that people with disabilities are being deprived of their Due Process rights, yet Defendant has failed and intentionally refused to remedy the situation, thereby exhibiting deliberate indifference to the violations of these rights.

485.   As a direct and proximate cause of this pattern, practice, and deliberate

indifference, individuals with disabilities in FDOC custody—Plaintiff's clients and constituents—have suffered, and continue to suffer from harm and violation of their Due Process rights.  These harms will continue unless enjoined by this Court.

## RELIEF SOUGHT

WHEREFORE, Plaintiff respectfully requests the following relief:

A.  A declaration that Defendant has violated, and continues to violate, the Americans with Disabilities Act, the Rehabilitation Act, the Eighth Amendment, and the Due Process Clause of the Fourteenth Amendment;

B.  A preliminary and permanent injunction requiring Defendant to cease violating the aforementioned laws protecting people with disabilities within FDOC custody;

C.  A preliminary and permanent injunction requiring Defendant to implement policies and take actions that will ensure future compliance with the aforementioned laws;

D.  An order retaining jurisdiction over this matter to ensure that the terms of any injunction are fully implemented;

E.  An award of attorneys' fees, costs, and litigation expenses under 42 U.S.C. § 12205, 29 U.S.C. § 794a, and 42 U.S.C. § 1988; and

F.  Such other and further relief as may be just and equitable.


Respectfully submitted,

Randall C. Berg, Jr., Esq.
Florida Bar No. 318371

*RBerg@FloridaJusticeInstitute.org*
Dante P. Trevisani, Esq.
Florida Bar No. 72912
*DTrevisani@FloridaJusticeInstitute.org*
FLORIDA JUSTICE INSTITUTE, INC.
3750 Miami Tower
100 S.E. Second Street
Miami, Florida 33131-2309
305-358-2081
305-358-0910 (FAX)

Molly Paris, Esq.
Fla. Bar. No. 90486
*Mollyp@disabilityrightsflorida.org*
David Boyer, Esq.
Fla. Bar No. 90917
*Davidb@disabilityrightsflorida.org*
DISABILITY RIGHTS FLORIDA, INC.
1930 Harrison St., Ste. 104
Hollywood, FL  33020-7850
850-488-9071
850-488-8640 (FAX)

Sharon Caserta, Esq.
Fla. Bar No. 0023117
*scaserta@forthepeople.com*
MORGAN AND MORGAN, P.A.
Deaf/Disability Rights Unit
76 South Laura Street, Suite 1100
Jacksonville, Florida 32202
(904) 361-0078 Direct Line
(904) 245- 1121 Videophone
(904) 361-4305 Facsimile

Attorneys for Plaintiff


By:   *s/Randall C. Berg, Jr.*
       Randall C. Berg, Jr.

       *s/Dante P. Trevisani*
       Dante P. Trevisani

       *s/Molly Paris*
       Molly Paris

- 122 -

_____*s/David Boyer*_____
David Boyer

_____*s/Sharon Caserta*_____
Sharon Caserta