## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
### Tallahassee Division

DISABILITY RIGHTS FLORIDA, INC.,

        Plaintiff,

vs.                                   Case No. 4:16-cv-47-RH-CAS

JULIE JONES, in her official capacity as
Secretary of the Florida Department of
Corrections,

        Defendant.

_____/

## EXPERT REPORT OF DENNIS COKELY, Ph.D.

### Table of Contents

I.  EXPERT QUALIFICATIONS ............................................................................ - 2 -

II.  EXECUTIVE SUMMARY ............................................................................ - 4 -

III.  ANALYSIS .................................................................................................... - 7 -

A.  *DEFINING DEAFNESS* ..................................................................................... - 7 -
SUMMARY OF OPINIONS WITH RESPECT TO DEFINING DEAFNESS: ......................................... - 9 -
B.  *THE AMERICAN DEAF COMMUNITY: A LINGUISTIC AND CULTURAL MINORITY* ..................................... - 9 -
SUMMARY OF OPINIONS WITH RESPECT TO THE AMERICAN DEAF COMMUNITY: ............................... - 10 -
C.  *DEAF PEOPLE AS A LINGUISTIC COMMUNITY* ................................................................... - 11 -
1.  AMERICAN SIGN LANGUAGE ...................................................................................... - 12 -
2.  LIMITATIONS OF ENGLISH WITHIN THE AMERICAN DEAF COMMUNITY ........................................ - 14 -
3.  LIMITATIONS OF LIP-READING AND SPEECH WITHIN THE AMERICAN DEAF COMMUNITY ........... - 18 -
SUMMARY OF OPINIONS WITH RESPECT TO DEAF PEOPLE AS A LINGUISTIC COMMUNITY: ................ - 24 -
D.  *SIGN LANGUAGE INTERPRETATION: MISCONCEPTIONS AND CERTIFICATIONS* .................................... - 25 -
SUMMARY OF OPINIONS WITH RESPECT TO SIGN LANGUAGE INTERPRETATION: ............................... - 32 -
E.  *d/DEAF AND HARD OF HEARING INMATES AT FDOC* .................................................................. - 32 -
F.  *NECESSARY CHANGES FOR FDOC REGARDING TREATMENT OF d/DEAF AND HARD OF HEARING*
*INMATES* ......................................................................................................................... - 33 -
1.  FDOC'S INABILITY TO ENSURE COMMUNICATIVE ACCESS FOR d/DEAF AND HARD OF HEARING
INMATES ........................................................................................................................... - 34 -
2.  FDOC'S RELIANCE UPON WRITTEN COMMUNICATION WITH d/DEAF AND HARD OF HEARING
INMATES ........................................................................................................................... - 35 -

3.   FDOC'S FAILURE TO PROVIDE NECESSARY VISUAL ALARMS AND/OR SIGNALS AND INFORMATION. - 36 -
4.   FDOC'S FAILURE TO PROVIDE INTERPRETERS AND TO ENSURE EFFECTIVE COMMUNICATION. ...- 39 -
5.   FDOC'S FAILURE TO PROVIDE VALID AND RELIABLE COMMUNICATION ASSESSMENTS. ...........- 43 -
6.   FDOC'S LACK OF VRI IS PROBLEMATIC AND INADEQUATE.........................................................- 45 -
7.   FDOC'S PROVISION OF TELEPHONIC ACCESS IS PROBLEMATIC AND INEFFECTIVE. ....................- 46 -
8.   INADEQUATE AND INEFFECTIVE ACCESS TO TELEVISION PROGRAMMING. ...................................- 51 -
9.   INADEQUATE AND INEFFECTIVE PROVISION OF HEARING AIDS. ...................................................- 52 -
10.  INADEQUATE TRAINING ORIENTATION OF FDOC PERSONNEL...................................................- 53 -
11.  INADEQUATE EMPLOYMENT OPPORTUNITIES FOR d/DEAF AND HARD OF HEARING INMATES ...- 54 -
12.  FDOC CONSOLIDATION OF d/DEAF AND HARD OF HEARING INMATES. ...................................- 55 -
13.  INADEQUATE OR NON-EXISTENT FDOC POLICIES AND PROCEDURES.......................................- 56 -
14.  PROVIDING ADEQUATE COMMUNICATIVE ACCESS. ....................................................................- 58 -

IV.  **CONCLUSIONS WITH RESPECT TO TREATMENT OF D/DEAF OR HARD OF HEARING INMATES IN FDOC FACILITIES**........................................................................ - 62 -

V.   **SUMMARY** ....................................................................................................................... - 64 -

VI.  **REFERENCES** ................................................................................................................. - 67 -

VII. APPENDICES

I.   <u>**EXPERT QUALIFICATIONS**</u>

I am currently a tenured Professor of American Sign Language ("ASL") and Modern Languages at Northeastern University. I am the Director of the American Sign Language Program, former Director of the World Languages Center and the former Chair of the Department of Languages, Literatures and Cultures. I have been involved with Deaf people on a personal and professional level for 48 years. I hold a Masters in Applied Linguistics from American University and a Doctorate in Sociolinguistics from Georgetown University. I am a nationally certified Sign Language interpreter and have served two terms as President of the Registry of Interpreters for the Deaf ("RID"), the professional organization of and the national certifying body for interpreters. I have authored or coauthored 10 textbooks, five book chapters, and 35 articles or conference proceedings, and have directed and/or edited over 350 videotapes focusing on American Sign Language and ASL/English Interpretation. I also have produced published translations of over 80 videotapes. The 1980 series of five texts that I co-authored is still widely used in Sign Language

programs and classes across the United States. My 1992 book, *A Sociolinguistic Model of the Interpretation Process*, is widely used in Interpreter Education Programs and has been translated into Italian and German and significant portions have been translated into Swedish and Japanese. I am currently the Principal Investigator for a $2 million grant from the U.S. Department of Education to establish a National Interpreter Education Center at Northeastern University.

Prior to coming to Northeastern, I spent 12 years working full-time as the President and co-owner of Sign Media, Inc., a video-production company specializing in producing print and video material focused on the American Deaf Community ("Deaf Community" or "Community"), American Sign Language, and ASL/English Interpretation. Prior to that I spent 13 years working at Gallaudet University[1] in a number of capacities: a teacher of elementary, undergraduate and graduate students; an administrator responsible for teaching and evaluating faculty and staff; and a Research Associate in the Linguistics Research Lab researching ASL/English interpretation. Attached as Appendix A is my complete curriculum vitae, which also includes a listing of the other instances in which I have served as an expert witness. During the last four-years I have not testified at trial and was deposed once on December 9, 2016 in *McBride, et al vs. the Michigan Department of Corrections,* Case No. C.A. 2:15-CV-11222) (E.D. Mich.).

I have been retained by Disability Rights Florida and the Florida Justice Institute to work on this case at the rate of $150.00 per hour. In addition to being based on my knowledge and experience, my report is based on: (1) face-to-face meetings with three d/Deaf or hard of hearing inmates at each of the following facilities: Tomoka Correctional Institution and Lowell Annex

---

[1] Gallaudet University is a federally chartered private university for the education of d/Deaf and hard of hearing people located in Washington, D.C.

(8/18/2016), Marion Correctional Institution and Union Correctional Institution (8/19/2016), Reception and Medical Center Main unit and Columbia Correctional Institution Annex (8/20/2016), Madison Correctional Institution (8/21/2016), Northwest Florida Reception Center Annex and Northwest Florida Reception Center Annex (8/22/2016), Okaloosa Correctional Institute (8/23/2016); (2) a visual inspection of those facilities; and (3) a review of materials provided to me by counsel and identified in Appendix B.

II.   **EXECUTIVE SUMMARY**

Members of the American Deaf Community are a linguistic and cultural minority. The language that binds them together and is the critical determinant for membership in the Community is American Sign Language. The vast majority of people who are not deaf have stereotypic misconceptions about d/Deaf [2] people and American Sign Language. They often believe that d/Deaf people can lip-read with a degree of accuracy that will enable meaningful communication, when in reality the level of lip-reading accuracy for most d/Deaf and hard of hearing people is 30% at best. Those who are not deaf often believe that d/Deaf people can read and write in fluent English when, in reality, the average Deaf person reads at approximately a fourth grade reading level. Those who are not d/Deaf often fail to understand that effective communication with d/Deaf people requires that one communicate visually, such as by using visual signals and alarms and provision of sign language interpreters when needed. These erroneous, stereotypic beliefs about and attitudes toward d/Deaf people frequently result in systematic discrimination against d/Deaf people. Such discrimination, known as audism, occurs when those who are not d/Deaf assume that d/Deaf people are inferior because of their different hearing status and when access to

---

[2] The significance of the distinction between lower case and upper case D in the word d/Deaf is explained below.

environments, technology, institutions and programs is predicated upon one's ability to hear. Simply put, the failure to provide visual access to aspects of society that are only auditorily accessible is audism.

Based on my experience of over 48 years, my visits to FDOC facilities between August 18 and 23, 2016 and meetings with 30 d/Deaf or hard of hearing inmates at those facilities, and my review of written documentation, I believe that d/Deaf and hard of hearing inmates in the Florida Department of Corrections (FDOC) have been denied effective communication and access to the services and technology that make effective communication possible. I believe that FDOC has restricted access to services, programs and communication in a way that denies meaningful and effective communicative access for FDOC d/Deaf and hard of hearing inmates. I further believe that the policies and procedures put in place unfairly and unnecessarily treat d/Deaf and hard of hearing FDOC inmates differently than non-deaf inmates and deny them access to services, programs and benefits that are afforded to non-deaf inmates. I also believe that the issues I observed at the ten FDOC facilities, the policies and procedures I have reviewed in documents provided to me, and the treatment of d/Deaf and hard of hearing inmates revealed during my interviews makes it clear to me that these issues are system-wide and not just restricted to 10 facilities. In sum, I believe that FDOC engages in audist behaviors.

To ensure effective communication, as well as the physical safety of d/Deaf and hard of hearing inmates, FDOC must, minimally, undertake the following major steps.

A.     In order to enable d/Deaf and hard of hearing inmates to communicate effectively with others at FDOC facilities, FDOC must reliably provide d/Deaf and hard of hearing inmates with qualified sign language interpreters.

- 5 -

B.    In order to enable d/Deaf and hard of hearing inmates to communicate effectively with others outside of FDOC facilities, FDOC must provide d/Deaf and hard of hearing inmates with access to a videophone and, if functionally appropriate, a TTY and/or a CapTel phone.

C.    In order to ensure that FDOC d/Deaf and hard of hearing inmates are notified of alarms or institutional emergencies at FDOC facilities, FDOC must at least install flashing light boards inside each d/Deaf and hard of hearing inmate's cell or install lights that are clearly visible from inside each d/Deaf and hard of hearing inmate's cell.

D.    FDOC must provide large screen televisions so that captions are accessible to d/Deaf and hard of hearing inmates and it must provide TV transmitters and receivers for those d/Deaf and hard of hearing inmates who can benefit from them. FDOC must also have policies in place that ensure captions are available to d/Deaf and hard of hearing inmates at all time television access is available to inmates who are not d/Deaf or hard of hearing.

E.    FDOC must review all of its policies and procedures to ensure that d/Deaf and hard of hearing inmates are not systematically disadvantaged relative to inmates who are not d/Deaf or hard of hearing.

E.    FDOC should require mandatory regular training/orientation sessions for all FDOC personnel who are responsible for or have the need to interact with d/Deaf and hard of hearing inmates..

F.      FDOC should consider consolidating d/Deaf and hard of hearing inmates at 3-5 FDOC facilities located near major urban areas which would result in significant cost savings by achieving economy of scale in providing communicative access to d/Deaf and hard of hearing inmates. These facilities should be geographically dispersed statewide so the d/Deaf and hard of hearing inmates can be as near as possible to family and friends to maintain family support and to ensure a better transition to society when released.

G.      FDOC should also re-examine its policy of only providing one hearing aid to hard of hearing inmates and should require an expedited timely repair of hearing aids. This would be more possible by contracting repair services with businesses located near facilities housing d/Deaf and hard of hearing inmates.

Finally, as additional information becomes available, I expect to examine that material and expand upon the opinions offered in this report.

III.    **ANALYSIS**

A.      *Defining Deafness*

Although it is often the case that those seeking to define or discuss deafness do so from a medical or audiological perspective, such a singular perspective significantly misses the mark. The meaning of deafness is best understood "when it is viewed as a social phenomenon rather than as a physical disability. To say this is not to deny the usefulness of studying deafness medically but rather to point out that such an approach tends to overlook how their deafness influences deaf

peoples' daily lives, how the disability of deafness becomes a handicap." (Schein, 1996).[3] Schein goes on to define deafness as "the common outcome of diverse causes resulting in an inability to hear and understand speech through the ear alone." The critical import of this definition is that it emphasizes communication – a quintessential function of human beings. This definition specifies that people who are deaf cannot hear *and* cannot understand speech; they may be able to hear speech but cannot understand it (i.e. cannot discriminate what is said). Even if they can hear loud noises and are aware that someone is talking, they are still deaf by this definition if they cannot understand the speech they hear. This functional definition then clearly and helpfully distinguishes the difference between those who are hard of hearing (those who have reduced hearing ability but can hear and understand speech) and those who are deaf (those who cannot hear *and* cannot understand speech).

The age at which one becomes deaf is critically important because this determines membership in one of two subsets within the larger class of deaf individuals. Childhood deafness creates significant obstacles to acquiring spoken language and becoming literate in English, and is generally associated with a tendency to seek out and socialize with other deaf people, thus becoming part of the American Deaf Community. Adult onset deafness, on the other hand, generally does not interfere with speech and those who become deaf as adults generally do not seek out members of the American Deaf Community (i.e. those early deafened) for companionship, nor do members of the American Deaf Community seek out late-deafened adults for companionship. This is because, although members of each subset are deaf (i.e. they cannot

---

[3] All secondary sources referenced in my report are listed in their entirety in the "References" section of my report, listed at pg. A B.

hear *and* cannot understand speech), and although members of each subset rely upon visual not auditory means of communication, their life experiences have had different trajectories.

#### <u>Summary Of Opinions With Respect To Defining Deafness:</u>

- The meaning of deafness is best understood when viewed as a social and communicative phenomenon rather than simply as a physical disability.

- The class of people who are deaf cannot hear and cannot understand speech.

- Within the class of people who are deaf, there are two subsets: those who are deaf from childhood and those who become late-deafened.

- Although each subset is deaf and relies upon visual communication, their life experiences have been very different.

B.  *The American Deaf Community: A Linguistic And Cultural Minority*

There is an identifiable subset of deaf people in America that is unable to rely upon hearing and speech as an effective and primary means of relating to the world and interacting with those who are not deaf. As children, some of these individuals, by virtue of parental decision or educational placement, are placed on a trajectory where they will spend their lives pursuing the goal of assimilating with the hearing and speaking majority of the population (i.e. trying to "pass") to the extent possible. Others, however, are placed on a very different trajectory because they have been given or choose to embrace a different "center" for their lives – a Deaf center. These deaf individuals see themselves as Deaf. The written distinction between "deaf" and "Deaf," lower and upper case, has been used since 1972 to differentiate between those who are deaf and those who are deaf but who also identify as a member of a linguistic and cultural minority (Woodward, 1972).

Individuals who are Deaf use American Sign Language and are fundamentally a visual people, with their own visual language, social organizations, history, and mores. They see themselves as members of the Deaf-World. Indeed, a case has been made that members of the

Deaf-World should be viewed as an ethnic group rather than a "disabled" group (Lane, Pillard & Hedberg, 2011). Contrary to the view held by most non-deaf people, Deaf people do not view their audiological condition as the primary reality that binds them together as a Community. Although society in general may view their audiological condition as a defining element for Deaf people, what binds Deaf people together is their use of American Sign Language. Deaf people are a linguistic and cultural minority that has been, and continues to be, communicatively disadvantaged by the hearing and speaking majority (e.g. Padden and Humphries 2005; Lane 1992; Jankowski, 1997; Wrigley, 1996). In short, these individuals, united by their use of American Sign Language, are members of the American Deaf Community.

The use of American Sign Language not only unites Deaf people but it also defines them as a linguistic minority. The primary reason for the central role of American Sign Language is that, unlike any other means of communication available to Deaf people, American Sign Language is the only means of communication that enables effective, efficient and reliable communication.

While some late-deafened adults do try to learn to sign, they often do so to compensate for the deteriorating intelligibility of their speech, to communicate with family members or friends who are learning to sign or perhaps to communicate with Deaf people they have met. However, learning to sign does not automatically mean that they wish to identify themselves as Deaf; late-deafened adults usually continue to identify themselves as deaf – unable to hear, sharing an audiological condition and the need for visual means of communication with Deaf people – but they do not see themselves as having a linguistic and cultural identity as a member of the Deaf Community.

**<u>Summary Of Opinions With Respect To The American Deaf Community:</u>**

- Deaf people are unable to rely upon their hearing and speech as an effective and primary means of relating to the world and interacting with the majority.

- Members of the American Deaf Community have their own visual language: American Sign Language.

- Deaf people are a linguistic and cultural minority that is communicatively disadvantaged by the hearing and speaking majority.

- American Sign Language is central to determining membership in and defining the American Deaf Community.

- American Sign Language is the only means of communication that enables effective, efficient and reliable communication for members of the American Deaf Community.

C.    *Deaf People As A Linguistic Community*

Although the existence of an American Deaf Community is now undeniable, most people with little or no knowledge of or experience with d/Deaf people make a number of stereotypic and unfounded assumptions about d/Deaf people (Cokely, 2001; Spingarn, 2001). For example, they wrongly assume that "all deaf people can lip-read" or that "all deaf people can speak" or that "all deaf people are fully literate in English." While these are uninformed and naïve views of d/Deaf people, the long-standing and well-documented reality is that members of the American Deaf Community, as a group, do not use their speech for communication, do not lip-read English well and, as a group, have extremely limited competence in English.

However, as noted above, the most significant factor uniting and identifying members of the American Deaf Community is not whether a Deaf person uses speech, the degree of hearing possessed by a Deaf person, or competence in English. Rather, it is whether a person uses American Sign Language (ASL) as his/her primary means of communication. The use of American Sign Language provides a means of determining acceptance into the Community, enables social interaction among members of the Community, and, through the use of ASL/English interpreters,

provides a ready means of interacting with non-deaf people. The importance of American Sign Language derives from the fact that it is a visually clear and accessible means of communication that enables Deaf people to have effective and efficient communication with each other and, by employing the services of an ASL/English interpreter, with the hearing and speaking majority.

Because of the essential nature of American Sign Language in defining the American Deaf Community as a linguistic minority, it is important to address and dispel several misconceptions about ASL.

### 1.    *American Sign Language*

A primary misconception often held by those unfamiliar with American Sign Language is that they assume it is simply a manual form of, or a derivative form of, spoken English. They assume wrongly. The lexicon (i.e. the vocabulary) of a signed language refers, not to the words of a spoken language, but rather directly to the concept or meaning that Deaf people wish to convey (Baker-Shenk & Cokely, 1980; Valli, Lucas & Mulrooney, 2005). In American Sign Language, signs refer not to English words, but rather to the concepts or meanings that its users wish to convey and exchange. For example, the American Sign Language sign refers to an object (e.g. a cat) and not to the English word for that object (just as the Japanese word "neko" refers, not to the English word "cat" but to the cat itself). American Sign Language has a lexicon and syntactic structure quite unlike that of spoken English. In simplest terms, there is not a one-to-one correspondence between American English words and the signs in American Sign Language, as is true of any two languages, spoken or signed. Instead, American Sign Language is a naturally evolved language used by members of the American Deaf Community and those non-Deaf people who have learned or acquired it. The linguistic evidence is clear and incontrovertible - American Sign Language is structurally different from English. (Stokoe, 1965)

Another way in which ASL differs from English is that it does not have a conventionally accepted written form, i.e. an orthography. This is true of all of the signed languages and many of the spoken languages in the world. There have been several attempts at creating a notation system for recording signed languages, the most notable of which is Stokoe notation system (Stokoe, et al 1965). However, like the International Phonetic Alphabet that is used to transcribe spoken languages, the use of Stokoe notation system has largely been restricted to linguists and is now being replaced by digital video recordings and computer programs that are being used to record and analyze signed languages (e.g. Boston University's SignStream http://www.bu.edu/asllrp/SignStream/ and SportsTec's StudioCode application http://www.sportstecinternational.com/). A more widely used means of trying to record signs is "glossing" (e.g. Baker-Shenk & Cokely, 1980), in which an English word written in all capital letters is used to refer to a sign. Thus the gloss "CAT" refers to the sign that is used to represent the concept "cat". Glossing has some severe limitations however. Unlike Stokoe notation, the reader of a glossed transcription must already know the sign being referred to in order to approximate the articulation of the sign that was glossed. Also the same gloss may refer to two different variants of the same sign, since glossing does not capture articulatory behaviors. Despite these limitations, it is not uncommon for Deaf people to use glosses when writing notes or when communicating with a TeleType Writer (the acronym TTY is used). TTYs began as retrofitted, discarded Western Union teletype machines, hence the acronym TTY.  Newer devices are also referred to by the acronym TDD - Telecommunication Device for the Deaf.  TTYs/TDDs make it possible for Deaf people to type to each other over existing phone lines; but TTYs/TDDs are now virtually obsolete because of the virtually ubiquitous presence of Videophones within the Deaf Community.

However, glossing is not a written form of American Sign Language, nor is it written English, even though the words may be English words. It is practically and linguistically inconceivable that a written two-dimensional form could reliably and easily capture three-dimensional moving, signed, conversational interactions. Analog and digital video recordings and the use of Videophones (essentially internet signed communication using video web-cams) not only have rapidly replaced TTYs and the need for a written form of American Sign Language, but also have provided a more accurate means of preserving and sharing signed interactions.

Deaf people as a group are unable to rely upon their hearing and speech as an effective and primary means of communication. Likewise, they also are unable to rely upon means of communication that are based on or derived from speech and hearing, such as written English, as an effective and primary means of communication. For Deaf people, the use of American Sign Language is not simply a matter of convenience or preference. American Sign Language provides the only effective and efficient means of linguistic communication for members of the Deaf Community.

### 2.    *Limitations Of English Within The American Deaf Community*

It is clear and undeniable that members of the American Deaf Community embrace and accept American Sign Language, and that its use is central to defining and understanding the Deaf Community. It is also clear that Deaf people exist as a linguistic minority within a society in which English is the dominant language. However, there are significant challenges that Deaf people, as a group, face in becoming fluent in English. Some of these challenges are the same as those for any second language learner, but other, more severe challenges exist for Deaf people. Nevertheless, one of the widely held misconceptions about Deaf people is that although they do

sign, they can read and write English fluently. As with other misconceptions about Deaf people, this has no basis in fact or reality.

While it certainly is a desirable goal for Deaf individuals to be competent in both ASL and English, the reality is that for the vast majority of Deaf people, competence in English is rarely attained. Certainly the history of the education of Deaf students attests to the fact that, for the vast majority of Deaf people, acquiring competence in <u>spoken</u> English is virtually unattainable (among others, Marschark & Spencer, 2003; Wrigley, 1996; Lane, 1992). Also, the majority of Deaf people do not attain competence in <u>reading</u> and <u>writing</u> English because those forms of communication are derived from spoken English. According to Karchmer and Mitchell (2003), study after study concludes with the same overriding concern: "…the average performance on tests of reading comprehension for deaf and hard of hearing students is roughly six grade equivalents lower than their hearing peers at age 15." (e.g. Allen, 1986; Traxler, 2000). The essential difficulty is that Deaf students are "…caught in a vicious circle: their impoverished vocabularies limit their reading comprehension and poor reading strategies and skills limit their ability to acquire adequate vocabulary knowledge from context." (deVillers and Pomerantz 1992). Thus, the commonly held misconception that Deaf people as a group can read and write English fluently is easily dismissed. The evidence is overwhelmingly clear – Deaf people, as a group, are not competent users of English.

Certainly, most Deaf people achieve what might be termed "survival" English. This means that, as a group, Deaf people have a level of literacy that enables them to interact with much of the routine written English language that they encounter in their daily lives. It is the repetitiveness, predictability and/or limited context within which this written English occurs that facilitates Deaf people's comprehension. For example, they read street signs, menus, subway directions,

advertising posters and flyers and other basic printed material that is necessary or useful for them to live their lives on a daily basis. As a group, Deaf people might be described as marginal readers. That is, Deaf people do subscribe to newspapers and magazines, although many seek out those portions of the publications supported by visual material (e.g. the comics page or advertising) or contain familiar arrays of numbers (e.g. the sports page). However, one should not mistake this level of responding to basic English print in routine day-to-day tasks with a level of literacy sufficient to rely upon printed material to gain non-recurring or important information or to read most books or magazines.

Deaf people also communicate via e-mail and TTY conversations, although those communications often read like written (i.e. glossed) versions of what they would sign. Further, Deaf people write notes to people who are not deaf, although their notes are frequently misunderstood. Just as in the non-deaf population as a whole, there is within the American Deaf Community a range of literacy.  However, the critical point is that the average literacy level of members of the American Deaf Community is significantly lower than it is for the population as a whole.

According to the Gallaudet Research Institute, "For the 17-year-olds and the 18-year-olds in the deaf and hard of hearing student norming sample, the median Reading Comprehension subtest score corresponds to about a 4.0 grade level for hearing students. That means that half of the deaf and hard of hearing students at that age scored above the typical hearing student at the beginning of fourth grade, and half scored below." (http://gri.gallaudet.edu/Literacy/). Given this and given that literacy levels among the U.S. prison population are generally lower than those among the general population (Alaska Justice Forum 24(2): 2-4), one could reasonably conclude that the literacy levels among Deaf inmates would be lower than the non-deaf inmate population.

- 16 -

In fact, given that the generally accepted definition of functional illiteracy is a level of reading and writing skills that is insufficient to manage tasks of daily living and employment that require a level of reading and writing beyond a basic level, one would expect that a greater proportion of Deaf inmates would be considered functionally illiterate than would be the case for the inmate population as a whole.

The difficulties that a limited level of literacy presents for Deaf people are clearly non-trivial. Consider, for example, that when one personality test was given to Deaf people using elementary English and again using ASL, the results were so different that the investigators concluded it was like giving two different tests. (Lane, 1992). This author goes on to describe the difficulties in administering psychological tests to Deaf people:

> Since Deaf test takers in America frequently are not fluent in English, they not only fail to understand test instructions thoroughly, invalidating the results, but also fail to understand the test content itself, as most tests are presented in written English, and in rather high-level English at that.
>
> One authority estimates that a tenth grade knowledge of English is needed to take most personality tests meaningfully. Yet only one deaf student in ten reads at eighth-grade level or better, and the average deaf student on leaving school has only a third grade command of English.

Lane, 1992

Deaf people, like most immigrant populations in this country, do attain a level of English that enables them to accomplish basic, routine and reoccurring tasks that involve written English. This variety of English has been called "Deaf English" (Charrow, 1974; 1975), which parallels, but is clearly not as proficient as, the English of those non-deaf people learning English as a second language.

It should be very clear that relying on standard written English as the primary or only means of communication with or for most Deaf people simply cannot be an effective means of communication.  It is the unquestionable ineffectiveness of speech, lip-reading and written English when communicating with Deaf people that makes the use of qualified sign language interpreters necessary for effective communication. The use of qualified sign language interpreters is also an important means of effective communication for those late-deafened deaf adults who have learned to sign.

        *3.*      ***Limitations Of Lip-Reading And Speech Within The American Deaf Community***

As challenging and ineffective as it is for Deaf people, as a group, to communicate in written English, it is even more challenging, ineffective and impractical for them to communicate successfully via lip-reading (also called speech-reading). Given the challenges Deaf people have in acquiring competence in written English, this should not be surprising. Unlike the permanent presence of the printed word that makes possible repeated readings, the spoken word is ephemeral. Given that Deaf people struggle for accurate and complete comprehension with the stationary written word, one cannot expect any greater level of competence or effectiveness when Deaf people try to comprehend the fleeting spoken word as it appears on the speaker's lips.

The common misconception that most non-deaf people have is that all Deaf people can lip-read. They mistakenly believe that, lacking one of their senses, the ability to hear, Deaf people's visual sense – and hence their ability to lip-read – becomes more acute in order to compensate. Most non-deaf people do not understand or appreciate the difficulties and limitations involved in trying to lip-read. It is extremely challenging to lip-read English because only a small fraction of the sounds used in the language are clearly visible. In fact, even someone who is fully fluent in

and who has full auditory access to spoken English would struggle to lip-read English (non-deaf people have only to turn their television set to a Chinese or Russian language program and turn off the volume to experience this frustration firsthand). Consider the difficulty in trying to lip-read accurately the spoken English phrase "white shoes." To a person trying to lip-read this phrase, it could be understood as "white shoes" or "why choose." When we consider the fact that many of the sounds in English look the same to a lip-reader, it should not be surprising that Deaf people's comprehension of spoken language is usually quite poor and is always even worse than their competence in written English.

One has only to look at oneself in a mirror and soundlessly mouth each of the following pairs of words to have a sense of the impossibility of lip-reading accurately. In each of these pairs one of the words is listed on the Frye list 4 of the one hundred most commonly occurring words in English.

> *to/you, in/thin, it/hit, he/she, on/don, are/car, with/width, his/is, i/eye, be/bee, or/ore, one/won, by/bye, but/butt, not/knot, your/door, an/ant, which/witch, do/due, their/there, out/shout, many/manny, then/ten, these/he's, so/sew, would/wood, like/lick, him/shim, time/thyme, two/too, more/moor, see/she, no/know, way/weigh, been/bin, oil/coil, day/say*

According to Bernstein and Auer (2003) "Estimates of the upper extremes for the accuracy of lip-reading words in sentences have been as low as 10-30% words correct." This is in keeping with earlier work (Liben, 1978) that also provides evidence that speech-readers understand only about one fourth of what is said in dyadic (one-to-one) conversations.

---

[4] The Frye list consists of the one hundred most common words used in English ranked in order of frequency.

Of course, there are a number of other uncontrollable factors beside the phonetic structure of English that make it extremely difficult for d/Deaf people to lip-read with any consistent degree of accuracy, such as a person's facial bone structure, facial musculature, facial hair, lighting, rate of speech, etc. (Bernstein and Auer, Jr. 2003). Given the inherent linguistic difficulties in lip-reading and the additional complications that arise from external factors, it is no wonder that lip-readers' comprehension is so limited.

If speech-readers understand only approximately a quarter of what is said in dyadic (one-to-one) conversations, it should not be surprising that the level of comprehension in small and large group interactions is significantly less. One reason for this is simply physical distance – the further away one is from a speaker the more difficult it is to discern fine muscle movements of the mouth necessary to lip-read. Another reason is because small group interactions in which a majority of the participants is not deaf generally rely upon turn-taking regulatory mechanisms that are auditorily determined, i.e. whoever talks first or loudest claims the floor. This places the d/Deaf lip-reader in an impossible position of trying to track who is speaking by waiting for others in the group to look at the person who is speaking. Deaf people trying to lip-read in small group interactions must constantly determine who is talking by trying to determine who other group members are looking at. By the time the d/Deaf person has determined who is speaking, the d/Deaf person has already missed the first several seconds of what the speaker has to say. This also means that it is difficult for the d/Deaf person to track who will next claim the floor and is often unable to claim a turn him/herself. Large groups pose even greater problems for the lip-reader: problems such as greater physical distance from the primary speaker, whether or not the primary speaker moves about while talking, variable lighting, and the impossibility of lip-reading questions or comments from anyone in the large group.

When interacting with deaf people who rely on lip-reading to interact in a given situation, one must exercise extra caution to ensure that the deaf person has actually understood the interaction. This is because deaf lip-readers will often nod their heads, which the non-deaf interlocutor takes as a sign of comprehension. However, this is no different than second language users who engage in the same behavior. For example, students who are just learning American Sign Language will often and regularly engage in this behavior when communicating with deaf people. They do this, and deaf people do this, not to deceive the other person, but rather to "save face." That is, they do not want the other person to think they are "stupid" or incompetent. Their reasoning is that if they actually interrupt the other person each time they do not understand, that is precisely the impression they will be creating. They would rather accept the consequences of not comprehending than create an impression of incompetence.

Ideally, someone interacting with a deaf person who is relying on lip-reading must be aware that head nodding may not always signal comprehension. Unfortunately, this is rarely the case. The result is that the two interlocutors leave the interaction with two different impressions of the interaction. The deaf person leaves with "comprehension gaps" while the non-deaf person leaves thinking that the deaf person has fully comprehended.

Given lip-readers' limited comprehension in one-to-one interactions and given the increased interactional complexities in small and large group interactions, lip-reading cannot be assumed to be an effective and meaningful communicative option for d/Deaf people in such settings.

Of course, even if d/Deaf people could lip-read with any reasonable level of accuracy, successful communication in those settings would also require that they then express themselves

in intelligible spoken English that, unlike late-deafened adults, they cannot do. Some Deaf people have speech that may be understood in limited contexts; most, however, do not. Despite years of speech training, most Deaf people are generally unable to regulate the volume, timbre or pitch of their speech and that, among other factors, makes their speech very difficult to understand. Deaf people, never having heard themselves speak, cannot monitor their speech in the way that non-deaf people can. Simply put, Deaf people don't know how words are supposed to sound; without such an auditory target they can only approximate the vocal formulation of words. Thus, the speech of Deaf people has been described as guttural, animalistic, and unintelligible.

Clearly, Deaf people know that their speech is ineffective as a primary means of communication: they know that those unfamiliar with "Deaf speech" have great difficulty understanding their speech; they know not to trust their speech for important interactions; they know that their speech sounds unnatural; and they know that non-deaf people react negatively when they do use their speech. Thus, unlike late-deafened adults, most Deaf people choose not to use their speech for routine communicative interactions because they know it is unintelligible and therefore not an effective means of communication, or in many cases they simply cannot use their speech.

It is true that many late-deafened individuals can be rather skilled lip-readers in some very controlled conditions (although factors listed above will also negatively impact their lip-reading accuracy). This is because, unlike those with childhood onset deafness, they have adult competence in spoken English to assist in making educated guesses. Unfortunately, their higher degree of accuracy at lip-reading coupled with their quite intelligible speech often lead people who are not deaf to conclude that the late-deafened individual is only pretending to be deaf and thus no special communication accommodations are needed or warranted.

- 22 -

Late-deafened adults are very likely to have intelligible speech and, because of their proficiency in English, are able to lip-read with slightly better accuracy. As noted, this often leads people who are not deaf to assume that the late-deafened adult is "faking" their deafness. But, as noted above, late-deafened adults who retain reasonably intelligible speech present a false image to those who are not deaf. They "sound normal" and so the conflation of speech and hearing becomes significant ("if you speak that well, I assume you must be able to hear as well"). That audist stereotype often leads to late-deafened adults being misunderstood and discriminated against because they cannot successfully engage in "normal" communication. That is, while they can express their thoughts in intelligible English, given the severe limitations of lip-reading and their lack of hearing, they are unlikely to understand what is said to them in response to their ideas.

For d/Deaf people as a group, then, lip-reading and speech cannot be assumed to provide a reliable and accurate means of communication in most interactions. It is certainly true that in some context-specific social interactions a variable combination of speech, lip-reading, written words and gestures may enable a rudimentary level of low stakes, social communication (e.g. "change the TV channel," "pass the salt," "lights out"). However a variable combination of speech, lip-reading, written words and gestures would definitely not ensure effective communication in what would be termed "high stakes" interactions. "High stakes" interactions are those in which the risks of miscommunication or misunderstanding are high and the consequences of miscommunications have significant, and possibly severe, negative repercussions for the d/Deaf individual.

Any list of "high stakes" interactions would certainly have to include disciplinary and/or investigative proceedings, medical appointments, mental health appointments (both individual and group counseling sessions), psychological evaluations, any formal evaluation (e.g. behavioral, educational, occupational), education sessions (e.g. specific training sessions, general educational

opportunities), religious activities, and instructions concerning health and safety. What these "high stakes" interactions have in common is that discussions, suggestions, courses of action and reliable decisions simply cannot be considered valid unless one can ensure that any communication between parties was conducted in a manner that was accurately conveyed and understood. Given the unreliability of lip-reading, speech and written communication that exists for d/Deaf people, one simply cannot conclude that relying solely on one or more of those forms of communication can result in accurate and effective communication in "high stakes" interactions.

The clear reality is that the only practical way for Deaf people and for many deaf people to participate effectively in these types of "high stakes" one-to-one interactions, and in any small or large group interaction, is to employ the services of a qualified sign language interpreter.

Because of the importance of qualified sign language interpreters in ensuring access and participation, the next section will examine several aspects of sign language interpretation and misconceptions about the nature of sign language interpreting.

### Summary Of Opinions With Respect To Deaf People As A Linguistic Community:

- Those with little or no knowledge of d/Deaf people or American Sign Language make numerous unfounded, stereotypic assumptions about d/Deaf people, their means of communication and their signed language.

- The most significant factor uniting members of the American Deaf Community is the use of American Sign Language (ASL).

- American Sign Language is neither a manual form nor a derivative form of English, and thus there is not a one-to-one correspondence between American Sign Language signs and English words.

- The grammatical and syntactic structure of American Sign Language is quite different from the grammatical and syntactic structure of English.

- There is no conventional written form of American Sign Language.

- As a group, Deaf people face severe challenges in acquiring competence in spoken or written English, and most Deaf people rarely attain competence in spoken or written English.

- The average literacy level of the American Deaf Community is significantly lower than it is for the population as a whole.

- Lip-reading is so unreliable that it cannot be used to ensure comprehension and effective communication in any group setting or in any "high stakes" one-on-one setting (i.e. interactions related to health, safety, discipline and the like).

- The use of speech for the vast majority of Deaf people is so ineffective that it cannot be relied upon to ensure accurate expression and effective communication.

- Late-deafened adults who have reasonably good lip-reading and speech skills, because of their previous exposure to spoken English, are often thought to be feigning deafness.

- The only way for Deaf people and for deaf people who have learned sign language to participate meaningfully and effectively in all group interactions and in all "high stakes" one-to-one interactions is to provide a qualified sign language interpreter.

D.   ***Sign Language Interpretation: Misconceptions And Certifications***

Given the passage of federal laws beginning in the early 1970s, including the Rehabilitation Act of 1973, it is probably safe to say that most non-deaf people have, at one time or another, seen a sign language interpreter. However, as with other aspects of the lives of d/Deaf people, there are several misconceptions and naïve assumptions surrounding sign language interpreters.

The first is the belief that anyone who can sign can be a qualified sign language interpreter. The fact is that competence in American Sign Language is a necessary, but not sufficient, condition to become a qualified sign language interpreter. This necessary, but not sufficient, condition of bilingualism is true for all interpreters whether of spoken or signed languages, and the literature is quite clear on this point. (e.g. Seleskovitch, 1978; Frishberg, 1986; Wadensjö, 1998; Cokely, 1992; Stewart et al, 1998; Janzen, 2005).

Another common misconception held by those who are not Deaf is that American Sign Language is easy to learn and thus one can rather quickly become a qualified sign language interpreter. However, the fact is that learning American Sign Language is as challenging as learning any spoken language; in fact, given the modality differences, many non-deaf students find it more challenging to learn American Sign Language than to learn a spoken language. (Peterson, 1999).

Another misconception about sign language interpreting is that signs exist in a one-to-one relationship with English words; that is, for every word there is a sign that conveys that word. Were this true, it would mean that interpreting would consist simply of learning the matched signs for the words one already knows and the rather mechanical process of producing the linked signs for the words one hears and, conversely, the spoken words for the signs one sees. However, anyone who has studied another language knows that the vocabularies of any two languages do not map in a one-to-one relationship; this is a cross-cultural and linguistic reality well supported by the literature. 5 Likewise, anyone who has studied American Sign Language knows that ASL and English do not map to each other in a one-to-one relationship, a realization also well supported by the literature. 6

To begin to understand the cognitive challenges and complexities of interpretation, and why competence in ASL is a necessary, but not sufficient, prerequisite to qualify as an interpreter, it is helpful to have a clear understanding of what interpretation is. The following definition provides such a starting point:

---

[5] e.g. Larson 1998; Lyons, 1977; 1995; Duranti, 1997; Crystal, 1997; Hatim and Mason, 1997; Weaver, 1997

[6] e.g. Stokoe, 1965; Cokely, 1992, 2001; McIntire (ed) 1986; Mindess, 1999

> Interpretation is the competent and coherent use of one naturally evolved language to express the meanings and intentions conveyed in another naturally evolved language for the purpose of negotiating an opportunity for a successful communicative interaction in real time within a triad involving two principal individuals or groups who are incapable of using, or who prefer not to use, the language of the other individual or group.

Cokely, 2001

This is a general definition of interpretation that applies to signed and spoken language interpretation, and one that is well supported in the literature. (e.g. Robinson, 1997; Wadensjö, 1998; Larson, 1998; Stewart et al, 1998; Pöchhacker, 2004; Janzen, 2005). This definition places in proper context the necessary, but insufficient, condition of bilingualism needed to interpret. Indeed, it is the ability to determine and then express meaning and intention that is at the heart of interpretation.

The cognitive processes by which meaning and intention are determined and then expressed in a different language are quite complex. It has only been in the last quarter of a century that we have begun to understand the process of interpretation; demands of which are such that interpretation has been called "…probably the most complex type of event yet produced in the evolution of the cosmos." (Richards, 1953). While some may say this is hyperbole, it is undeniable that interpretation is an extremely complex cognitive task. In the past three decades, various models of the cognitive process have emerged that have helped shape and guide our understanding of interpretation, research into interpretation, and the training of interpreters (e.g. Moser-Mercer, 1978; Chernov, 1978; Cokely, 1984, 1992; González et al, 1991). Examining any of these models makes clear the fact that excellent skill in both languages is unquestionably a necessary, but not sufficient, prerequisite for interpreters. In fact, in the case of qualified sign language interpreters,

national certification by the Registry of Interpreters for the Deaf evolved, in part, to differentiate between those who could sign and those who could interpret (Cokely, 2005).

Interpretation generally takes one of two forms – consecutive or simultaneous. Consecutive interpretation often happens in one-to-one interactions such as doctor's appointments, supervisor meetings and in some legal settings. In diplomatic situations, it may be used when delegates or diplomats deliver speeches. In consecutive interpretation, one of the participants speaks or signs and, at a logical semantic or syntactic point, pauses. The interpreter, who may have been taking notes, then begins to interpret what was just said or signed. When the interpreter is done, the speaker continues until the next pause at which time the interpreter begins. This alternating pattern continues until the speaker is finished. In general, interpreters and participants agree beforehand that the interpretation will proceed consecutively. In one-to-one interactions, the logical pause points may, for instance, be the conclusion of one of the participant's turns (e.g. asking a question).

Simultaneous interpretation happens without benefit of regular and planned pauses. In simultaneous interpretation the interpretation is delivered in the same general time frame as the original. The term "simultaneous" interpretation is actually a misnomer. No interpretation is delivered perfectly synchronously with the delivery of the original message. Because the interpreter's goal is to render the meaning and intent of the original, that means that the interpreter must first comprehend the original message. To do so requires that the interpreter wait to receive enough of the original message so that the interpreter is confident in the intended meaning of the speaker or signer. Thus, there is always a small temporal discrepancy between the production of the original message and the production of its interpretation because interpreters must necessarily chunk information that is coming to them. This temporal difference is called lag time (or sometimes by the French term décalage).

- 28 -

For at least the last five decades, it has been widely accepted within the Deaf Community and among those who work with Deaf people, including interpreters, that for non-social communicative interactions between Deaf people and those who are not deaf and who cannot sign fluently, consecutive or simultaneous interpretation is the only viable option to ensure that Deaf people have effective communicative access and reliable opportunities for participation. No other reasonable accommodation at the present time can successfully enable Deaf people and those deaf people who can sign to participate in and benefit from small and large group interactions in real time. One has only to look at the prevalence of interpreters in the education, business, religious, entertainment and social service segments of American society to realize the widespread recognition and acceptance of the reality that interpreters are the only viable option for Deaf people in such settings. For example, the presence of on-camera interpreters during Mayor Bloomberg's regular broadcasts to citizens of New York City during Hurricane Sandy and the growing national discussion about provision of interpreting services during emergency situations are clear indications of the recognition of the importance of interpreters for effective communication for d/Deaf people. At the other end of the spectrum, there was international attention given to the failure to provide effective interpreting services because of the use of a faux interpreter at the funeral services for Nelson Mandela.

Late-deafened adults who have learned to sign also benefit from and rely upon the services of qualified sign language interpreters. Such individuals often rely upon the combination of the interpreter's signs and lip-reading the interpreter or the speaker in order to have effective and reliable communicative access, both in small or large group and one-on-one settings. This augmented communication is necessary given the fragmentary nature of lip-reading and the likely fragmentary comprehension of signs by someone who is late-deafened. These sources of

information work together in a complementary fashion to ensure a greater level of comprehensibility than either one does alone. Moreover, when acquiring a second language, the norm is that one's comprehension of that language always outpaces one's production of that language (think of young children who can always understand more than they can express). Accordingly, late-deafened adults who learn sign language generally comprehend the signs of qualified sign language interpreters better than (and faster than) the adult can produce the signs themselves.   Thus, provision of competent interpreters is often necessary to provide communicative rights and access to someone who is late-deafened.

The national professional organization for qualified sign language interpreters in the United States is the Registry of Interpreters for the Deaf (http://www.rid.org). Founded in 1964, the Registry of Interpreters for the Deaf (RID) currently has over 14,000 members nationwide. In 1972, the RID implemented a national evaluation and certification system that would provide a ready means of identifying those individuals deemed qualified to interpret. As mentioned previously, the certification system was motivated, in large part, by an expressed need to differentiate between those who could sign and those who could interpret (Cokely, 2005). For the past 44 years, the assessment procedures have been implemented, revised and monitored using acceptable psychometric procedures to ensure their validity and reliability (http://www.rid.org).

The Registry of Interpreters for the Deaf also certifies interpreters to work in legal settings. According to the RID's 2007 Standard Practice Paper on Legal Interpreting:

> Legal interpreting encompasses a range of settings in which the deaf person interacts with various parts of the justice system. Legal interpreting naturally includes court interpreting; however, a legal interpreter's work is not restricted to the courtroom. Rather, legal interpreting occurs during attorney-client conferences, investigations by law enforcement, depositions, witness interviews,

> real estate settlements, court-ordered treatment and education
> programs and administrative or legislative hearings. Legal
> interpreting requires highly skilled and trained specialists because
> of the significant consequences to the people involved in the event
> of a failed communication.

RID, 2007

National assessment and certification of interpreters is a significant factor in ensuring that an individual possesses the range of competences and capabilities needed to render effective interpretation. All languages exhibit sociolinguistic variation. Sociolinguistic variation will include, for example, age variation (senior citizens and teenagers may use different vocabulary items), gender variation (men and women may use different vocabulary items and grammatical structures) and geographic variation (people from different parts of the country may have distinct accents and/or linguistic patterns). Despite such natural variation, teenagers still communicate with senior citizens, men communicate with women, and people from different parts of the country communicate with each other. The critical point is that naturally occurring sociolinguistic variation does not impede communication among different members of a linguistic community.

American Sign Language, as is true of all signed and spoken languages, also exhibits natural sociolinguistic variation (e.g. Woodward, 1994; Lucas, 2001). This means, for example, that older Deaf people may sign slightly differently than younger Deaf people, Deaf people from the North may sign slightly differently than Deaf people from the South, and Deaf people from various educational backgrounds may sign slightly differently from each other. Nevertheless, just as with spoken English, such naturally occurring linguistic variation does not in any way preclude Deaf people from communicating with each other. Certification of interpreters at a national level provides a readily identifiable measure of assurance that the certificate holder possesses the

knowledge and communicative flexibility necessary to interpret successfully for groups of diverse

Deaf people that embody naturally occurring sociolinguistic variation.

**Summary Of Opinions With Respect To Sign Language Interpretation:**

- Competence in American Sign Language and English is a necessary, but not sufficient, condition to become a qualified sign language interpreter.

- The cognitive processes involved in interpretation are extremely complex and require the ability to determine meaning and intent.

- For non-social communicative interactions between Deaf people and those who are not deaf and who cannot sign fluently, consecutive or simultaneous interpretation provided by a qualified interpreter is the only viable option to ensure that Deaf people have effective communication access and have reliable opportunities for participation.

- Certification of interpreters at a national level provides a readily identifiable measure of assurance that the certificate holder possesses the knowledge and communicative flexibility necessary to interpret successfully for groups of diverse Deaf people that embody naturally occurring sociolinguistic variation.

- Late-deafened adults who have learned to sign benefit from and rely upon the services of qualified sign language interpreters.

E.    *d/Deaf And Hard Of Hearing Inmates At FDOC*

Between June and December 2016, I reviewed a number of documents provided to me by

counsel. In August 2016 I visited the following FDOC facilities: Tomoka Correctional Institution

and Lowell Annex (8/18/2016), Marion Correctional Institution and Union Correctional Institution

(8/19/2016), Reception and Medical Center Main unit and Columbia Correctional Institution

Annex (8/20/2016), Madison Correctional Institution (8/21/2016), Northwest Florida Reception

Center Annex and Northwest Florida Reception Center Annex (8/22/2016), Okaloosa Correctional

Institute (8/23/2016). During each site visit, I met individually with at least three selected d/Deaf

or hard of hearing inmates from each facility. I believe these inmates reflect a representative

sample of all FDOC d/Deaf and hard of hearing inmates. A list of inmates interviewed can be

found in Appendix C. During these interviews I was able to identify difficulties that have arisen

for inmates due to a lack of effective communicative access and was able to make a determination about levels of inmates' sign language proficiency.

Based on my forty-eight years of experience, my separate meetings with inmates, my inspection of FDOC facilities, and a review of documents provided to me (see Appendix B), I believe there are several areas involving a lack of communicative rights and access for FDOC d/Deaf and hard of hearing inmates that warrant examination and discussion. Although the inmates I interviewed have audiological and linguistic differences from the general FDOC inmate population that are not completely identical, there are a number of common issues across all d/Deaf prisoners that require visual accommodations in order to provide them with effective and efficient communicative access.

F.   ***Necessary Changes ForinmaaFDOC Regarding Treatment Of d/Deaf And Hard Of Hearing Inmates***

As noted above, it is simply not possible to determine or infer effective means of communication solely on the basis of an audiological exam, and certainly not by using a flawed classification based on audiological test results. In attempting to determine the communication needs of d/Deaf and hard of hearing inmates, it is most reasonable to believe that the inmates themselves should be consulted on what means of communication are effective for them. The practice of not involving d/Deaf and hard of hearing inmates in identifying their own communication access needs creates and reinforces a pejorative and uninformed audist view that d/Deaf and hard of hearing inmates do not know what constitutes effective communication for them.

I believe that FDOC must develop and implement procedures that ensure that each d/Deaf and hard of hearing inmate is involved in any decisions about what constitutes effective

communication for that specific inmate. Once determined, the means of effective communication must be reflected in an inmate's individualized communication plan. An individualized communication plan would detail what specific means of communication are required for effective communication with that individual inmate and under what circumstances. That plan should be part of the inmate's record and would follow that inmate in the event of transfer to another facility or would be reviewed by any new staff that would have direct contact with that inmate.

1.    FDOC's Inability To Ensure Communicative Access For d/Deaf And Hard Of Hearing Inmates.

Based on my 48 years of experience, my tour of FDOC facilities, my interviews with 30 d/Deaf or hard of hearing inmates, and my review of documents, it is clear that FDOC has failed to take adequate steps to ensure that d/Deaf and hard of hearing inmates are being provided effective communication. These failures have serious, negative consequences for the communicative rights and access needs of d/Deaf and hard of hearing inmates.

The lack of a comprehensive, reliable list of d/Deaf and hard of hearing inmates, the lack of appropriate and regular training and the failure to involve d/Deaf and hard of hearing inmates in determining effective communication means that FDOC cannot ensure that it is meeting the communicative access needs of d/Deaf and hard of hearing inmates. To the extent that FDOC personnel are not proactively ensuring that appropriate communication accommodations are being provided for d/Deaf and hard of hearing inmates system-wide, FDOC cannot reliably claim that it is providing effective communication and appropriate access for those inmates.

I believe that FDOC must develop and implement procedures that ensure that appropriately tasked individuals are mandated to act proactively and regularly in order to ensure that FDOC facilities and accommodation decisions are compliant with federal laws. Minimally, this would

include regular reporting of all FDOC accommodation decisions for those protected by federal laws, but especially those decisions regarding the communicative rights and access needs of d/Deaf and hard of hearing inmates. Absent this I believe that FDOC cannot ensure that its facilities are reliably and consistently providing effective communication and appropriate access for d/Deaf and hard of hearing inmates.

       2.     FDOC's Reliance Upon Written Communication With d/Deaf And Hard Of Hearing Inmates.

Based on my review of documents and my interviews with d/Deaf and hard of hearing inmates, I believe that FDOC's reliance upon written communication seriously disadvantages d/Deaf and hard of hearing inmates who have limited literacy skills. While reliance upon written communication also disadvantages those inmates who are not d/Deaf or hard of hearing and who possess limited literacy skills, those inmates have other means of readily acquiring needed information (e.g. communicating directly with FDOC personnel or other inmates) that are not readily available to d/Deaf and hard of hearing inmates.

There appears to be an assumption by FDOC personnel, including medical and mental health external vendors, that merely providing written material or exchanging written notes provides effective access for d/Deaf and hard of hearing inmates. I believe this erroneous assumption is based on lack of information and training about d/Deaf and hard of hearing inmates. It appears that FDOC relies upon written communication for a number of recurring activities, for example to file grievances or to request accommodations. To the extent that there are not alternate effective means of, for example, filing grievances, requesting accommodations, and communication with nurses and doctors, FDOC seriously disadvantages d/Deaf and hard of hearing inmates who have limited literacy skills, and FDOC cannot claim to provide effective

communication for those inmates. For example, inmates ████████████ (Marion), ████████

████ (NWFRC Annex) and ████████████ (Madison) report that while medical personnel

occasionally will write notes to them, they are not able to understand what is written and thus

cannot access information vital to their own healthcare.

Worse, a number of d/Deaf and hard of hearing inmates at different FDOC facilities

reported that medical personnel refused to even attempt to write or to let the inmates write to them

(further discussed below). For example, inmate ████████████ (Lowell Annex), ████████████

(NWFRC Main), ████████████ (Union) all stated that medical staff have refused to write with

them. As a consequence, they are not provided access to information vital to their own healthcare.

I believe that FDOC must develop or identify alternate means by which d/Deaf and hard

of hearing inmates who have limited literacy skills can conduct routine recurring activities that

now must be conducted in writing. I also believe that these alternate means must be implemented

system-wide across FDOC.

*3.*     FDOC's Failure To Provide Necessary Visual Alarms And/Or Signals And
         Information.

Based on my tour of FDOC facilities, my review of documents and my interviews with

d/Deaf and hard of hearing inmates, I believe that FDOC has failed to provide effective visual

alarms and/or signals, and that such failure poses significant risks for d/Deaf and hard of hearing

inmates. My tour of the FDOC facilities named above which house d/Deaf and hard of hearing

inmates, revealed no visual alarms and/or signals in any of the areas we visited. Those areas

included medical areas, inmate common areas, inmate open dormitory and inmate cell areas. In

none of these locations did I observe any sort of visual alarms or signaling device with the

exception of fire alarm strobe lights visible in some, but not all, facilities.

The lack of adequate visual alarms and/or signaling devices in cases of emergencies poses serious and potentially fatal risks for d/Deaf and hard of hearing inmates. The absence of visual alarms means that d/Deaf and some hard of hearing inmates are unable to respond to calls/counts on their own and with the same level of swiftness as non-d/Deaf inmates. Apparently, in the absence of visual alarms, FDOC relies upon FDOC officers and/or non-d/Deaf inmates to alert d/Deaf and hard of hearing inmates of an alarm. But this is clearly an ineffective means of alerting d/Deaf and hard of hearing inmates. For example, ██████████ (Marion), ██████████ (Madison), ██████████ (Madison), ██████████ (NWFRC Annex), ██████████ (Okaloosa), ██████████ (Okaloosa), ██████████ (Tomoka), ██████████ (Tomoka), ██████████ (Marion), ██████████ (Union) ██████████ (Union), ██████████ (RMC Main) all report that they have missed calls and, in the case of missed meal calls, are not allowed to eat or have even been issued disciplinary tickets.

A number of inmates at different facilities report that officers have laminated cards which they hold up at the time of a "call" (e.g. chow, medical, count). These cards are intended to notify d/Deaf and hard of hearing inmates of a "call". This is clearly a non-equivalent level of access. The effectiveness of such cards depends on and assumes that the d/Deaf or hard of hearing inmate is looking at the card. However, merely holding up a card does not and cannot alert an inmate who is preoccupied in the way a PA announcement or an officer yelling alerts inmates who are not d/deaf or hard of hearing. While PA announcements or an officer yelling are invasive measures, holding up a card is a passive measure designed to inform but not to get one's attention.

As noted above, during my interviews of inmates at each facility, d/Deaf and hard of hearing inmates reported that they have missed meals, roll calls and alarms because no one informed them or they did not see a card. They also report that they are disciplined (given tickets)

- 37 -

when this happens and it appears to happen often. Clearly, reliance upon FDOC officers and/or non-d/Deaf inmates to alert d/Deaf and hard of hearing inmates is a misguided practice that poses potentially serious risks for d/Deaf and hard of hearing inmates and disadvantages them vis-à-vis inmates who are not d/Deaf or hard of hearing. The receipt of a disciplinary report (DR) can result in the d/Deaf or hard of hearing inmate losing gain time off his/her sentence, and therefore potentially serving a longer prison sentence than inmates who are not d/Deaf or hard of hearing.

It is very clear that, as a group, d/Deaf and hard of hearing inmates are unable to hear and thus unable to respond to spoken announcements or "move/call" signals that are made over a PA system or yelled out by officers. While some hard of hearing inmates, when they have their hearing aid(s) on may know that an announcement is being made (sound localization), they are unable to understand the content of the announcement. Deaf inmates are not even able to discern that an announcement is being made. Thus, as a group, d/Deaf and hard of hearing inmates have virtually no equivalent access to information, some of which is potentially life-threatening, that is available to all other inmates. In order for d/Deaf and hard of hearing inmates to be provided with the same level of information, independence and communicative access as non-deaf and hard of hearing inmates, it is my opinion that visible, lighted message-differentiated signal boards must be provided in each of the living quarters, clearly visible in dorm settings and from or within each cell that houses a d/Deaf or hard of hearing inmate. In addition, FDOC should also consider installing bed-shaking devices that would vibrate and physically notify d/Deaf and hard of hearing inmates. This would also afford d/Deaf and hard of hearing inmates a measure of independence.

I believe that FDOC must install visual alarms and signals in all common areas (e.g. visiting areas, medical areas, employment areas, classroom areas, library areas) and, if not in the cell/room of each d/Deaf and hard of hearing inmate, at least in a location that is clearly visible from all parts

of the cell/room. In each facility where a d/Deaf or hard of hearing inmate was housed in a cell, I entered one cell in each of those facilities. In none of them was an alarm visible through the window of the cell door. Ideally, instead of a simple light or strobe light, FDOC would install lighted message boards that would alert d/Deaf and hard of hearing inmates to the nature of what is being signaled (alarm, lock down, meals, roll call, etc.). And, importantly, the visual alarms and signals installed should be uniform across all facilities so that a d/Deaf inmate transferred to a different facility does not need to learn new alarms and signals.

       *4.*     FDOC's Failure To Provide Interpreters And To Ensure Effective Communication.

Based on my interviews with d/Deaf and hard of hearing inmates, I conclude that FDOC has failed to provide sign language interpreters for interactions involving d/Deaf and hard of hearing inmates. When asked about interpreters, inmates responses included: no interpreters at AA meetings (███████████, Lowell Annex), no interpreters at ADA meetings (███████████, Madison), no interpreters for classes ███████████, Madison), no interpreters provided for classes or religious services for two years (███████, NWFRC Annex), no interpreters for classes (████████, NWFRC Main), no interpreters at all (████████, Okaloosa), no interpreters for GED classes (████████, Okaloosa), none for medical appointments (████████, Tomoka), none for medical or classes (████████, Tomoka), no interpreters provided at all (████████, Union). Based on these interviews and a review of policies and procedures, I believe that interpreters are usually not provided for disciplinary hearings, work opportunities (e.g. PRIDE). Clearly there is a systemic failure to provide interpreters for critical interactions involving d/Deaf and hard of hearing inmates.

As noted above, d/Deaf and hard of hearing inmates need qualified sign language interpreters in order to communicate effectively in all group interactions and in all "high stakes" (examples described above) one-on-one interactions. While most of the FDOC inmates I interviewed reported that they required the services of an interpreter in order to communicate effectively, the fact is that FDOC personnel need interpreters as much as the d/Deaf and hard of hearing inmates do. It is not simply one party in an interaction who needs interpretation services; interpreters are needed because the participants do not have a shared language and thus cannot communicate directly or effectively with each other. An interpreter is needed not because someone is d/Deaf or hard of hearing; an interpreter is needed because counselors, doctors, hearing officers, etc. do not know American Sign Language and because d/Deaf and hard of hearing inmates do not have reliable access to spoken English. FDOC's failure to provide interpreters makes it clear that it does not view provision of interpreters as necessary for its personnel to do their jobs. Absent the provision of interpreters, FDOC cannot claim that its counselors, doctors, hearing officers, etc. are able to communicate effectively with d/Deaf and hard of hearing inmates in group interactions and in all "high stakes" one-on-one interactions.

At one facility a Deaf inmate with diabetes ██████████, Tomoka) reported that for years he routinely received a regular, single injection from the prison's medical facility always without an interpreter. He stated that one day several months ago, he reported to medical, again with no interpreter, and on that day was given two injections. He had, and to this day still has no idea whether each injection was half a dose or whether his diabetes had worsened so that he needed a double dose. Yet another Deaf inmate reported that for years he had regularly taken five medications (██████████, NWFRC Annex), one of which was for a heart condition. Again, no interpreter was present when he was given his medications. He stated that one day he reported to

medical, without an interpreter, and was given only four medications – but not his heart medication. He was never given his heart medication again. He had, and to this day still has no idea whether this was/is a medical staff oversight or whether his heart condition changed so that he no longer needs the heart medication. Another Deaf inmate (███████████, Marion) stated that he has had leg problems and, without an interpreter, was unable to accurately describe the symptoms to medical personnel and they were unable to properly treat his leg problems. He also reported that he was given an eye exam, again without an interpreter, and was given a glasses prescription that caused him headaches and as a result he stopped wearing his glasses. His requests for another appointment with an interpreter were ignored.

FDOC's failure to provide interpreters was reported at all facilities I visited. Inmates I interviewed at all facilities reported that interpreters are not routinely provided for "high stakes" interactions. Two of the inmates I interviewed (████████, Okaloosa; ████████, NWFRC Main) reported that "inmate interpreters" were used on more than one occasion. This practice of using "inmate interpreters" is highly problematic and troublesome for a number of reasons.

Here it is worth stressing that there is a difference between "social signers" (i.e. individuals who know how to sign and may, in some very limited and low risk situations be able to facilitate communication between d/Deaf and hard of hearing people and non-deaf people) and qualified, certified interpreters. The level of competence achieved by these "social signers" is clearly not the level of fluency required to interpret with accuracy, fidelity and fluidity, which are necessary for effective communication.

Without proper training, these "social signers" turned interpreters are likely to be unaware of the linguistic and structural differences between ASL and English. They also are likely to think

that the goal of interpreting is nothing more than rendering a sign for each word they hear or vice versa, when the essence of interpretation lies in determining meaning and intent and, as discussed above, discarding the form (i.e. the words or signs) of the original message. Finally, these "social signers/faux interpreters" are likely to be unable to manage and control lag time in order to deal with more structurally dense or complex messages.

Another, perhaps more important issue that must be considered is that employee or inmate "social signers/faux interpreters" will often have an interest in the material that they are signing or speaking. Someone acting as an interpreter who has a vested interest in the outcome of an interaction (e.g. a disciplinary meeting) will be unable to maintain the level of neutrality and objectivity required to accurately communicate the interaction. In addition, there are potential HIPAA violations by involving someone in an interaction who is not bound by confidentiality. By contrast, certified interpreters provide a level of measured, objective neutrality in their work that signing co-workers or fellow inmates may be unable to do so. Like doctors and lawyers, certified interpreters are bound by a professional code of ethics and conduct and pledge to maintain confidentiality, neutrality, impartiality and objectivity in their work (http://www.rid.org/ethics/code/index.cfm); "social signers/faux interpreters" are bound by no such code of ethics or ethical code of conduct.

Numerous d/Deaf and hard of hearing inmates across all FDOC facilities I visited report that they wish to take educational (GED) and/or self-help programs (e.g. AA, NA) available to the general inmate population. However, without sign language interpreters, they are unable to participate in or benefit from such classes or programs. Thus, the benefits available to the inmate population in general are denied to d/Deaf and hard of hearing inmates. Failure to provide interpreting services is not isolated by interaction type (e.g. medical, educational, disciplinary) nor

is it isolated by facility (failure to provide interpreters was reported at all FDOC facilities I visited). In my opinion there is a systemic failure on the part of FDOC to provide interpreters so that d/Deaf and hard of hearing inmates have access to the services and programming available to the general inmate population.

Finally, a number of inmates expressed frustration at the delays in receiving appropriate responses to grievances they file. They report that grievances are routinely denied. They also report that grievances regarding provision of interpreting services, after being denied, are often referred to medical for resolution. Such delays mean that d/Deaf and hard of hearing inmates are not provided the same timely response to grievances as those inmates who are not d/Deaf or hard of hearing. Identification of what is needed for effective communication for each inmate should be clearly indicated on each d/Deaf and hard of hearing inmate's file. This would be significantly facilitated by a statewide system and, at least in cases involving provision of interpreters, reduce grievance response time.

I believe that in order to have meaningful and effective communication between FDOC employees and d/Deaf and hard of hearing inmates in all group interactions and an in all "high stakes" one-on-one interactions, and to provide communicative access to educational and therapeutic programming throughout the FDOC system, FDOC must provide sign language interpretation by state or nationally credentialed sign language interpreters.

     *5.*    FDOC's Failure To Provide Valid And Reliable Communication Assessments.

Based on my review of documents submitted, my knowledge and experience, and my review of documents, I believe that FDOC's audist actions clearly speak louder than its words in the matter of valid and reliable language/communication skills and needs assessments of d/Deaf

and hard of hearing inmates. FDOC personnel's view of d/Deaf and hard of hearing inmates means that, as noted above, they rely on medical personnel to determine whether interpreting services are needed for individual d/Deaf or hard of hearing inmates. This means that the determination of effective means of communication with d/Deaf and hard of hearing inmates lies in the hands of medical personnel who, more than likely, do not know American Sign Language and, more importantly, do not know how to assess effective communication when interacting with d/Deaf and hard of hearing inmates. The determination of effective means of communication with d/Deaf and hard of hearing inmates should be made by language or communication specialists who are fluent in sign language and by d/Deaf and hard of hearing inmates themselves.

Based on my review of documents it appears that no one is responsible for assessing overall communication/language skills and that there is no clear assessment of ASL proficiency for d/Deaf and hard of hearing inmates. This should be done when the inmate first enters the FDOC at the reception centers.  Without valid language and communication assessments, d/Deaf and hard of hearing inmates are significantly disadvantaged relative to inmates who are not d/Deaf or hard of hearing, and are also denied opportunities available to inmates who are not d/Deaf or hard of hearing. The fact that one uses another language, spoken or signed, is in no way an accurate or valid indicant of one's capabilities. What is valid is that if those whose first language is "sign language" are not provided appropriate and effective means of communicative access to various services and programming (e.g. educational and vocational), they will not be able to successfully access such services or programming. The fault lies not in those whose first language is "sign language" but rather in the failure of FDOC to provide effective communicative access to services and programs.

- 44 -

I believe that FDOC must provide language/communication skills and needs assessments of d/Deaf and hard of hearing inmates by qualified individuals during intake at the reception centers, and that the process for determining what language/communication skills and needs assessments of d/Deaf and hard of hearing inmates require for effective communication to occur must include those d/Deaf and hard of hearing inmates in making those determinations.

      *6.*     FDOC's Lack Of VRI Is Problematic And Inadequate.

Based on my tour of FDOC facilities, my review of documents and my interviews with d/Deaf and hard of hearing inmates, I believe that FDOC's failure to use Video Remote Interpreting (VRI) services for emergency "high stakes" interactions (e.g. medical and disciplinary) is inadequate, ineffective and problematic. VRI enables two people in the same location who cannot communicate effectively (e.g. a d/Deaf inmate and a nurse/doctor) to connect with an interpreter situated in another physical location. VRI is basically an on-demand service so there is no delay in waiting to schedule an in-person interpreter. However, reliance on wireless connectivity in certain facilities may mean that VRI cannot be a reasonable alternative to in-person interpreting. However, in those facilities I believe that FDOC must use hard-wired Ethernet connectivity to ensure reliable VRI access.

Even if the apparent bandwidth issue could be addressed (as it should be), the physical size of the FDOC facilities makes dedicated VRI units in the medical areas, disciplinary/hearing rooms and individual counseling rooms appropriate and necessary. Absent this, FDOC cannot claim to provide d/Deaf and hard of hearing inmates with effective communication and a comparable level of communicative access as is enjoyed by non-d/Deaf and hard of hearing inmates.

To the extent that FDOC personnel are not using VRI for complete "high stakes" (e.g. medical and disciplinary) interactions whenever in-person interpreting is not available, it cannot claim to be providing effective communication with d/Deaf and hard of hearing inmates in such interactions.

I believe that in order to have meaningful and effective communication between FDOC personnel and for d/Deaf and hard of hearing inmates via VRI, FDOC must ensure that the internet bandwidth is sufficient to provide reliable video access. I also believe that in order to provide rapid response to unscheduled "high stakes" interactions, at a minimum FDOC must have VRI units in the medical, disciplinary and counseling areas of each facility that has a d/Deaf or hard of hearing inmate. Further, FDOC should use VRI only when an in-person interpreter is not available.  It has been my experience that greater internet bandwidth is more readily available near major urban areas.  It is for this reason and others that I have recommended that d/Deaf and hard of hearing inmates be placed in correctional facilities closer to major urban areas.

       *7.*    FDOC's Provision Of Telephonic Access Is Problematic And Ineffective.

Based on my tour of FDOC facilities, my experience and knowledge, my review of documents and my interviews with d/Deaf and hard of hearing inmates, I believe that FDOC's current practices and procedures provide d/Deaf and hard of hearing inmates with significantly less equivalent and effective telephonic access than inmates who are not d/Deaf or hard of hearing.

In particular, d/Deaf and hard of hearing inmates in FDOC facilities are provided limited access to a TTY relative to the access other inmates have to regular telephones. There are several limitations to TTYs, however. One limitation is that this direct point-to-point TTY communication requires that both parties have TTYs. Although TTYs are free, federally mandated TTY relay

services have, in the past, provided a significant level of communication access for d/Deaf and hard of hearing people, the fact is that TTY technology has essentially become obsolete for reasons discussed below. Also because a TTY conversation is typed, TTY conversations always take more time than if the conversation had been spoken or signed. One has only to compare the difference between telegraphic communication (using Morse Code) and telephonic communication (using spoken English) to have a rough parallel to the levels of access provided by TTYs and telephones.

Because TTYs are essentially obsolete, it is increasingly unlikely that those with whom FDOC d/Deaf and hard of hearing inmates wish to communicate will even own TTYs. For example, inmates ██████████ (NWFRC Annex), ██████████ (Madison) and ██████ ██████ (Marion) all report that their families do not own a TTY thus making direct communication with their families impossible. However, they each report that their families have videophones (discussed below) which would make direct communication possible.

For different reasons, a TTY does not provide FDOC d/Deaf and hard of hearing inmates with effective communication with those outside FDOC. In order to use a TTY effectively, the user must be proficient in written English and, as described above, many d/Deaf and hard of hearing inmates do not communicate effectively in English. Thus, for those inmates a TTY does not provide telephonic access that is reasonably equivalent to the level of access available to non-deaf inmates.

In addition to the limitations noted above, inmates report that TTY calls are more expensive than regular telephone calls. A number of inmates (e.g. ██████████, Tomoka; ██████████, Okaloosa; ██████████, Tomoka; ██████████, Marion) all report that they do not make TTY calls as often as they would like because of the increased cost.  At several facilities I visited

- 47 -

or documents I reviewed, it was frequently reported that the TTY did not work, the officer in charge of the TTY did not know how to operate it, and at one institution the officer took the TTY out of the box for the first time and did not have any idea how it operated. Additionally d/Deaf and hard of hearing inmates, unlike all other inmates, must request that the TTY be brought to them which delays their telephonic access relative to other inmates. At some facilities I visited the TTY was located in a different building in the facility resulting in a significant delay in obtaining the TTY thus providing an unequal level of telephonic access to d/Deaf and hard of hearing inmates. While there is an FDOC policy/procedure that provides d/Deaf and hard of hearing inmates double time when they use TTYs, some inmates report that they were not provided double time. Doing so results in d/Deaf and hard of hearing inmates having truncated telephonic access via TTY. There is some question whether this policy/procedure is reliably and consistently being followed.

For many d/Deaf and hard of hearing inmates who have intelligible speech and proficiency in reading English, new telephone technology exists that would provide them with a level of communicative access equivalent to other inmates. This technology, captioned telephone (CapTel), allows a d/Deaf or hard of hearing caller with intelligible speech to place a telephone call to anyone who has a regular telephone. Using CapTel, inmates would place their call and speak directly to the other party. The other party would then speak in response to the inmate. The other party's spoken response would then be converted to on-screen text that the inmate could read. For late-deafened, educated native speakers of English who possess the literacy skills necessary, the use of CapTel would give them an equivalent level of telephonic access as other non-deaf inmates. The use of CapTel is especially effective for individuals who lose their hearing later in life and those who have intelligible speech.  For example, inmate ███████████ (Union) specifically stated that he would like to have access to CapTel because he cannot use the telephone directly. It

is my opinion that to ensure effective communication, FDOC must provide d/Deaf and hard of hearing inmates who have intelligible speech and proficiency in English with CapTel access reasonably equivalent to the level of access as other non-deaf inmates have to regular telephones.

For some d/Deaf and hard of hearing inmates, CapTel is not at all a viable option because of their unintelligible speech and extremely limited English proficiency. During the past fifteen years, Deaf people have eagerly and quickly replaced TTYs with Videophones (VPs) over the last 10 to 15 years for two very understandable reasons. First, TTYs require communication in typed English (the second language for most d/Deaf and hard of hearing people and a language in which, as noted above, they rarely attain any significant level of fluency). Second, because TTY conversations are typed, those conversations take significantly longer and thus when d/Deaf or hard of hearing people use TTYs they tend to keep conversations very brief (e.g. to make arrangements to meet in person). VPs, by contrast, enable d/Deaf and hard of hearing people to communicate using American Sign Language, a language in which they are much more comfortable and fluent. Thus, their VP conversations are not encumbered by written English nor slowed by having to type. Signed VP conversations are exactly analogous to spoken telephone conversations. A significant advantage to VP conversations relative to TTY calls is that, other than the institutional cost of the internet connection, there is no per call cost.

If each party has a VP then they can communicate directly; however, if only one party has a VP then communication with the party who does not have a VP is only possible using a free Video Relay Service (VRS), which utilizes the same hardware/software as the VP. Either party can initiate communication by connecting with a VRS provider and a VRS interpreter will facilitate the call, communicating via VP with the d/Deaf or hard of hearing caller and via voice with the non-deaf caller. If calling someone who does not have a VP, d/Deaf and hard of hearing

inmates would use the VP to call a VRS center where a qualified ASL interpreter will answer. The d/Deaf or hard of hearing inmate then provides the phone number he wishes to call and the ASL interpreter places the call. The d/Deaf or hard of hearing inmate signs to the interpreter who then interprets into spoken English for the non-deaf person on the other end of the phone line, and also interprets that person's spoken English into ASL for the d/Deaf or hard of hearing inmate.

There is no cost to the individual for using VRS other than the cost of internet connectivity. The Federal Communications Commission (FCC) established the Telecommunications Relay Fund to fund the costs of Telecommunication Relay Services (established under Title IV of the Americans with Disabilities Act). Funding comes from rate adjustments or surcharges on local telephone bills that are set annually by the FCC. Companies that offer Video Relay Services (VRS) are paid from the TRS fund and those companies provide free Videophone equipment to d/Deaf individuals and companies/entities with d/Deaf employees. In addition to the fact that the only cost for a VP is the internet connection, a major advantage is that VPs allow Deaf people to communicate directly in ASL. A secure VP that is as accessible to d/Deaf and hard of hearing inmates as telephones are to non-deaf inmates is necessary to provide them an equivalent level of telephonic access as is provided to non-deaf inmates.

The FCC has also encouraged correctional facilities to move beyond the use of antiquated TTYs:

> Access to more advanced forms of TRS, including VRS, IP Relay, CTS, and IP CTS, may be necessary to ensure equally effective telephone services for these inmates. We recognize that some facilities have already begun providing access to alternative forms of TRS, often as the result of litigation brought under these other statutes. We strongly encourage other facilities to continue this trend voluntarily, without the need for further litigation. (FCC, 2015)

A number of state DOCs have installed and make use of VideoPhones which also allow inmates to use VRS. Among those state DOCs are Maryland, Maine, Vermont, Virginia and Wisconsin.

What is most important, however, is that a d/Deaf and hard of hearing inmate's effective telephonic communication cannot be determined simply by the results of an audiogram or an overly simplistic classification. For all these reasons it should be clear why d/Deaf and hard of hearing inmates must be involved in determining what counts as effective communication.

It is my opinion that in each facility housing d/Deaf and hard of hearing inmates, FDOC must make at least one CapTel phone readily and permanently available to d/Deaf and hard of hearing inmates who have telephonically intelligible speech to make it possible for them to access point-to-point telephone calls. Further, I believe that FDOC must provide access to VPs for d/Deaf or hard of hearing inmates and access to Video Relay Service (VRS) providers for them to have telephone services and benefits that are equivalent to those afforded non-deaf inmates. Provision of a VP would also help reduce the communicative isolation of some d/Deaf or hard of hearing inmates because they would be able to communicate directly with other Deaf people or with fluent interpreters.

8.  Inadequate And Ineffective Access To Television Programming.

Many of the FDOC facilities I visited had 19 inch analog televisions mounted ten feet above floor level. Although most of the televisions that I saw had captions displayed, the captions were illegible because of the small size of the television and the distance from the viewer. In some facilities d/Deaf and hard of hearing inmates reported that the captions were turned on just before my visit but were not routinely displayed. I was told that FDOC relies on donated television sets

provided to FDOC when donors purchase new television sets. The current practice in many on the FDOC facilities I visited provides the illusion of access without meaningful access. I believe that FDOC must provide large screen televisions so that captions are accessible to d/Deaf and hard of hearing inmates.

There are a number of d/Deaf and hard of hearing inmates who benefit from the use of radio transmitters (using the telecoil setting on their hearing aids or special receivers) to access the audio portion of television programming. However, despite a previous legal ruling, inmates report that facilities have failed to provide or install these transmitters (e.g. ███████, Okaloosa; ███████, Union). I believe that, in addition to providing legible captioning, FDOC must provide TV transmitters and radio receivers for those d/Deaf and hard of hearing inmates who can benefit from them.  For it does the hard of hearing no benefit whatsoever for the TV to have radio transmitters if the FDOC does not also provide the hard of hearing with a telecoil device and radio receiver for the hearing aid.  Providing the hard of hearing with a telecoil device and radio transmitter so the inmate can hear the TV is no different in kind than providing the visually challenged with a pair of glasses so he can see the TV.  It is simply a different reasonable accommodation.

> 9.    Inadequate And Ineffective Provision Of Hearing Aids.

It appears that the standard policy at FDOC is to provide d/Deaf and hard of hearing inmates with a single hearing aid. In my opinion this is problematic for several reasons. A single hearing aid may not enable a d/Deaf or hard of hearing inmate to locate the source of a sound (echo location) and may adversely affect that inmates balance. Indeed, a number of inmates report that they had two aids before entering the FDOC system and that they have continuing difficulties adjusting to only a single aid (e.g. ███████, Union; ███████, Okaloosa; ███████,

RMC Main; ███████, NWFRC Main; ███████, NWFRC Main). Some inmates (e.g. ███████, Union) results in ringing in the unaided ear or that they no longer wear the single aid because of the problems it causes (e.g. ███████, Columbia Annex). The provision of only a single aid for inmates who need two is analogous to providing a glasses wearer with only one lens. An FDOC policy of providing only one lens would clearly be seen as unacceptable and ineffective. Inmates also report that they are denied requests for new ear molds, batteries or repair of their aids. I believe that FDOC must reexamine and revise its policy of providing only a single aid to d/Deaf and hard of hearing inmates and should reexamine its policy of only replacing/upgrading hearing aids every four years.

10.    Inadequate Training Orientation Of FDOC Personnel

d/Deaf and hard of hearing inmates report that they are regularly maltreated by FDOC personnel. The vast majority of inmates that I interviewed (24 out of 30) report such maltreatment by FDOC personnel. This maltreatment includes harassment, being teased by officers, officers cursing and swearing at them, mocking their use of signing, being threatened by officers, retaliation for requesting an interpreter, total indifference by officers, accusing them of faking their hearing abilities, overall negative attitudes, among other complaints.

Such treatment stems from ignorance and confirmation bias (Nickerson, 1998). As noted above, most people who are not deaf have very uninformed beliefs about and attitudes toward deaf people. Without appropriate training and information, they then seek evidence or support for their existing beliefs or opinions. Based on my interviews at FDOC facilities, it is clear that FDOC personnel have uninformed beliefs about d/Deaf and hard of hearing people and confirmation bias supports those uniformed beliefs. To address this, I believe that FDOC must institute regular and mandatory training for all FDOC personnel who interact with d/Deaf and hard of hearing inmates.

- 53 -

I believe that FDOC must provide regular orientation and training sessions to FDOC personnel (officers, counselors, and medical personnel) that present the communicative access rights and needs of d/Deaf and hard of hearing inmates from a social and communicative perspective rather than simply an audist, medical perspective.

> 11.   Inadequate Employment Opportunities for d/Deaf And Hard Of Hearing Inmates

d/Deaf and hard of hearing inmates report that the FDOC employment opportunities available to them are limited to being housemen and house women even though they wish other types of employment (e.g. ██████████, Union; ██████████, NWFRC Main; ██████████, NWFRC Annex; ██████████, Okaloosa; ██████████, Okaloosa).  I was told that a "houseman" is akin to custodial staff for the dorm; they wipe down tables, mop floors, and clean up the dorm. Many times these tasks can be completed rather quickly, thus leaving the inmate with nothing to do for the rest of the day.  This lack of opportunities can contribute to social isolation and inhibit rehabilitation by not giving the inmate a sense of purpose while in prison.  They are specifically told that they cannot have other types of employment because "you're deaf", "you're disabled", "you can't hear". This is clearly discrimination on the basis of audiological status, i.e. audism.

d/Deaf and hard of hearing inmates are also denied opportunities to participate in re-entry programs, work release programs, PRIDE programs and other employment opportunities (e.g. ██████████, Okaloosa; ██████████, Okaloosa; ██████████, NWFRC Annex; ██████████, NWFRC Main; ██████████, Union; ██████████, Madison). Once again, they report that they are denied these opportunities, especially re-entry programs, simply because of their audiological status. These inmates report that requests for interpreters in order to participate in these programs are routinely denied. This is another example of ignorance, confirmation bias and

audism as noted above. Again, I believe FDOC must provide regular training for FDOC personnel. Appropriately informed decision makers would improve opportunities and access for d/Deaf and hard of hearing inmates to enable them to secure appropriate and meaningful employment.

12.    FDOC Consolidation Of d/Deaf And Hard Of Hearing Inmates.

Based on my knowledge and experience, my tour of FDOC facilities, my interviews with d/Deaf and hard of hearing inmates and my review of documents, I believe that the current FDOC practice of dispersing d/Deaf and hard of hearing inmates throughout the FDOC statewide system is problematic for several reasons. First, this practice means that the communication access accommodations discussed above must be provided at each facility that houses a d/Deaf or hard of hearing inmate. Based on my interviews with d/Deaf and hard of hearing inmates it is clear that this practice does not provide effective and efficient communication access for d/Deaf and hard of hearing inmates. Second, this practice makes it very likely that cost will be invoked as a reason for not providing effective and efficient communication access. Indeed, cost was reported by a number of d/Deaf and hard of hearing inmates as the reason why interpreters were not being provided. Third, this practice makes it possible that d/Deaf and hard of hearing inmates might be housed in what can only be described as communicative solitary confinement, i.e. housed in a facility in which they are unable to have meaningful, extended communication with other inmates. Fourth, selecting facilities near large metropolitan areas makes it much more likely that regular access to qualified, credentials interpreters can be provided, and access to better bandwidth for internet services for VP and VRI. Fifth, selecting facilities near large metropolitan areas would enable FDOC to contract with local hearing aid dealers/repair facilities that would significantly reduce the time that d/Deaf and hard of hearing inmates have to wait for their aids to be repaired, and not have to wait to be transferred to Lake Butler for all hearing aid repairs which is apparently the

current procedure.  There are large hearing aid centers near major metropolitan areas which provide a higher quality hearing aids and hearing aid repair at a fraction of the cost of other providers.

I believe that FDOC should consider consolidating d/Deaf and hard of hearing inmates in 3-5 FDOC facilities located near major metropolitan areas. This would result in significant system wide cost savings by making only 3-5 facilities fully accessible for d/Deaf and hard of hearing inmates rather than making each facility in the FDOC system accessible. It would also create a critical mass of d/Deaf and hard of hearing inmates in those facilities would then make it more likely that FDOC personnel in those facilities would be more aware of and sensitive to the visual access needs of d/Deaf and hard of hearing inmates.  It is also important to ensure that there are a sufficient number of geographically dispersed institutions, to ensure that an inmate is not housed an in institution that is far from family or friends.  It is also important to stress that these institutions must vary by classification/security designation (e.g., institutions that can hold high and low risk security inmates, close management facilities, and facilities with a sufficient level of medical care). Finally, being located near larger metropolitan areas would provide easier and more reliable access to interpreter referral agencies and a larger pool of interpreters. It also would reduce travel time to DOC facilities which is an important consideration for interpreters. Additionally, it would make it possible to use local hearing aid repair facilities which would greatly decrease turn-around time for repairs.

     *13.*     Inadequate Or Non-Existent FDOC Policies And Procedures.

Based on my knowledge and experience, my tour of FDOC facilities, my interviews with d/Deaf and hard of hearing inmates and my review of documents, I have found that many of FDOC's failures in ensuring effective communication with/by d/Deaf and hard of hearing inmates

are a result of FDOC's failure to implement, and ensure the consistent application of, adequate system–wide institutional policies and procedures concerning those inmates. FDOC should have in place policies and procedures that, at the very least:

(1) implement procedures that ensure that appropriately tasked individuals are mandated to act proactively and regularly in order to ensure that FDOC facilities and accommodation decisions are compliant with federal laws ensure an in-depth assessment of the communication needs of d/Deaf and hard of hearing inmates, involving the inmates themselves, as soon as possible upon entry into the prison system

(2) ensure adequate and reliable tracking of d/Deaf and hard of hearing inmates as they move throughout the system

(3) ensure notification of facility level officials upon the arrival of a d/Deaf or hard hearing inmate at their facility

(4) provide comprehensive guidelines for the provision of all necessary accommodations to d/Deaf and hard of hearing inmates (not merely piecemeal guidelines or procedures that address limited accommodations at certain facilities that house d/Deaf and hard of hearing inmates)

(5) require annual audits to evaluate compliance and allow for improvement

(6) examine the policy of cuffing d/Deaf and hard of hearing inmates behind their backs, a practice which eliminates their ability to communicate by writing, gesturing or signing

(7) examine the current grievance procedures and the reasons for the constant delays reported by d/Deaf and hard of hearing inmates. Implementation of the current grievance procedures seems to place an undue burden on d/Deaf and hard of hearing inmates.

The current lack of appropriately implemented policies and procedures, and the failure to recognize the lack of and need for enforcing such policies and procedures, has resulted in a system in which there is no uniform approach to providing the accommodations needed to ensure effective communication with d/Deaf or hard hearing inmates.

      *14.*     Providing Adequate Communicative Access.

Here it is worth noting that at least one other state prison system has taken appropriate steps to address access issues of d/Deaf and hard of hearing inmates. As my cv indicates, in 2010 I was an expert witness in a class action lawsuit against the Virginia Department of Corrections (Minis, et al v VDOC). The issues faced by Virginia d/Deaf and hard of hearing inmates are the same issues faced by d/Deaf and hard of hearing inmates in Florida. In 2010 the Virginia Department of Corrections signed a consent decree that, in my opinion, committed VDOC to provide appropriate and adequate remedies to these access issues. I believe that this decree serves as a model for providing effective communication and communication access.

Given that FDOC does not provide d/Deaf and hard of hearing inmates with appropriate visual alarms/signals, has not provided d/Deaf and hard of hearing inmates with an equivalent level of telephonic communication as enjoyed by other inmates, and has not provided d/Deaf and hard of hearing inmates with regular services of qualified interpreters, I believe that the following remedies must be put in place in order for FDOC d/Deaf and hard of hearing inmates to have a level of effective communication and a level of communicative access similar to that enjoyed by inmates who are not d/Deaf or hard of hearing:

             a)     I believe that FDOC must provide qualified, professional, credentialed interpreters for all "high stakes" interactions involving

d/Deaf and hard of hearing inmates which clearly include, but are not limited to, disciplinary and investigative meetings, medical appointments and visits, appointments with psychologists/psychiatrists and/or other mental health professionals, offender treatment programing, meetings with facility administration, meetings with counselors, classification officers, religious activities, classes and/or educational opportunities. In my opinion, failure to do so means that FDOC cannot accurately state that it is providing d/Deaf and hard of hearing inmates with "qualified interpreters" (state or nationally credentialed) needed to permit meaningful and effective communication. In addition to high stakes situations as discussed above, all "public" events and group settings such as classes and/or educational opportunities or group meetings clearly require professional interpreting services for d/Deaf or hard of hearing inmates. Since classes, meetings and other regular recurring events have set schedules, interpreter referral agencies should be retained to provide interpreters for such events. If FDOC facilities are located near large metropolitan areas this makes provision of interpreters more reliable and efficient. For a number of obvious reasons, interpreting services should not be provided by inmates or by correctional personnel.

b)      I believe that FDOC must provide those d/Deaf or hard of hearing inmates who have telephonically intelligible speech and are literate

in English with access to a captioned telephone (CapTel) that will allow them the same level of telephonic freedom experienced by non-deaf inmates. This will enable those d/Deaf and hard of hearing inmates to place approved calls directly to friends, family and other individuals or businesses with whom they may wish to have contact — the same telephonic access provided to non-deaf inmates.

c)      I believe that FDOC must provide d/Deaf or hard of hearing inmates who do not have telephonically intelligible speech or who do not possess sufficient literacy to use a TTY or a CapTel with access to a Videophone (VP). This will allow them the same level of telephonic freedom experienced by non-deaf inmates by enabling them to place approved calls directly to those who also have a VP or, using the free FCC-funded VRS interpreters, to place calls to friends, family and other individuals or businesses with whom they may wish to have contact who do not have a VP. Again it is critical to involve the d/Deaf or hard of hearing inmate in decisions about what equipment will provide them with effective telephonic communication.

d)      I believe that FDOC must install Video Remote Interpreting (VRI) units in strategic locations in each facility that houses a d/Deaf or hard of hearing inmate, given that it is not reasonable or practical for FDOC to have on-staff interpreters present at all times. While it is true that, for most interactions, a physically present interpreter is

preferred whenever possible, technology now offers this additional option.

e)      In my opinion, the installation of VRI equipment at least in the medical facilities office and rooms in which disciplinary and counseling meetings might occur is necessary to provide a much more appropriate level of communicative access for d/Deaf and hard of hearing inmates and would provide that access in an immediate and timely manner. VRI service is an on-demand service, available seven days a week, twenty-four hours per day, and some companies will bill only for minutes used rather than to the nearest half hour. Using VRI to supplement the physically present interpreter, d/Deaf and hard of hearing inmates and officials at FDOC facilities will never have to experience inordinate and inappropriate delays in being able to communicate efficiently and effectively with each other in such settings. This will also ensure that in these "high stakes" settings FDOC is able to provide "an interpreter who is able to interpret effectively, accurately and impartially both receptively and expressively, using any necessary specialized vocabulary." (http://www.ada.gov/taman3.htm.)

It is my opinion that VRI should be used to supplement, but definitely not replace, regularly scheduled physically present interpreters. There are a number of interpreted interactions that are best handled with a physically present interpreter or will occur in

physical locations not equipped for VRI. These interactions must be analyzed to determine the number of hours for which a physically present interpreter is scheduled.

A number of state DOCs have installed and make use of VRI including California, Oregon and Virginia.

f)  I believe that FDOC must install visual alarms and signals in all common areas (e.g. visiting areas, medical areas, employment areas, classroom areas, library areas) and, if not in the cell/room of each d/Deaf and hard of hearing inmate, at least in a location that is clearly visible from all parts of the cell/room.

## IV.   **Conclusions With Respect To Treatment Of D/Deaf Or Hard Of Hearing Inmates in FDOC Facilities.**

Direct communicative interaction:

- The fact that a d/Deaf or hard of hearing person uses his/her speech in certain restricted interactions cannot be taken as an indication that that person does not require the services of an ASL/English interpreter in order to have effective communication.

- The fact that a d/Deaf or hard of hearing person is able to lip-read in certain restricted interactions cannot be taken as an indication that that person does not require the services of an ASL/English interpreter in order to have effective communication.

- Reliance upon verbal commands, announcements and signals is an inefficient and ineffective means of communicating with many d/Deaf or hard of hearing inmates.

- Reliance upon announcements made over a PA system to signal all moves and provide other information is not an effective way to communicate with d/Deaf and hard of hearing inmates.

- 62 -

- Provision of a visual alarms/alert notification system (e.g. lighted message board) is necessary to ensure effective and efficient communication with d/Deaf and hard of hearing inmates.

Telephonic access:

- Provision of TTYs where d/Deaf and hard of hearing inmates have a level of literacy sufficient to use the TTY effectively.

- Provision of CapTel functionality is necessary to provide equivalent telephonic services to d/Deaf and hard of hearing inmates who have telephonically intelligible speech and a level of literacy.

- Provision of a Videophone and access to a Video Relay Service is necessary to provide equivalent telephonic services to d/Deaf and hard of hearing inmates unable to use CapTel.

Provision of interpreting services:

- Provision of qualified sign language interpreter services is the only way to provide d/Deaf and hard of hearing inmates with access and effective communication for the same educational, training and self-improvement programs available to inmates who are not d/Deaf or hard of hearing.

- Video Remote Interpreting (VRI) is the best way to provide d/Deaf and hard of hearing inmates with effective and equivalent access to "an interpreter who is able to interpret effectively, accurately and impartially both receptively and expressively, using any necessary specialized vocabulary" in high stakes, "emergency" situations.

- VRI equipment in the nurse's office, warden's office and other key locations in each FDOC facility that houses d/Deaf and hard of hearing inmates, may be the only way for FDOC to provide effective communication in emergency, "high stakes" situations.

- VRI should only be used in "last minute/emergency" situations in which an interpreter is needed. VRI should not be viewed as a replacement for physically present interpreters at most scheduled high stakes and "public" situations.

FDOC personnel training:

- A mandatory information, orientation and education program for FDOC personnel who are responsible for, or have need to interact with d/Deaf and hard of hearing inmates is necessary to address any stereotypes and audist biases and to promote the level of understanding of issues and needs of d/Deaf and hard of hearing inmates that will ensure nondiscrimination.

FDOC policies and procedures:

- A review of all FDOC policies and procedures, with appropriate modifications where warranted, is necessary to ensure that d/Deaf and hard of hearing inmates are not systematically disadvantaged relative to inmates who are no d/Deaf or hard of hearing.

- The FDOC needs a policy and practice of reviewing all d/Deaf or hard of hearing inmates at intake at the Reception Centers to determine their communication needs. The process of making such a determination must include each d/Deaf and hard of hearing inmate in determining what is needed for effective communication for each inmate. FDOC must ensure they are properly tested (not just hearing tests) and appropriately coded in the system. This coding will indicate the interpreter services needed for appointments, disciplinary hearings, work opportunities, programs, and religious services. When such appointments, hearings, etc. are held FDOC should arrange for interpreting services. It should not be the responsibility of the inmate to make requests for interpreting services. The policy and practice should be reviewed at least yearly because communication needs change. If an inmate changes facilities, that inmate's communication/access profile should follow – it is important to remember that, in general, an inmate's communication needs do not change only how a specific facility will meet those needs.

Consolidation of FDOC d/Deaf and hard of hearing inmates:

- Consolidate FDOC d/Deaf and hard of hearing inmates in 3-5 facilities located in large metropolitan areas to increase access to qualified, credentialed interpreters.

V.   **Summary**

Members of the American Deaf Community are a linguistic and cultural minority. The language that binds them together and is the critical determinant for membership in the Community is American Sign Language. Many people who are not deaf have stereotypical and audist misconceptions about Deaf people and American Sign Language. They believe that d/Deaf people can lip-read with a degree of accuracy that will enable meaningful communication, when in reality the level of accuracy for most d/Deaf people is 30% at best. Those who are not deaf believe that Deaf people can read and write English fluently when in reality the average Deaf person reads at approximately a fourth grade reading level. Those who are not deaf fail to understand that in order

for communication with d/Deaf inmates to be effective and efficient it must be visually clear and unambiguous.

FDOC has not installed visual alarms or signals that provide meaningful access for d/Deaf and hard of hearing inmates. Light boards that would display specific inmate "moves" or "calls" (e.g. counts, chow) would provide d/Deaf and hard of hearing inmates with the same access to information provided to non-deaf inmates by hearing PA announcements. Alternately, there are page alert systems, if appropriately and reliably implemented, might provide an acceptable alternative.

For meaningful, high stakes interactions, communicative access for d/Deaf and hard of hearing inmates must be provided by employing the services of a qualified sign language interpreter. In addition to physically present interpreters, technology has made it possible to use the services of Video Relay Services (VRS) or a Video Remote Interpreter (VRI), when it is impractical to have a physically present interpreter. VRI provides the only meaningful way to ensure accurate and effective communication in "last minute" emergency situations.

The only way to provide d/Deaf and hard of hearing inmates who do not have telephonically intelligible speech and a level of literacy with telephone services and benefits equivalent to those afforded non-deaf inmates is the provision of a Videophone and access to Video Relay Services.

The only way to provide d/Deaf and hard of hearing inmates who have telephonically intelligible speech and a level of literacy with telephone services and benefits equivalent to those afforded non-deaf inmates is the provision of TTY or CapTel telephone services.

Based on my 48 years' experience with the Deaf Community and my review of the record, I believe that FDOC has denied d/Deaf and hard of hearing inmates access to effective communication. Based on my experience, I believe that d/Deaf and hard of hearing inmates housed in FDOC facilities are the victims of audism.

I believe that FDOC must regularly review all of its policies and procedures and revise them where necessary to ensure that d/Deaf and hard of hearing inmates are not systematically oppressed and discriminated against d/Deaf and hard of hearing inmates.

Lack of information about Deaf people, their language and their culture on the part of FDOC employees appears to play a major role in their decisions to deny or restrict access for d/Deaf and hard of hearing inmates to programs and services available to non-deaf inmates. One way to address lack of information and ignorance about Deaf people, their language and their culture is to implement regular awareness-training programs. Among other topics, these training programs should address the stereotypes and biases about d/Deaf and hard of hearing people discussed above (e.g. levels of literacy and lip-reading) and the need for visual access.

This opinion is based on the materials I have reviewed thus far. I reserve the right to supplement this Declaration should new material become available to me.

I understand that a false statement in this Declaration will subject me to penalties for perjury. I declare under penalty of perjury that the foregoing is true and correct.


  /s/ Dennis Cokely
Dennis Cokely
Date:  January 27, 2017

VI.   <u>REFERENCES</u>

<u>Publications</u>

1. Alaska Justice Forum 24(2): 2-4. National Assessment of Adult Literacy and Literacy Among Prison Inmates. Justice Center, University of Alaska Anchorage. (Summer 2007).

2. Baker, Charlotte and Robbin Battison (eds.). 1980. Sign Language and the Deaf Community: Essays in Honor of William C. Stokoe. Silver Spring, MD: National Association of the Deaf.

3. Baker-Shenk, Charlotte and Dennis Cokely. 1980. American Sign Language: a Teacher's Resource text on Grammar and Culture. Washington, DC: Gallaudet University Press.

4. Bernstein, Lynne and Edward Auer, Jr. 2003. "Speech Perception and Spoken Word Recognition." In Marschark and Spencer (eds.) Deaf Studies, Language, and Education. New York: Oxford University Press.

5. Brown, C. M. (1988). Human-computer interface design guidelines. Norwood, NJ: Ablex Publishing.

6. Charrow, Veda. 1974. Deaf English: An Investigation of the written English Competence of Deaf Adolescents. Unpublished dissertation. Stanford University.

7. Charrow, Veda. 1975. "A Psycholinguistic Analysis of 'Deaf English'. Sign Language Studies 4:7 pg.139-149.

8. Chernov, Ghelly. 1978. Inference and Anticipation in Simultaneous Interpreting. Philadelphia, PA: John Benjamins.

9. Cokely Dennis. 2005. "Shifting Positionality: a Critical Examination of the Turning Point in the Relationship of Interpreters and the Deaf Community." In: Marschark, Peterson, and Winston, (eds): Sign language Interpreting and Interpreter Education: Directions for Research and Practice. Oxford: Oxford University Press.

10. Cokely, Dennis. 1992. Interpretation: A Sociolinguistic Mode of the Interpretation Process. Burtonsville, MD: Linstok Press

11. Cokely, Dennis. 2001 "Interpreting Culturally Rich Realities: Research Implications for Successful Interpretation." Journal of Interpretation: Millennial Edition 1-46.

12. Costello, Elaine. 1995 Signing: How to Speak with Your Hands. New York, NY: Bantam Books

13. Crystal, David. 1997. The Cambridge Encyclopedia of Language. Cambridge, UK: Cambridge University Press.

14. deVilliers, P. and S. Pomerantz. 1992. "English Literacy Development in Deaf Children: Directions for Research and Intervention." In J. Miller (ed.) Research on child Language Disorders: A Decade of Progress. Austin, TX: Pro-Ed.

15. Duranti, Alessandro.1977. Linguistic Anthropology. Cambridge, UK: Cambridge University Press.

16. Federal Communications Commission. 2015. FCC 15-136. Second Report and Order and Third Further Notice of Prposed Rulemaking.

17. Frishberg, Nancy. 1986. Interpreting: An Introduction. Silver Spring, MD: RID Publications.

18. Gates, George and John Mills. 2005. "Presbycusis." The Lancet: 366(9491), 1111-1120

19. González R.D., V.F. Vásquez and H. Mikkelson. 1991. Fundamentals of court Interpretation: Theory, Policy and Practice. Durham, NC: Academic Press.

20. Hatim, Basil and Ian Mason. 1997. The Translator as Communicator. New York: Routledge.

21. Jankowski, Katherine. 2002. Deaf Empowerment: Emergence, Struggle, and Rhetoric. Washington, DC: Gallaudet University Press.

22. Janzen, Terry (ed.). 2005. Topics in signed Language Interpreting. Philadelphia, PA: John Benjamins.

23. Karchmer, Michael A. and Ross E. Mitchell. 2003. "Demographic and Achievement Characteristics of Deaf and Hard-of Hearing Students." In Marschark and Spencer (eds.) Deaf Studies, Language, and Education. New York: Oxford University Press.

24. Klare, G.R. (1974). "Assessing readability." Reading Research Quarterly: 10(1), 62-102.

25. Klare, George R. "Readability." Handbook of Reading Research. P. David Pearson, et al. (eds.) New York: Longman, 1984. 681-744.

26. Klima, Edward and Ursula Bellugi 1979. The Signs of Language. Cambridge, MA: Harvard University Press.

27. Kruger, Justin and David Dunning. 1999. "Unskilled and unaware of it: How Difficulties in Recognizing One's Own Incompetence Lead to Inflated Sel-Assessments. Journal of Personality and Social Psychology. Volume 77 (6) 1121-1134

28. Lane, Harlan. 1984. When the Mind Hears: A History of the Deaf. New York: Random House.

29. Lane, Harlan. 1992. Mask of Benevolence: Disabling the Deaf Community. New York: Knopf.

30. Lane, Harlan, Richard Pillard and Ulf Hedberg. 2011. The People of the Eye: Deaf Ethnicity and Ancestry. New York: Oxford University Press

31. Larson, Mildred. 1998. Meaning-Based Translation: a Guide to Cross-Cultural Equivalence. Lanham, MD: University Press of America.

32. Liben, Lynn. 1978. Deaf Children: Developmental Perspectives. New York: Academic Press.

33. Lucas, Ceil. 2001. The Sociolinguistics of the Deaf Community. Cambridge, UK. Cambridge University Press.

34. Lyons, John. 1977. Semantics. Cambridge, UK: Cambridge University Press.

35. Lyons, John. 1995. Linguistic Semantics: An Introduction. Cambridge, UK: Cambridge University Press.

36. Marschark, Marc and Patricia Elizabeth Spencer (eds.). 2003. Deaf Studies, Language, and Education. New York: Oxford University Press.

37. McIntire, Marina (ed.). 1986. Interpreting: The Art of Cross-Cultural Mediation. Silver Spring, MD: RID Publications.

38. Mindess, Anna. 1999. Reading Between the Signs: Intercultural Communication for Sign Language Interpreters. Yarmouth, ME: Intercultural Press.

39. Moser-Mercer, Barbara. 1978. "Simultaneous Interpretation: A Hypothetical Model and Its Practical Application." In Gerver & Sinaiko (eds.). Language Interpretation and Communication. New York: Plenum Press

40. Nickerson, Raymond. 1998. "Confirmation Bias: A Ubiquitous Phenomenon in Many Guises." Review of General Psychology (Vol. 2, No. 2): 175-220.

41. Padden, Carol and Tom Humphries. 1989. Deaf in America: Voices from a Culture. Cambridge, MA: Harvard University Press.

42. Padden, Carol and Tom Humphries. 2005. Inside Deaf Culture. Cambridge, MA: Harvard University Press.

43. Peterson, Rico. 1999. The Perceptions of Deafness and Language Learning of Incoming ASL Students. Unpublished dissertation. University of California, Riverside.

44. Pöchhacker, Franz. 2004. Introducing Interpreting Studies. London: Routledge.

45. Registry of Interpreters for the Deaf. 2007. Interpreting in Legal Settings

46. Richards, I. 1953. "Towards a Theory of translating" American Anthropological Association, Studies in Chinese Thought 55 (Memoir 75): 247-262.

47. Robinson, Douglas. 1997. Becoming a Translator. New York: Routledge.

48. Rutherford, Susan. 1992. A Study of American Deaf Folklore. Burtonsville, MD: Linstok Press.

49. Seleskovitch, Danica. 1978. Interpreting for International Conferences. Washington, DC: Pen and Booth.

50. Schein, Jerome. 1996. "The Demography of Deafness" in Higgins and Nash (eds) Understanding Deafness Socially. Springfield, IL: Charles C. Thomas,

51. Spingarn, Tracie. 2001 "Knowledge of Deaf Community-Related Words, Symbols and Acronyms among Hearing People: Implications for the Production of an Equivalent Interpretation. Journal of Interpretation: Millennial Edition 69-84.

52. Stewart, Davis, Jerome Schein and Brenda Cartwright. 1998. Sign Language Interpreting: Exploring Its Art and Science. Needham Heights, MA: Allyn Bacon.

53. Stokoe, William, Dorothy Casterline and Carl Croneberg. 1965. A Dictionary of American Sign Language on Linguistic Principles. Washington, DC: Gallaudet University Press.

54. Valli, Clayton, Ceil Lucas and Kristin Mulrooney. 2005. Linguistics of American Sign Language. Washington, DC: Gallaudet University Press.

55. Wadensjö, Cecilia. 1998. Interpreting as Interaction. New York. Addison Wesley Longman.

56. Weaver, Gary. 1997. Culture, Communication and Conflict: Readings in Intercultural Relations. Boston, MA: Pearson Publishing.

57. Woodward, James C. 1972. "Implications for Sociolinguistic Research among the Deaf." Sign Language Studies 1:1-7.

58. Woodward, James. 1978. "Historical Bases of American Sign Language." In P. Siple (ed) Understanding Language Through Sign Language Research. New York: Academic Press.

59. Woodward, James C. 1994. Describing Variation in American Sign Language: Implicational Lects on the Deaf Diglossic Continuum. Silver Spring, MD: Linstok Press.

60. Wrigley, Owen. 1996. The Politics of Deafness. Washington, DC: Gallaudet University Press.

## Websites

1. Video Analysis Software

   - http://www.bu.edu/asllrp/SignStream/
   - http://www.sportstecinternational.com/
   - National Consortium of Interpreter Education Centers
   - http://www.interpretereducation.org/wp-content/uploads/2013/02/Practitioner_FINAL_REPORT_021513.pdf

2. Registry of Interpreters for the Deaf
   - http://www.rid.org

3. Americans with Disabilities Act Technical Assistance Manual

- http://www.ada.gov/taman3.htm

**APPENDIX A**

**DENNIS COKELY CURRENT CV**

Dennis Cokely
78 Potter Pond
Lexington, MA 02421
Cell: (781) 710-2065
Office: (617) 373-3064
Fax: (617) 373-3065
Email: d.cokely@neu.edu
SS#: 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

**Education:**

Ph.D. 1984, Georgetown University, Washington, DC.
  Major: Sociolinguistics
  Minors: Applied Linguistics & Sociolinguistics and Sign Language
  Dissertation (with distinction): Towards a Sociolinguistic Model of the Interpretation Process:
    Focus on ASL and English.
M.A. 1976, American University, Washington, DC.
  Major: Applied Linguistics
B.A. 1968, St. Mary's University, Baltimore, Maryland
  Major: Philosophy
  Minor: Classical Languages

**Professional Experience:**

Full Professor, American Sign Language Program, Northeastern University
  2007 – present
Director, American Sign Language Program, Northeastern University
  1996 – present
Director, World Languages Center, Northeastern University
  2006 – 2016
Chair, Department of Languages, Literatures and Cultures, Northeastern University
  1998 – 2015
Associate Professor, American Sign Language Program, Northeastern University
  1996 – 2007
President, Sign Media, Inc. Burtonsville, Maryland,
  1980 - 1998
Director, Sign Languages International, Newark, England
  1993 - 1998
Adjunct Professor, Madonna University, Sign Language Studies Department
  1990 - 2005
Project Director, Interpreter Education Curriculum Development Project
  University of New Brunswick, Fredericton, Canada,
  1985 - 1986
Adjunct Professor, Western Maryland College (Graduate programs: Teaching ASL Program & Teaching
  Interpretation Program), Westminster, MD
  1987 - 1993
Instructor & Assistant Professor
  Gallaudet College, Graduate School, Washington, DC.
  1976 - 1984
Research Associate, Linguistics Research Lab
  Gallaudet Research Institute, Gallaudet College Washington, DC.
  1980 - 1984
Coordinator, Pre-College Manual Communication Programs
  Pre-College Programs, Gallaudet College Washington, DC.
  1977 - 1980
Sign Language Specialist, Kendall Demonstration Elementary School Gallaudet College
  1975 - 1977
Instructor, Kendall Demonstration Elementary School Gallaudet College 1971 - 1975

1

Dennis Cokely

**Print Publications:**
  **Books and Monographs:**

*Challenging Sign Language Teachers and Interpreters: The Reflector Revisited.* (ed) Burtonsville, MD: Linstok Press, 2007.

*Interpretation: A Sociolinguistic Model of the Interpretation Process*, Burtonsville, MD: Linstok Press, 1992. Significant portions have been translated and excerpted into Swedish and Japanese. The full text has also been translated into Italian and German.

> *Il processo di interpretazione: un modello sociolinguistico*: Edizioni Kappa. 2002. In cooperation with the Mason Perkins Deafness Fund (Italian Translation of *Interpretation: A Sociolinguistic Model*; "This is the first book on [sign language] interpretation ever published in Italy and is an essential text for interpreter training courses").

> *Gebärdensprach-Dolmetschen. Ein soziolinguistisches Modell*. (Internationale Arbeiten zur Gebärdensprache und Kommunikation Gehörloser; 28) Hamburg: Signum Verlag 1995.

*Sign Language Interpreters and Interpreting*, (ed) SLS Monograph Series, Burtonsville, MD: Linstok Press, 1992.

*New Brunswick Sign Language Interpreter Training Curriculum* (ed): University of New Brunswick. Fredericton, New Brunswick, 1988

*American Sign Language: a Teacher's Resource Text on Grammar and Culture* (with Charlotte Baker), Silver Spring, MD: T.J. Publishers, Inc., 1980; Washington, DC Gallaudet University Press, 1991.

*American Sign Language: a Teacher's Resource Text on Curriculum, Methods, and Evaluation* (with C. Baker), Silver Spring, MD: T.J. Publishers, Inc., 1980; Washington, DC Gallaudet University Press, 1991.

*American Sign Language: a Student Text units 1 - 9* (with Charlotte Baker), Silver Spring, MD: T.J. Publishers, Inc., 1980; Washington, DC Gallaudet University Press, 1991.

*American Sign Language: a Student Text units 10 - 18*  (with Charlotte Baker), Silver Spring, MD: T.J. Publishers, Inc., 1980; Washington, DC Gallaudet University Press, 1991.

*American Sign Language: a Student Text units 19 - 27* (with Charlotte Baker), Silver Spring, MD: T.J. Publishers, Inc., 1981; Washington, DC Gallaudet University Press, 1991.

*Pre-College Programs: Guidelines for Manual Communication*. Washington, DC: Gallaudet College, 1979.

*Instructor's Manual for Kendall Demonstration Elementary School Family Sign Program*. Washington DC: Gallaudet College. 1973

**Book Chapters:**

The National Consortium of Interpreter Education Centers in the United States of America (with Winston). In J. Napier (ed.), *International Perspectives on Sign Language Interpreter Education*, Gallaudet University Press, 2009.

Never Our Language; Never Our Culture: the Importance of Deaf Community Connectedness for Interpreters. in Bidoli and Ochse (eds.) *English in International Deaf Communication*. Peter Lang *Linguistics Insights Series*. 2008

Shifting Positionality: a Critical Examination of the Turning Point in the Relationship of Interpreters and the Deaf Community. In: Marschark, Peterson, and Winston, (eds): *Sign language Interpreting and Interpreter Education: Directions for Research and Practice*. Oxford: Oxford University Press, 2005.

Curriculum Revision in the Twenty First Century. In Roy (ed.) *Advances in Teaching Sign Language Interpreters.* Washington, DC: Gallaudet University Press, 2005.

The Effects of Lag Time on Interpreter Errors. In Cokely (ed) *Sign Language Interpreters and Interpreting*, SLS Monograph Series, Linstok Press, 1992. (previously appeared in *Sign Language Studies* 15:53)

Assessing Student ASL Skills. In Baker-Shenk (ed) *A Model Curriculum for Teachers of American Sign Language and Teachers of ASL/English Interpretation*. Silver Spring, MD. RID Publications, 1980

Assessing Students in Interpreter Preparation Programs. In Baker-Shenk (ed) *A Model Curriculum for Teachers of American Sign Language and Teachers of ASL/English Interpretation*. Silver Spring, MD. RID Publications, 1980

Dennis Cokely

Sign Language: Teaching, Interpreting, and Educational Policy. In Baker and Battison (eds) *Sign Language and the Deaf Community: Essays in Honor of William C. Stokoe*. Silver Spring, MD: National Association of the Deaf, 1980.

Sign language in the 20th century: a Chronology. In: Baker and Battison (eds): *Sign Language and the Deaf Community. Essays in Honor of William C. Stokoe*. Silver Spring: NAD, 1980.

Childrenese as Pidgin. (with R. Gawlik) In: Stokoe, William C. (ed): *Sign and Culture. A Reader for Students of American Sign Language*. Silver Spring, MD : Linstok Press, 1980. (previously published in *Sign Language Studies* 5, 1974)

**Refereed Articles:**

Interpreting in Teams: A Pilot Study on Requesting and Offering Support. (with J. Hawkins) *Journal of Interpretation*, Fall 2003.

Interpreting Culturally Rich Realities. *Journal of Interpretation,* Fall 2001.

Exploring Ethics: A Case for Revising the Code of Ethics. *Journal of Interpretation,* Fall 2000.

The Effectiveness of Three Means of Communication in the College Classroom. *Sign Language Studies*, 69, Winter, 1990. Translated into German (*Die Relative Effektivität Unterschiedlicher Kommunikationsmittel im College-Unterricht.* In: Das Zeichen 5: 17 (1991))

Sociolinguistics, Language Policy and Education. in: J. Van Cleve (ed): *Gallaudet Encyclopedia of Deaf People and Deafness.* Vol. 3. S-Z, Index. New York, NY: McGraw-Hill Book Company, Inc., 1987.

The Effects of Lag Time on Interpreter Errors. *Sign Language Studies* 15, Fall, 1986

Foreigner's Talk and Learner's Grammar. *The Reflector,* 1984.

Comment on Newell et al.  *Sign Language Studies* 12: 41, 1983.

When is a Pidgin not a Pidgin? An Alternate Analysis of the ASL-English Contact Situation. *Sign Language Studie*s, 38, Spring, 1983.

Metanotative Qualities: How Accurately are They Conveyed by Interpreters? *The Reflector*, 5, Winter, 1983.

The Interpreted Medical Interview: It Loses Something in the Translation. *The Reflector*, 1982.

Sign Language Interpreters: A Demographic Survey. *Sign Language Studies*, 10, Fall, 1981.

Assessing Communication Skills. *Directions*, 1, No. 4, 1980.

Options II: Childrenese as Pidgin. (with R. Gawlik) *Sign Language Studies* 5 1974. (expanded version of an earlier piece in *The Deaf American*).

**Non-Refereed Articles:**

A response to "The Danger Within…" CIT News, July 2006

How it's (not) done! In: *Sign Language Studies 23:* 84, 1994.

Editor's Comments: Tri-cultural Awareness. *The Reflector*, 1984.

Editor's Comments: Cultures of Deaf People. *The Reflector*, 1983.

Editor's Comments: Functional Competence. *The Reflector*, 1983.

Editor's Comments: Fluency in ASL. *The Reflector*, 1983.

Editor's Comments: Style Levels. *The Reflector*, 1983.

Editor's Comments: Signs for Special Purposes. *The Reflector*, 1982

College Level Sign Language Programs: a Resource List. *The Reflector* 1981.

Editor's Comments: Terminology. *The Reflector,* 1981.

Editor's Comments: Assessing Interpretation. *The Reflector*, 1981.

Options II: Childrenese as Pidgin. (with R. Gawlik) In: *The Deaf American* 26, 1974

Options: A position paper of the relationship between Manual English and Sign. (with R. Gawlik) In: *The Deaf American* 25, 1973.

Dennis Cokely

**National Consortium of Interpreter Education Centers grant-funded publications:**

Understanding the Challenges of Deaf Interpreters  (with T. Schafer), December, 2016

Understanding the Challenges of Heritage Interpreters (with T. Schafer), December, 2016

Understanding the Challenges of Interpreters of Color (with T. Schafer), December, 2016

Understanding the Challenges of Interpreters Working in the Video Medium (with T. Schafer), December, 2016

Understanding the Challenges of Interpreters Working with Children in K-12 Settings (with T. Schafer), December, 2016

Preparing Interpreters for Tomorrow: Report on a Study of emerging Trends in Interpreting and Implications for Interpreter Education (with Cathy Cogen), January 2015

Interpreter Referral Agency Needs Assessment Final Report, October 2015

Interpreter Practitioner Needs Assessment Final Report, January 2013

Interpreter Practitioner Needs Assessment Trends Analysis Final Report (with E. Winston), May 2010

Recent Findings: Stakeholder Trends, (with E. Winston), May 2010

Recent Findings: Trends Across All Needs Assessments, (with E. Winston), May 2010

Interpreter Education Programs Assessment Trends Analysis Final Report (with E. Winston), March 2010

Vocational Rehabilitation Needs Assessment Final Report (with E. Winston), November 2009

Phase II Deaf Consumer Needs Assessment Final Report (with E. Winston), September 2009

Interpreter Referral Agency Needs Assessment Final Report (with E. Winston), October 2008

Phase I Deaf Consumer Needs Assessment, Final Report (with E. Winston), September 2008

Interpreter Education Programs Needs Assessment, Final Report (with E. Winston), July 2008

NCIEC Interpreter Practitioner Needs Assessment, Final Report (with E. Winston), September 2007

**Conference Proceedings:**

Multimedia Dictionary of American Sign Language (Wilcox, Scheibman, Wood, Cokely, and Stokoe co-authors) in *Proceedings of the first annual ACM Conference on Assistive Technologies*. New York, NY ACM Press, 1994.

A Diagnostic Approach to Assessing American Sign Language. In: Caccamise, Garretson, and Bellugi (eds): *Teaching American Sign Language as a Second Language. Proceedings of the Third National Symposium on Sign Language Research and Teaching.* Boston, MA October 26-30, 1980. Silver Spring: NAD, 1982.

Meeting the Communication Needs of Deaf Students and Their Families. In: Bulgarian Deaf Union (ed): *The Deaf People in Modern Society. Proceedings of the 8th World Congress of the World Federation of the Deaf*. Varna, 1981.

Videotape Techniques in Sign Language Teaching. In Stokoe (Ed.) *Proceedings of the 1977 National Symposium on Sign Language Research and Teaching.* Silver Spring, MD: National Association of the Deaf, 1980.

Program Considerations in a Bilingual ASL-English Approach to Education. In Caccamise and Hicks (Eds.) *Proceedings of the 1978 National Symposium on Sign Language Research and Teaching*. Silver Spring, MD: National Association of the Deaf, 1980.

Evaluating ASL Skills in Pre-College Programs. (with David Knight) In Caccamise and Hicks (Eds.) *Proceedings of the 1978 National Symposium on Sign Language Research and Teaching.* Silver Spring, MD: National Association of the Deaf, 1980.

Curriculum and Instruction: Evaluation. In Caccamise and Gustason (Eds.) *Manual/Simultaneous Communication Instructional Programs in the Educational Setting*. Washington, DC: Gallaudet College Press, 1979.

An Innovative Approach to Family Sign Language Instruction. In: *Proceedings of the Forty-Seventh Convention of American Instructors of the Deaf,* 1975.

**Video Publications:**

**Program Creation, Development, Direction, and Post-Production:**

Dennis Cokely

For each of the following 130 programs or program segments, responsibilities included: program background research, program preparation, program content and format, script writing and sequencing, talent selection and direction, program continuity control, log camera master videos, prepare edit decision list, supervise on-line edit, approve final edit, and supervise voice-over session.

| Program Title | Number of Tapes | Year Published |
|---|---|---|
| *Interpreter Practice Materials* | 33 | 1996 |
| *Edgar Allan Poe* | 3 | 1996 |
| *Sherlock Holmes* | 3 | 1996 |
| *High-Five! Fables and Fairy Tales* | 5 | 1994 |
| *When the Mind Hears* | 13 | 1993 |
| *Using Your TTY* | 1 | 1993 |
| *An Introduction to the Deaf Community* | 1 | 1992 |
| *Interpreting the Miranda Warnings* | 1 | 1992 |
| *ASL Across America* | 12 | 1992 |
| *Semantic Awareness Test Kit* | 7 | 1991 |
| *Fingerspelling Practice Tapes* | 4 | 1991 |
| *Sports Sign Series* | 4 | 1991 |
| *Sign Language Interpreters in the Public Schools* | 3 | 1990 |
| *Signs Around the World* | 9 | 1990 |
| *Colors Around the World* | 1 | 1990 |
| *Selected Signs Around the World* | 1 | 1990 |
| *Alphabets Around the World* | 1 | 1990 |
| *Four For You! Fables and Fairy Tales* | 5 | 1989 |
| *Interpreters on Interpreting* | 6 | 1989 |
| *ABC Stories* | 1 | 1988 |
| *The Parent Sign Series* | 10 | 1985 |
| *Interpreter Models Series* | 2 | 1985 |
| *American Sign Language videotapes* | 6 | 1980 |

**Direction, and Post-Production:**

For each of the following 51 programs or program segments, responsibilities included: program format, talent selection and direction, continuity control, and approve final edit.

| Program Title | Number of Tapes | Year Published |
|---|---|---|
| *American Freedom Speeches* | 2 | 1995 |
| *Interpreting in the American Legal System* | 12 | 1995 |
| *The Gospel of Luke: An ASL Translation* | 5 | 1995 |
| *Live at SMI !!* | 7 | 1993 |
| *Working With a Sign Language Interpreter* | 1 | 1993 |
| *Deaf-Blind Communication & Community* | 2 | 1992 |
| *The Face of ASL* | 4 | 1991 |
| *To Your Health* | 2 | 1991 |
| *Poetry in Motion* | 3 | 1990 |
| *ASL Numbers: Developing Your Skills* | 3 | 1989 |
| *Overuse Syndrome* | 1 | 1989 |
| *The American Sign Language Phrase Book* | 3 | 1988 |
| *The Mystery of the Superintendent's House* | 1 | 1986 |
| *Introduction to American Deaf Culture* | 5 | 1985 |

**Published ASL-English Translations:**

Each of the following English translations was prepared for published videotapes. These translations of American Sign Language were used as scripts in the production of spoken translations that comprise the accompanying audio track. These translations are also available in printed form upon request. I am the sole translator of these materials.

5

Dennis Cokely

| | |
|---|---|
| *Gilbert Eastman: Live at SMI* | *Four For You: Fables and Fairy Tales, volume 1* |
| *Patrick Graybill: Live at SMI* | *Four For You: Fables and Fairy Tales, volume 2* |
| *Eric Malzkuhn: Live at SMI* | *Four For You: Fables and Fairy Tales, volume 3* |
| *When the Mind Hears: My New Family* | *Four For You: Fables and Fairy Tales, volume 4* |
| *When the Mind Hears: Shepherd and Symbol* | *Four For You: Fables and Fairy Tales, volume 5* |
| *When the Mind Hears: High Theater* | *Sports Sign Series: Basketball* |
| *When the Mind Hears: A Tale Based on Fact* | *Sports Sign Series: Baseball* |
| *When the Mind Hears: The Secret* | *Sports Sign Series: Volleyball* |
| *When the Mind Hears: Success and Failure* | *Sports Sign Series: Soccer* |
| *When the Mind Hears: Fortune and Misfortune* | *High Five! Fables and Fairy Tales, volume 1* |
| *When the Mind Hears: Spreading the Word* | *High Five! Fables and Fairy Tales, volume 2* |
| *When the Mind Hears: Concerning Women* | *High Five! Fables and Fairy Tales, volume 3* |
| *When the Mind Hears: A Dangerous Incursion* | *High Five! Fables and Fairy Tales, volume 4* |
| *When the Mind Hears: The Denial* | *High Five! Fables and Fairy Tales, volume 5* |
| *When the Mind Hears:  The Incurable Deafness* | *Sherlock Holmes: Red-Headed League* |
| *Edgar Allen Poe: The Black Cat* | *Sherlock Holmes: The Blue Carbuncle* |
| *Edgar Allen Poe: Fall of the House of Usher* | *Sherlock Holmes: The Speckled Band* |
| *Edgar Allen Poe: The Pit and the Pendulum* | *The Preservation of Sign Language* |

**Published English-ASL Translations:**

Each of the following American Sign Language translations was prepared for *American Freedom Speeches*, a videotape/text instructional package published in 1994. These ASL translations of English texts were used in the production of the videotape portion of this package. Co-translated with Patrick Graybill.

*The Preamble to the Constitution*
*The Bill of Rights*
*Liberty or Death,* by Patrick Henry
*Inaugural Address,* by Thomas Jefferson
*Gettysburg Address*, by Abraham Lincoln
*On Woman's Suffrage*, by Susan B. Anthony
*Inaugural Address*, by Franklin D. Roosevelt
*Inaugural Address*, by John F. Kennedy
*I Have A Dream*, by Martin Luther King, Jr.
*Struggle for Justice*, by Cesar Chavez
*On Human Rights*, Jimmy Carter
*Vice-Presidential Acceptance Speech*, by Geraldine Ferraro

**Web Published articles:**

Sign Language Interpreters — Complicit in a Devil's Bargain? December, 2011
    (http://www.streetleverage.com/2011/12/sign-language-interpreters-—-complicit-in-a-devils-bargain/)
Defenders of Certification: Sign Language Interpreters Question "Enhanced" RID NIC Test January 2012
    (http://www.streetleverage.com/2012/05/defenders-of-certification-sign-language-interpreters-question-
    enhanced-rid-nic-test/)
Vanquished Native Voices — A Sign Language Interpreting Crisis? March 2012
    (http://www.streetleverage.com/2012/01/vanquished-native-voices-—-a-sign-language-interpreting-crisis/)
Sign Language Interpreters Seek clarity to Defend RID NIC Certification May 2012
    http://www.streetleverage.com/2012/07/sign-language-interpreters-seek-clarity-to-defend-rid-nic-certification/

Sign Language Interpreters Seek clarity to Defend RID NIC Certification May 2012
    http://www.streetleverage.com/2012/07/sign-language-interpreters-seek-clarity-to-defend-rid-nic-certification/

**Grants:**
**Successful External Grants (total funding to date: $14,822,803; at Northeastern: $14,072,803)**
    Principal Investigator, Northeastern University National Interpreter Education Center, Department of
        Education, 2017-2022 (grant award - $2,000,000)

Dennis Cokely

Principal Investigator, Northeastern University National Interpreter Education Center, Department of Education, 2015-2016 (grant award - $600,000)

Co-Principal Investigator, Northeastern University ProjectGO Intensive Arab instruction 2015-2017, Defense Department (first year award - $293,803)

Co-Principal Investigator, Northeastern University ProjectGO Intensive Arab instruction 2012-2014, Defense Department (first year award - $268,000)

Principal Investigator, Northeastern University National Interpreter Education Center, Department of Education, 2011-2015 (grant award - $3,000,000)

Key Personnel, Northeastern University Regional Interpreter Education Center, Department of Education, 2011-2015 (grant award - $1,500,000)

Co-Principal Investigator, Northeastern University National Interpreter Education Center, Department of Education, 2005-2010 (grant award - $3,000,000)

Key Personnel, Northeastern University Regional Interpreter Education Center, Department of Education, 2005-2010 (grant award - $1,500,000)

Co-Principal Investigator, Teaching Interpreter Educators and Mentors Online, Department of Education, 2002-2005 (grant award - $700,000)

Key Personnel, Northeastern Interpreter Education Project, Department of Education, 2000-2005 (grant award – $675,000)

Key Personnel and Grant Administrator, NIH SBIR grant-funded *ASL CD-ROM Dictionary* Project 1988-1993 (grant award – $750,0000)

**Successful Internal Grants:**

Instructional Development Fund grant, 2008, Northeastern's Provost's office (award - $7,660)

Teaching With Technology grant, 2002, Northeastern's Provost's office (award - $25,000)

**Selected Related Experience:**

President, Registry of Interpreters for the Deaf, 1983 - 1987

Member, Board of Directors, Registry of Interpreters for the Deaf 1978- 1980

Associate Editor, *Sign Language Studies* 1984-1996

English Editor NIH SBIR grant-funded *ASL CD-ROM Dictionary* Project 1988-1993

Editor, *The Reflector, A Journal for Sign Language Teachers and Interpreters* 1981- 1985.

Coordinator of Interpreters for National and International Conferences

Selected experiences: Coordinated Conferences include the NATO International Conference on Sign Language Research (Copenhagen, Denmark), Georgetown University Round Table on Languages and Linguistics (annually 1978 – 1985) the Third National Symposium on Sign Language Research and Teaching (Boston).

Evaluation/Certification Team Chair, Sign Instructors Guidance Network (S.I.G.N.), 1976 – 1986.

Professional Interpreter, 1971 – present

Member, Advisory Board, The Learning Center for the Deaf

**Selected Certification:**

Comprehensive Skills Certificate (CSC), Registry of Interpreters for the Deaf
Comprehensive Permanent Certification, American Sign Language Teachers Association (ASLTA/SIGN)
Teaching English as a Second/Foreign Language, American University
Lifetime Post-Secondary Teaching Certificate, state of California

**Selected Awards and Honors:**

2006 Northeastern University Nominee for the CASE Professor of the Year Award (Council for Advancement and Support of Education)

2005 Outstanding Interpreter Educator Award
Massachusetts Registry of Interpreters for the Deaf

7

Dennis Cokely

2002 Excellence in Teaching Award
     Northeastern University
2002 Northeastern University Nominee for the Robert Foster Cherry Award for Great Teaching
     Baylor University
2000 Advisor of the Year Award
     College of Arts and Sciences, Northeastern University
1993 President's Award of Excellence, Madonna University
     "For excellence in promoting the language and culture of the Deaf Community"
1987 The Mary Stotler Professional Development Award
     by Registry of Interpreters for the Deaf and the Conference of Interpreter Trainers
1983 The Virginia Hughes Award
     by the Sign Language Interpreters of California
          "for Outstanding Contributions to the Interpreting Profession"

**Expert Witness Cases, Reports and/or Testimony:**

On behalf of Briggs, et al., 2016
     Briggs et al. v Massachusetts Department of Corrections
     Prisoners' Legal Services

On behalf of Disability Rights Florida, 2016
     Disability Rights Florida v Florida Department of Corrections
     Disability Rights Florida

On behalf of McBride, et al., 2016
     McBride et al. v Michigan Department of Corrections
     Covington & Burling, Attorneys
     Washington Lawyers' Committee for Civil Rights and Urban Affairs

On behalf of David Bryant, 2012 & 2015
     Bryant v Federal Bureau of Prisons
     Sullivan & Cromwell LLP, Attorneys
     Washington Lawyers' Committee for Civil Rights and Urban Affairs

On behalf of Adams, Knights, et al., 2014
     Adams, Knights, et al v Kentucky Department of Corrections
     Weil, Gotshal & Manges LLP, Attorneys

On behalf of Holmes, Baxter, et al. 2014
     Holmes, Baxter, et al. v Illinois Department of Corrections\
     Winston & Strawn, LLP, Attorneys
     Washington Lawyers' Committee for Civil Rights and Urban Affairs

On behalf of Messrs. Boyd and Heyer, 2013
     Boyd and Heyer v Federal Bureau of Prisons
     Arnold and Porter LLP, Attorneys
     Washington Lawyers' Committee for Civil Rights and Urban Affairs

On behalf of Larry Berke, 2012
     Berke v Federal Bureau of Prisons
     Ballard Spahr LLP, Attorneys
     Washington Lawyers' Committee for Civil Rights and Urban Affairs

On behalf of Minis, et al, 2010
     Minis, et al v Virginia Department of Corrections
     Winston & Strawn, LLP, Attorneys
     Washington Lawyers' Committee for Civil Rights and Urban Affairs

On behalf of Deborah Gibson, 2008
     NIR vs Deborah Gibson
     William Pincus, Attorney

Dennis Cokely

On behalf of Jeffery Beardsley and Colette Ward, 2006
 Beardsley and Ward vs City of North Las Vegas
 Marina Kolias and Dale Boam, Attorneys

On behalf of Hubbard et. al. 2006 - 2009
 Hubbard et al vs United States Postal Service
 Covington & Burling, Attorneys
 Washington Lawyers' Committee for Civil Rights and Urban Affairs

On behalf of Stockdale et. al. 1999 - 2000
 Stockdale et al vs Dorsey Business School
 Jeff Kojacar, Attorney

On behalf of the DeCosta family 1998 - 1999
 DeCosta family vs Beth Israel/Deaconess hospital
 Lin Beck, Attorney

On behalf of the US Department of Justice and the state of Maine 1997 - 1999
 Janet DeVinney vs Maine Medical Center
 James Moore, US Department of Justice, Attorney

On behalf of John Doe, 1992 - 1993
 John Doe vs state of South Carolina
 John Claybrooke, Attorney

On behalf of Carl Dupree, 1991 - 1992
 Family of Carl Dupree vs Gallaudet University
 Sarah Blackridge, Attorney

**Seminar, and Workshop Presentations:**
 Over a thousand invited international and domestic seminars, lectures and workshop presentations on a
 wide range of topics, including:
 Theoretical Models of Interpretation, Theoretical Aspects of Interpretation, Interpretation,
 Evaluation and Testing, Diagnostic Assessment of Interpretation, Proficiency Assessment of
 Interpretation, Educational Preparation of Interpreters, Comparative Linguistics for Interpreters,
 Semantics of American Sign Language, Teaching American Sign Language, Sign Language
 Assessment and Evaluation, Bilingual Education, Developing Communication Policy, Linguistics
 of American Sign Language, Communication and Communication Systems, Language
 Development, Language Acquisition, Cross-Cultural Interaction, Culture and Language

 Selected domestic institutions at which invited graduate and undergraduate seminars and workshops have
 been offered during the past fifteen years include:
 University of Hawaii, California State University at Northridge, Community College of
 Philadelphia, Central Piedmont Community College, DeKalb Community College, Gallaudet
 University, Georgetown University, Johnson County Community College, LaGuardia Community
 College, Madonna University, National Technical Institute for the Deaf, New York University,
 Ohlone College, Rutgers University, Seattle Central Community College, Syracuse University,
 Towson State University, University of Alabama, University of California at Berkeley, University
 of California at San Diego, University of Delaware, University of Maryland, University of New
 Hampshire, University of New Mexico, University of Pennsylvania, University of Tennessee,
 Vista College, Western Maryland College, William Woods University.

 Selected international institutions at which invited seminars and workshops have been offered during the
 past fifteen years include:
 University of Perugia, (Italy), American University of Rome (Italy), University of Copenhagen
 (Denmark), Tokyo Christian University (Japan), Durham University (Great Britain), University of
 New Brunswick (Canada), University of Ottawa (Canada), Stockholm University (Sweden),
 Wolverhampton University (Great Britain), Central Lancashire University (Great Britain), McGill
 University (Canada), Herriot-Watt University (Scotland).

Dennis Cokely

**Recent Selected Invited International Conference Presentations:**

Trends Report: aligning Interpreter Education & Tomorrow's Challenges (with Cathy Cogen) 2015 Conference of the Registry of Interpreters for the Deaf

National Consortium of Interpreter Education Centers: Needs Assessment Activity Report. 2014 Region 1 Conference Registry of Interpreters for the Deaf.

National Consortium of Interpreter Education Centers: Needs Assessment Activity Report (with Cathy Cogen). 2013 Conference of the Registry of Interpreters for the Deaf.

IDP-DC Community Forum Panel: What's Our IQ (Impact Quotient)? Part II. 2009 Conference of the Registry of Interpreters for the Deaf.

National Consortium of Interpreter Education Centers: Needs Assessment Activity Report (with Betsy Winston). 2007 Conference of the Registry of Interpreters for the Deaf.

Discover Interpreting! Marketing Interpreting as a Career (with Cathy Cogen). 2007 Conference of the Registry of Interpreters for the Deaf.

IDP-DC Community Forum Panel: What's Our IQ (Impact Quotient)? Part I. 2007 Conference of the Registry of Interpreters for the Deaf.

Research Implications for Interpreting in Teams. Italian Interpreters Association, American University of Rome, January 2003.

Diagnostic Assessment of Sign Language Skills. Italian Sign Language Teachers Association Conference, Rome, January 2003.

A Rights-Based Approach to Ethics for Sign Language Interpreters. Keynote Address at the first International Supporting Deaf People Online Conference, Derbyshire, Great Britain, January 2001.

Culturally Rich Realities: Challenges for Interpreters. Keynote address, International Symposium on Sign Language Interpretation, Durham University, October 1998.

ASL: Syntactic Structure. Pan-Asian International Sign Language Symposium, Tokyo Christian University, April 1994.

Diagnostic Assessment of Interpretation, Swedish Conference on Interpretation, August 1993.

**Selected Recent Invited National and Regional Conference Presentations:**

Understanding the Motives for Sign Language Documentation at Commemorating George Veditz and Georgetown Pioneers in 100 Years of Sign Language documentation, Georgetown University, November, 2013

The Importance of the Day Before keynote presentation at StreetLeverage-Live! Atlanta, GA April 2013

Deaf Community Health Quotient workshop presentation at StreetLeverage-Live! Atlanta, GA April 2013

Portfolios: A Place in Assessing Interpreter Competencies presented to the Legal Interpreters Member Section at the Registry of Interpreters for the Deaf conference, Atlanta, 2011

What's in Your Knapsack? Endnote presentation at the RID Region I Conference August 15, 2010.

Cars, Dogs and Cows: Getting Inside the Interpreter's Mind. Workshop presented to the Vermont Registry of Interpreters for the Deaf. May 16, 2009.

Ignoring our Past, Dooming Our Future? Workshop presented to the interpreting community of Hudson Valley, Newburgh, NY, April 26, 2009.

Culturally Rich Realities: Implications for Interpreters. Conferencia PRRID (Puerto Rico Registry of Interpreters for the Deaf Conference), August 4-5, 2006.

Curriculum Revision for Interpreter Education Programs. Conference of Interpreter Trainers, Gallaudet University, October 2004.

Exploring Ethical Decision-Making for Interpreters. Pennsylvania State Registry of Interpreters for the Deaf, Philadelphia, Pennsylvania, October 2002.

10

Dennis Cokely

Portfolios and Mentoring. Nashua, New Hampshire. New England Mentorship Conference for Working Interpreters, September 2001.

A Systematic Approach to Diagnostic Assessment of Interpretation. Registry of Interpreters for the Deaf conference, Orlando Florida, August 2001.

Reflections on The Linguistics Research Lab. The Study of Signed Languages: A Conference in Honor of William Stokoe, Gallaudet University, October 1999.

Interpreting Culturally Rich Realities: Research Implications for Successful Interpretations. Registry of Interpreters for the Deaf, Boston, Massachusetts, July 1999.

## Northeastern University Teaching History 1996 – 2015

| Year | Term | Course | Title | Enrollment |
|---|---|---|---|---|
| 1996-97 | Fall | ASL 1520 | Interpreting Role & Ethics | 11 |
| | Winter | ASL 1250 | Linguistics of ASL | 8 |
| | Spring | ASL 1507 | ASL-English Interpreting 3 | 11 |
| | | ASL 1801 | Directed Study | 3 |
| 1997-98 | Fall | ASL 1211 | Deaf Culture | 7 |
| | | ASL 1520 | Interpreter Role & Ethics | 8 |
| | Winter | ASL 1212 | Deaf History | 14 |
| | | ASL 1250 | Linguistics of ASL | 18 |
| 1998-99 | Fall | ASL 1220 | Deaf People in Society* | 76 |
| | | ASL 1505 | ASL-English Interpreting 1 | 15 |
| | | ASL 1520 | Interpreter Role & Ethics | 13 |
| | Winter | ASL 1801 | Directed Study | 4 |
| | | ASL 1810 | Special Topics in Interpreting* | 5 |
| | Spring | ASL 1220 | Deaf People in Society | 50 |
| | | ASL 1250 | Linguistics of ASL | 19 |
| | | ASL 1801 | Directed Study | 4 |
| 1999-00 | Fall | ASL 1001 | College Intro | 5 |
| | | ASL 1220 | Deaf People in Society | 70 |
| | | ASL 1505 | ASL-English Interpreting 1 | 12 |
| | | ASL 1508 | ASL-English Interpreting 4 | 12 |
| | | ASL 1520 | Interpreter Role and Ethics | 12 |
| | | ASL 1801 | Directed Study | 1 |
| | Winter | ASL 1801 | Directed Study | 3 |
| | Spring | ASL 1211 | Deaf History | 21 |
| | | ASL 1220 | Deaf People in Society | 67 |
| | | ASL 1801 | Directed Study | 2 |
| 2000-01 | Fall | ASL 1220 | Deaf People in Society | 76 |
| | | ASL 1505 | ASL-Eng Interpreting 1 | 13 |
| | | ASL 1520 | Interpreter Role & Ethics | 8 |
| | | ASL 1801 | Directed Study | 4 |
| | Winter | ASL 1212 | Deaf Culture | 27 |
| | | ASL 1801 | Directed Study | 3 |
| | | ASL 1810 | Practicum | 8 |
| | | ASL 1801 | Directed Study | 3 |
| | Spring | ASL 1211 | Deaf History | 11 |
| | | ASL 1801 | Directed Study | 2 |
| 2001-02 | Fall | ASL 1220 | Deaf People in Society | 79 |
| | | ASL 1505 | ASL-Eng Interpreting 1 | 11 |
| | | ASL 1520 | Interpreter Role & Ethics | 14 |
| | | ASL 1802 | Directed Study | 2 |
| | Winter | ASL 1212 | Deaf Culture | 30 |
| | | ASL 1801 | Directed Study | 1 |
| | Spring | ASL 1211 | Deaf History | 28 |
| | | ASL 1220 | Deaf People in Society | 78 |
| | | ASL 1801 | Directed Study | 2 |
| 2002-03 | Fall | ASL 1220 | Deaf People in Society | 73 |
| | | ASL 1505 | ASL-Eng Interpreting 1 | 13 |
| | | ASL 1520 | Interpreter Role & Ethics | 9 |
| | | ASL 1801 | Directed Study | 3 |

11

Dennis Cokely

|         |        | Winter | ASL 1212  | Deaf Culture                    | 30 |
|         |        |        | ASL 1801  | Directed Study                  | 1  |
|         |        | Spring | ASL 1211  | Deaf History                    | 28 |
|         |        |        | ASL 1220  | Deaf People in Society          | 78 |
|         |        |        | ASL 1801  | Directed Study                  | 3  |
| 2003-04 | Fall   |        | ASL 150   | Deaf People in Society          | 80 |
|         |        |        | ASL 350   | Deaf History & Culture          | 24 |
|         |        |        | ASL 510   | Interpreting Inquiry Texts*     | 14 |
|         |        |        | ASL 650   | Ethical Decision-Making*        | 10 |
|         |        |        | ASL 924   | Directed Study                  | 3  |
|         | Spring |        | ASL 950   | Interpreting Practicum          | 9  |
|         |        |        | ASL 924   | Directed Study                  | 9  |
| 2005-06 | Fall   |        | ASL 150   | Deaf People in Society          | 71 |
|         |        |        | ASL 100   | Introduction to College         | 9  |
|         |        |        | ASL 510   | Interpreting Inquiry Texts      | 3  |
|         |        |        | ASL 650   | Ethical Decision-Making         | 15 |
|         |        |        | ASL 651   | Ethical Fieldwork               | 15 |
|         | Spring |        | ASL 950   | Interpreting Practicum          | 14 |
|         |        |        | ASL 460   | ASL Linguistics                 | 19 |
|         |        |        | ASL 934   | Directed Study                  | 2  |
| 2006-07 | Fall   |        | ASL 150   | Deaf People in Society          | 69 |
|         |        |        | ASL 100   | Introduction to College         | 6  |
|         |        |        | ASL 510   | Interpreting Inquiry Texts      | 8  |
|         |        |        | ASL 650   | Ethical Decision-Making         | 3  |
|         |        |        | ASL 651   | Ethical Fieldwork               | 3  |
|         |        |        | ASL 960   | Research Capstone               | 7  |
|         | Spring |        | ASL 950   | Interpreting Practicum          | 3  |
|         |        |        | ASL 934   | Directed Study                  | 5  |
| 2007-08 | Fall   |        | ASL 150   | Deaf People in Society          | 61 |
|         |        |        | ASL 100   | Introduction to College         | 5  |
|         |        |        | ASL 650   | Ethical Decision-Making         | 14 |
|         |        |        | ASL 651   | Ethical Fieldwork               | 14 |
|         |        |        | ASL 960   | Research Capstone               | 16 |
|         | Spring |        | ASL 950   | Interpreting Practicum          | 13 |
|         |        |        | ASL 934   | Directed Study                  | 5  |
| 2008-09 | Fall   |        | ASL 150   | Deaf People in Society          | 55 |
|         |        |        | ASL 100   | Introduction to College         | 5  |
|         |        |        | ASL 650   | Ethical Decision-Making         | 14 |
|         |        |        | ASL 651   | Ethical Fieldwork               | 14 |
|         |        |        | ASL 550   | Intro to Interpreting Profession| 15 |
|         |        |        | ASL 960   | Research Capstone               | 18 |
|         | Spring |        | ASL 950   | Interpreting Practicum          | 13 |
|         |        |        | ASL 934   | Directed Study                  | 4  |
| 2009-10 | Fall   |        | DEAF 1500 | Deaf People in Society          | 45 |
|         |        |        | DEAF 2500 | Deaf History & Culture          | 12 |
|         |        |        | INTP 4650 | Ethical Decision-Making         | 12 |
|         |        |        | INTP 4651 | Ethical Fieldwork               | 12 |
|         |        |        | INTP 3500 | Intro to Interpreting Profession| 12 |
|         |        |        | INTP 4940 | Research Capstone               | 7  |
|         | Spring |        | INTP 4995 | Interpreting Practicum          | 11 |
|         |        |        | INTP 3550 | Research Capstone               | 4  |
|         |        |        | DEAF 4992 | Directed Study                  | 3  |
| 2010-11 | Fall   |        | DEAF 1500 | Deaf People in Society          | 48 |
|         |        |        | DEAF 2500 | Deaf History & Culture          | 16 |
|         |        |        | INTP 4650 | Ethical Decision-Making         | 8  |
|         |        |        | INTP 4651 | Ethical Fieldwork               | 8  |
|         |        |        | INTP 3500 | Intro to Interpreting Profession| 8  |
|         |        |        | INTP 4940 | Research Capstone               | 4  |
|         | Spring |        | ASL 950   | Interpreting Practicum          | 11 |
|         |        |        | ASL 460   | Research Capstone               | 7  |
|         |        |        | ASL 934   | Directed Study                  | 4  |
| 20011-12| Fall   |        | DEAF 1500 | Deaf People in Society          | 49 |
|         |        |        | DEAF 2500 | Deaf History & Culture          | 12 |
|         |        |        | INTP 4650 | Ethical Decision-Making         | 10 |
|         |        |        | INTP 4651 | Ethical Fieldwork               | 10 |

Dennis Cokely

| | | | | |
|---|---|---|---|---|
| | | INTP 3500 | Intro to Interpreting Profession | 8 |
| | | INTP 4940 | Research Capstone | 3 |
| | Spring | INTP 4995 | Interpreting Practicum | 10 |
| | | INTP 3550 | Research Capstone | 7 |
| | | DEAF 4992 | Directed Study | 3 |
| 20012-13 | Fall | DEAF 1500 | Deaf People in Society | 49 |
| | | DEAF 2500 | Deaf History & Culture | 14 |
| | | INTP 4650 | Ethical Decision-Making | 6 |
| | | INTP 4651 | Ethical Fieldwork | 6 |
| | | INTP 3500 | Intro to Interpreting Profession | 10 |
| | Spring | INTP 4995 | Interpreting Practicum | 5 |
| | | INTP 3550 | Research Capstone | 6 |
| 20013-14 | Fall | DEAF 1500 | Deaf People in Society | 49 |
| | | DEAF 2500 | Deaf History & Culture | 20 |
| | | INTP 4650 | Ethical Decision-Making | 5 |
| | | INTP 4651 | Ethical Fieldwork | 5 |
| | | INTP 3500 | Intro to Interpreting Profession | 9 |
| | Spring | INTP 4995 | Interpreting Practicum | 6 |
| | | INTP 3550 | Research Capstone | 5 |
| 20014-15 | Fall | DEAF 1500 | Deaf People in Society | 27 |
| | | DEAF 2500 | Deaf History & Culture | 14 |
| | | INTP 4650 | Ethical Decision-Making | 7 |
| | | INTP 4651 | Ethical Fieldwork | 7 |
| | | INTP 3500 | Intro to Interpreting Profession | 8 |
| | Spring | INTP 4995 | Interpreting Practicum | 7 |
| | | INTP 3550 | Research Capstone | 8 |
| 20015-16 | Fall | DEAF 1500 | Deaf People in Society | 25 |
| | | DEAF 2500 | Deaf History & Culture | 13 |
| | | INTP 4650 | Ethical Decision-Making | 7 |
| | | INTP 4651 | Ethical Fieldwork | 7 |
| | | INTP 3500 | Intro to Interpreting Profession | 11 |
| | Spring | INTP 4995 | Interpreting Practicum | |
| | | INTP 3550 | Research Capstone | |

**Service:**

University:

Senate agenda Committee 2015 – 2016

Faculty Senate, 2012 – 2016

Chair, Faculty Handbook Revision Committee, 2010

Chair, College of Social Sciences and Humanities Re-Structuring Task Force, 2009

Chair, Council of Chairs Agenda Committee

Member, International Programs Advisory Committee

Chair, Ad Hoc Committee to review University Tenure Appeals, 2008

Chair, Faculty Development Committee, 2008

Director, World Languages Center, 2007 - present

Faculty Senate, 2005 – 2008

Committee on Community Harmony and Inclusion, 2007 - present

RSFD proposal review committee, 2006

University Retention Committee, 2003-06

Chair, Senate Enrollment and Admissions Policy Committee, 2003-04

Member, University Retention Committee, 2000-03

Faculty Advisor for ICNU (the Interpreting Club of Northeastern University)

Faculty Advisor for NUCALLS (Northeastern University Culture and Language Learning Society)

College:

Chair, Faculty Development Committee 2016

College Faculty Development Committee 2015 – 2016

Chair Tenure and Promotion Committee 2016

College Tenure and Promotion Committee 2015 – 2016

College of Arts and Sciences Council of Chairs Agenda Committee Chair, 2000-2010

College of Arts and Sciences Tenure and Promotion Committee Chair, 1999 - 2006

College Tenure and Promotion Committee member, 1998 -1999

Program:

Head Advisor, American Sign Language Program, 1996 – present

Experiential Education Advisor American Sign Language Program, 1996 – present

Community:

Advisory Board member, Horace Mann School for Deaf Students

Interpret for DEAF, Inc. Board meetings, *pro bono*, 2005 - present

Interpret weekly FAA AWOL meetings, *pro bono*, 2004 - 2006

Advisory Board member, PAH! Deaf Youth Theater, 1998 - 2001

Advisory Board member, Madonna University Sign Language Studies, 1983 – present

Administer annual ASL Festival, April 1997 – present

Administer annual ASL Poetry, Storytelling & Deaf Art Competition, April 1998 – present

Discipline

Reviewer for NSF -- dissertation and grants proposals

Reviewer for DoE grant proposals

Various Interpreter Education program structure and faculty reviews

Various Interpreter Education program curriculum reviews

Review of manuscripts

Review of tenure dossiers

**Membership in Professional Organizations:**

Registry of Interpreters for the Deaf (Lifetime Member)

Conference of Interpreter Trainers

Linguistics Society of America

American Council on the Teaching of Foreign Languages

Dennis Cokely

American Association of Applied Linguistics

Research Committee for Sociolinguistics

American Translators Association

Dennis Cokely

# APPENDIX B
# DOCUMENTS RECEIVED AND REVIEWED

Dennis Cokely

# Documents Received and Reviewed

Complaint Case: 4:16-cv-00047-WS-CAS
Plaintiffs First Request for Production of Documents
Plaintiffs First Set of Interrogatories
Bulletin No. 15.02.06
Role & Responsibilities of the Institution's Impaired Inmate Nurse
Procedure Number: 302.301
33-103.002 Inmate Grievances - Terminology and Definitions
Housing units, closed caption TV, date last tested
Claudia Gunnels email regarding inmate ███████ 3/13/15
Memo to Warden Marie Boan 1/6/2015
███████ correspondence 4/21/2014
Evelyn Garst email regarding inmate ███████ 1/8/2016
Evelyn Garst email regarding inmate ███ 12/30/2014
Ricky Dixon email regarding inmate ███ 8/17/2015
Evelyn Garst email regarding inmate ███ 11/20/2015
Angela Gordon email regarding inmates ███████ and ███ 6/3/2013
Claudia Gunnels email regarding inmate ███ 4/13/2016
Evelyn Garst email regarding inmate ███ 2/16/2016
Evelyn Garst email regarding inmate ███ 7/15/2015
███████ Accommodation request form 8/11/2012
Djuna Poole email regarding inmate ███ 4/20/2016
Martie Taylor letter regarding letter of inmate ███ 12/2/2013
Purchase Order Terms and Conditions Rev. 10/2012
Pre-Approval of Health Care Services for inmate ███████ 4/30/2015
Health Problem List for inmate ███ 2/16/2012
Evelyn Garst email regarding inmate ███ 3/25/2016
Health Problem List for inmate ███ 11/24/2003
Cynthia Phelps memo to Warden Gordon regarding inmate ███████ 10/22/2014
███████ Accommodation request form Lee 8/9/2013
Larry Purintun email regarding inmates ███, ███, ███, ███, ███, ███ and ███ 1/29/2014
Pre-Approval of Health Care Services for inmate ███ 8/24/2015
Order No. AD91EC payment for interpreting services 9/15/2015
Order No. PO567153 Translating and Interpreting 5/29/2014
Health Problem List for inmate ███ 9/5/2012
Health Problem List for inmate ███ 3/10/1999
Consultation Request/Consultant's Report for inmate ███ 10/5/2015
Invoice for VRI call minutes 3/16/2016
Order No. A76F42 hearing aid batteries 3/15/2013
Order No. AB749B Wireless Listening Center 11/4/2014
Order No. AE506F Interpreting Services 3/4/2016
Order No. AD91EC Interpreting Services 9/15/2015
Order No. AE65E6 Deaf Interpreter Services 3/4/2016
Order No. PO321391 Interpreter Services 6/20/2013
Order No. PO146249 Changed 2/28/2013
Order No. PO322963 Interpreting Services 6/24/2013
Order No. PO311072 Interpreting and Translating Services 6/4/2013
Order No. A830A9 Changed 8/9/2013

17

Dennis Cokely

Order No. AD7E87 Interpreting Services 8/31/2015
Order No. A75C45 Mandarin Interpreting Services 2/21/2013
Order No. ACDC02 Interpreting Services 6/8/2015
Order No. A83335 Interpreting Services 7/1/2013
Order No. A9F07D Interpreting Services 4/3/2014
Order No. PO308055 Interpreting Services 5/30/2013
Order No. A82846 Interpreting Services Changed Order 8/23/2013
Order No. PO308056 Interpreting Services Changed Order 6/10/2014
ADA DRF ADA PowerPoint slides re: Instructor's Guide to ADA (no date)
DC4-691 Impaired Inmate Management and Service Plan Revised 1/22/12024
DC1-206 Inmate Worker Acknowledgement of Responsibility 4/15/2010
Procedure No. 602.013 Automated Inmate Telephone Use 8/24/2015
Technical Manual Bureau of Classification Management Revised 11/13/2014
Nursing Manual Revised 5/1/2015
Site Review Schedule 2014
Operational Review Checklist 7/1/2015
Hearing Impaired Facilities by Region (no date)
FDOC Facilities Bed Type by housing Unit (no date)
Inmate Orderlies and Assistants – Orientation & Training Checklist Revised 7/22/2014
Inmate Assistant ID Badge and Duty Log Protocol 7/22/2014

Dennis Cokely

**APPENDIX C**
**LIST OF INMATES INTERVIEWED AND FACILITIES VISITED**

Dennis Cokely

| Facility | Inmate Name | Date interviewed |
|---|---|---|
| Tomoka | ██████ | 8/18/2016 |
| | ████████ | |
| | | |
| Lowell Annex | ████████ | 8/18/2016 |
| | ████████ | |
| | | |
| Marion | ████████ | 8/19/2016 |
| | ████████ | |
| | | |
| Union | ████████ | 8/19/2016 |
| | ███████ | |
| | ███████ | |
| RMC Main | ██████ | 8/20/2016 |
| | ██████ | |
| | ███████ | |
| Columbia Annex | ████████ | 8/20/2016 |
| | ██████ | |
| | ██████ | |
| Madison | ████ | 8/21/2016 |
| | ████████ | |
| | █████████ | |
| NWFRC Annex | ████████ | 8/22/2016 |
| | ██████ | |
| | █████ | |
| NWFRC Main | ██████ | 8/22/2016 |
| | ██████ | |
| | █████████ | |
| Okaloosa | ██████ | 8/23/2016 |
| | ██████ | |
| | ████████ | |

20